UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

```
-------------------------------X
In Re Simon II Litigation
-------------------------------X
```



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 22 2002 ★

No. 00-CV-5332

<u>Related to</u>

No. 98-CV-0675
No. 98-CV-1492
No. 98-CV-3287
No. 99-CV-1988
No. 99-CV-6142
No. 00-CV-2340
No. 00-CV-4442
No. 00-CV-4632
No. 02-CV-0599

<u>AMENDED
MEMORANDUM
AND ORDER</u>

*APPEARANCES:*

Plaintiff's Attorneys:

Lieff, Cabraser, Heimann, & Bernstein, LLP
780 Third Avenue, 49th Floor
New York, New York 10017-2004
By:     Steven E. Fineman, Esq.

Lieff, Cabraser, Heimann, & Bernstein
275 Battery Street, 30th Floor
San Francisco, CA 94111
By:     Elizabeth J. Cabraser, Esq.
        Richard M. Heimann, Esq.

Weitz & Luxenberg, P.C.
180 Maiden Lane, 17th Floor
New York, New York 10038
By:     Perry Weitz, Esq.
        John M. Broadus, Esq.

1

Brown Rudnick Freed & Gesmer
One Financial Center
Boston, MA 02111
By: M. Frederick Pritzker, Esq.
Gregory T. Arnold, Esq.

Waite, Schneider, Bayless & Chesley Co.
1513 Central Trust Tower
Fourth and Vine Street
Cincinnati, OH 45202
By: Stanley M. Chesley, Esq.

Spohrer Wilner Maciejewski & Matthews P.A.
701 West Adams Street, Suite 2
Jacksonville, Florida 32204
By: Norwood Wilner, Esq.

Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601
By: Dianne M. Nast, Esq.

Defendant Philip Morris Inc.:    Arnold & Porter
Thurman Arnold Building
5555 Twelfth St., N.W.
Washington, D.C. 20004
By: Murray R. Garnick, Esq.
David S. Eggert, Esq.
Heather Pigman, Esq.
Eric Suter, Esq.
J. Benjamin King, Esq.

Defendant R. J. Reynolds:    Jones, Day, Reavis & Pogue
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
By: Theodore M. Grossman, Esq.

Jones, Day, Reavis & Pogue
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
By: Robert H. Klonoff, Esq.
Michael Fried, Esq.

Jones, Day, Reavis & Pogue
222 East 41st Street
New York, New York 10017
By:     Harold K. Gordon, Esq.
          George Kostolampros, Esq.

Defendant Brown & Williamson:     Kirkland & Ellis
Citicorp Center
153 East 53rd St.
New York, New York 10022-4675
By:     Peter Bellacosa, Esq.

Kirkland & Ellis
Amoco Building
200 East Randolph Drive
Chicago, IL 60606
By:     David Bernick, Esq.

Defendant Lorillard Tobacco Co.:     Greenberg, Traurig, LLP
885 Third Avenue, 21st Floor
New York, New York 10022
By:     Alan Mansfield, Esq.
          Stephen L. Saxl, Esq.

Defendant BAT Industries, p.l.c.:     Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017-3954
By:     Peter Shapiro, Esq.

Defendants Liggett Group Inc.,
Liggett & Meyers, Inc., and
certain of its affiliates where
applicable:     Kasowtiz Benson Torres & Friedman
1633 Broadway
New York, NY 10019-6799
By:     Aaron H. Marks, Esq.
          Leonard A. Feiwus, Esq.

JACK B. WEINSTEIN,
Senior District Court Judge:

Table of Contents

I.   Introduction ............................................................. 6
     A.  General Considerations ........................................... 6
         1.   Equity ...................................................... 6
         2.   Punitive Damages .......................................... 12
     B.  The Instant Case ................................................ 14
II.  Summary ............................................................... 17
     A.  Options Selected ................................................ 18
     B.  Possible Permutations .......................................... 19
         1.   Punitive Damages .......................................... 19
         2.   Compensatory Damages ...................................... 20
         3.   Advantages and Disadvantages .............................. 20
III. Facts ................................................................. 24
     A.  Physical Effect of Tobacco ..................................... 24
     B.  Industry Conspiracy ............................................ 30
         1.   Formation and Execution ................................... 30
         2.   Public statements from the 1950s to the present ........... 36
         3.   Knowledge from the 1950s to the present ................... 40
         4.   Coverup ................................................... 44
         5.   Other Deceptive Conduct ................................... 47
     C.  Consumer Harm from Deceptive Practices ......................... 53
         1.   Knowledge that Consumers Would Act Upon Deceptive Practices ...... 54
         2.   Evidence that Misrepresentations Caused Consumers Harm ........... 55
              a.   Expert testimony ..................................... 55
                   (1)   Dr. Jon Krosnick ............................... 55
                   (2)   Dr. Jeffery Harris and others .................. 58
              b.   Videotaped depositions ............................... 60
              c.   Surveys, medical and psychological literature and documents .. 63
IV.  Procedural History .................................................... 64
     A.  Individual Plaintiff cases ..................................... 64
         1.   Simon I ................................................... 64
         2.   Decie ..................................................... 65
         3.   Ebert ..................................................... 66
         4.   Browne .................................................... 66
         5.   Simon II .................................................. 66
     B.  Blue Cross Cases ............................................... 67
         1.   Empire Blue Cross ......................................... 67
         2.   Other Blue Cross plans .................................... 68
     C.  Union Health fund cases ........................................ 69
         1.   National Asbestos Workers ................................. 69
         2.   Bergeron .................................................. 70
     D.  Asbestos cases ................................................. 71
         1.   H.K. Porter ............................................... 71
         2.   Raymark ................................................... 71

4

|       |       | 3.   | Falise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72 |
|       | E.    | Mason (Medicare) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72 |
|       | F.    | Foreign Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74 |
|       | G.    | Tobacco Cases Nationwide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74 |
|       | H.    | Difficulty in Prosecuting Tobacco Lawsuits . . . . . . . . . . . . . . . . . . . . . . . | 81 |
| V.    | Substantive Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82 |
|       | A.    | Fraud and Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82 |
|       | B.    | Preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 87 |
|       | C.    | Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 91 |
|       |       | 1.   | In general . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 91 |
|       |       | 2.   | Relation Back . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 94 |
|       | D.    | Res Judicata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99 |
|       | E.    | Individualized Proof of Causation and Damages . . . . . . . . . . . . . . . . . . . . . | 99 |
|       |       | 1.   | Federal Rules of Civil Procedure and Evidence . . . . . . . . . . . . . . . . . . . | 102 |
|       |       | 2.   | Appropriateness of Sampling and Survey Techniques . . . . . . . . . . . . . | 105 |
|       |       | 3.   | Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 112 |
|       |       | 4.   | Jury Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 116 |
|       |       | 5.   | Erie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123 |
| VI.   | Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 126 |
|       | A.    | Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 126 |
|       | B.    | Caps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 134 |
|       |       | 1.   | Supreme Court Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 134 |
|       |       | 2.   | Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 136 |
| VII.  | Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140 |
|       | A.    | In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140 |
|       | B.    | New York Rule of Babcock v. Jackson and Interest Analysis . . . . . . . . . . . . . | 143 |
|       | C.    | Application of Babcock Rules to Complex Fact Patterns . . . . . . . . . . . . . . | 144 |
|       | D.    | Constitutional Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 158 |
|       | E.    | Interest Analysis in This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 159 |
| VIII. | Class Certification Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 169 |
|       | A.    | General Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 |
|       |       | 1.   | Requirements of Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 |
|       |       | 2.   | Subclassing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 175 |
|       |       | 3.   | Methods of Modern Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 177 |
|       |       | 4.   | Special Requirements for Limited Fund Actions . . . . . . . . . . . . . . . . . | 179 |
|       |       | 5.   | Limited Fund Class Action Based on Constitutional Caps . . . . . . . . . . | 180 |
|       | B.    | 23(f) Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 185 |
|       | C.    | Amendments to Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . | 186 |
|       | D.    | Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 186 |
|       | E.    | Rule 23 Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190 |
|       |       | 1.   | Numerosity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190 |
|       |       | 2.   | Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190 |
|       |       | 3.   | Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 191 |

    4.    Adequacy of Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
    5.    Limited Punishment under Rule 23(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 193
IX.  Disposition of Funds by Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
    A.  Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
    B.  Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198
X.   Trial Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200
XI.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

I.     Introduction

    A.  General Considerations

        1.    Equity

This class action raises tantalizing factual, substantive and procedural problems. The order of September 19, 2002 certifying the class is expanded by this memorandum. See In re Simon II Litigation, – F.Supp.2d – (E.D.N.Y. 2002).

The cigarette industry has for many years legally produced and sold a product that has caused the premature deaths of, and serious diseases for, millions of United States residents. The product is partially regulated by governments, national, state and local. Warnings of serious health dangers have been required to be placed on cigarette packages, yet people continue to smoke.

Smokers have alleged and demonstrated in many suits that, had they not been misled by the industry, they would not have started smoking or would have quit earlier, thus eliminating or reducing cigarette-caused damage to their health. In the main, the industry has won these litigations, which present substantial factual and legal barriers to recovery, but a trend in favor of plaintiffs seems to be developing.

One of the problems for claimants has been the enormous expense of trying the cases, making them unattractive to plaintiffs' attorneys suing for individual clients on a contingency fee.

basis. Class or consolidated actions for compensatory damages have been difficult to justify because of the varied individual circumstances of the smokers. Yet statistical analysis based upon the law of large numbers, together with extensive demographic and epidemiological data and sampling techniques, arguably provide a basis for computing an appropriate approximation of total compensatory damages that could be awarded were all those injured to sue as a single class.

Another impediment to a determination of total damages is the fact that the law of fraud and other legal bases for recovery varies from state to state, making computation particularly troublesome. Should the law of one jurisdiction apply, this problem would be largely obviated.

Allocation of any global compensatory award to individual class members also suggests an enigma since diseases and circumstances vary so greatly. An award based on a matrix such as was used in Agent Orange, the Holocaust cases, and is being used to settle such massive torts as asbestos, DES and Breast Implants might provide a key to the puzzle since those who preferred to sue on their own could opt out of the compensatory class. For the overwhelming number of those injured the matrix would provide a benefit only theoretically available in individual suits.

Another difficulty with a compensatory class suit is that the information now being made available by the industry is much more frank respecting dangers than it has been in the past; higher taxes and exclusion of smoking in many public and private places have substantially reduced smoking and provided information of a kind potential smokers and smokers cannot ignore, thus reducing the viability of any future claim of fraud by manufacturers. See, e.g., Jodi Wilgoren, Facing New Costs, Some Smokers Say 'Enough,' New York Times, July 17, 2002, at A14. The statute of limitations provides only a narrow and closing window of opportunity for

effective litigation by plaintiffs.

It cannot be said under these circumstances that plaintiffs' decision to forego an opt- out class action for compensatory damages is unreasonable. There is no inconsistency in this decision and one to sue as a class for punitive damages. No violation of fiduciary duties of class representatives can be charged to this pragmatic view.

A new legal development arguably supports the conclusion and choices represented in the present suit. Recently the amount of total punitive damages that may be assessed against tortfeasors for essentially one continuing course of fraudulent conduct has been capped by constitutional limitations applied by the Supreme Court. Arguably this rule permits a non-opt out class action for a limited punitive damages fund that might be unfairly depleted by individual suits. Since the punitive award can be said to constitute a punishment on behalf of society generally, cy pres and fluid recovery concepts may make justifiable matrixes and other devices to divide the fund in the public interest as well as in that of the injured. A court's newly minted wide power to limit punitive damages, as contrasted to its limited authority to reduce excessive compensatory awards, suggests an additional reason for acknowledging the special equitable-fiduciary powers of the court to control distribution of a punitive damage recovery.

A class action for punitive damages has the advantage of ensuring that transactional costs and utilization of the fund will be limited, consonant with the purpose of the recovery. Such a distribution can avoid such questionable attrition of the huge sums agreed to be paid by the tobacco companies in settlement of suits by the State Attorney Generals through enormous attorney fees, use of the funds for general municipal purposes, and even to help subsidize growers of tobacco. Strict control by the court of legal fees in a class action ensures that what

some have pointed to as excessive compensation to attorneys in private suits and State Attorney General settlements will not occur. Cf. Brown & Williamson Tobacco Corp., et al. v. Stanley M. Chesley, et al., No. 117050/01, N.Y. Sup. Ct. (N.Y. Co.), Sept 25, 2002 (finding that legal fees of $1.3 billion awarded in one State Attorney General settlement were unjustified).

Fortunately there is at hand an equitable procedure in the form of the class action that permits a sensible resolution of these problems in the absence of any legislative solution. The class action -- as well as the Federal Rules of Civil Procedure generally -- are based upon an equity practice flexible enough to assure a fair remedy and due process even in the vexing area of tobacco litigation.

Potential plaintiffs, as a group and individually, can hardly complain about the procedure which provides a benefit that, as a practical matter, compensatory tort law is not designed to allow. Defendants have no reason to protest against a single case which discharges their total liability for punitive damages; the exact division among class members is not, for them, critical, and in fact has not been an issue in any settled or tried mass tort in the past as long as the total sum due from defendants is fair and fairly arrived at.

That the class action generally, and the particular form proposed by the representatives of the class in this case, is a departure from the traditional one-plaintiff-one-defendant individually tried case cannot be confuted. Yet, individualism yields to common interests when pragmatism suggests the former will work to almost everyone's disadvantage. As Professor Stephen C. Yeazell, in his path-breaking study, From Medieval Group Litigation to the Modern Class Action (1987), put it (p.2):

These decisions about representation [in class actions] are necessary because the

9

class action forms an exception to a prevailing ethos. Anglo-American law has proved to be durably, perhaps obsessively, individualistic. In numerous contexts it exalts individual choice. From ancient doctrines of property to recent developments in American constitutional law one finds expressions of the proposition that the individual is the bedrock unit both of social action and of legal thought. Much has been written in political theory, in philosophy, and in law concerning the ramifications of this individualistic tradition. But like the most great principles, this one has fallen short of consistent application. Neither Anglo-American societies nor their legal systems carry individualism to its ultimate conclusion, and any account of those societies would have to deal with numerous situations in which groups performed crucial functions.

Justice Breyer, quoting then Professor Benjamin Kaplan, Reporter to the Advisory Committee that developed Rule 23, made much the same point as Professor Yeazell: "The reform of Rule 23 was intended to shake the law of class actions free of abstract categories ... and to rebuild the law on functional lines responsive to those recurrent life patterns which call for mass litigation through representative parties." Ortiz v. Fibreboard Corp., 527 U.S. 815, 882 (Breyer, J., dissenting). He also declared:

> I cannot easily find a legal answer to the problems [of mass asbestos cases] by referring as does the majority, to "our `deep-rooted tradition that everyone should have his own day in court.'" ... Instead ... I believe our Court should allow a district court full authority to exercise every bit of discretionary power the law provides.

Id. at 868 (Breyer, J., dissenting).

The majority in Ortiz has described the roots of Rule 23 in equity. See 527 U.S. at 832-34; see also, e.g., In re Joint E. & S. Dist. Asbestos Litig., 878 F.Supp. 473, 513–35 (E.D.N.Y. 1995) (history of the power of the modern judge acting in equity). The Ortiz majority analysis rejecting a class settlement was in the context of a non-opt out limited fund asbestos class action where conflicts between those suffering current disabilities and possible future disabilities had not been resolved. See 527 U.S. at 852-53, 854, 857. Nor had the entire available fund been

10

tendered by defendant corporation, which was left virtually unwhipped of justice; a new virtual and arbitrary fund established only for the settlement was held to be insufficient. Id. at 821, 848 ("failed to demonstrate that the fund was limited except by agreement of the parties"). The majority explicitly left open application of a limited fund Rule 23(b)(1)(B) class action in other kinds of cases. Id. at 844 ("We do not ... decide the ultimate question whether Rule 23(b)(1)(B) may ever be used to aggregate individual tort claims."); 862 ("we have not ruled out the possibility under the present rule of a mandatory class to deal with mass tort litigation on a limited fund rationale"); see also Joan Steinman, Managing Punitive Damages: A Role for Mandatory "Limited Generosity" Classes and Anti-Suit Injunctions?, 36 Wake Forest L. Rev. 1043, 1075 (2001) ("Neither Ortiz, nor Amchem, not any other Supreme Court decision disallowed, or even addressed, mandatory punitive damages classes certified under Rule 23(b)(1)(B).").

The instant case is quite different from Ortiz or its progeny. The group here, through trial of a class action, proposes to perform the vital function of helping to close the book on a terrible chapter of American medical-legal-entrepreneurial failures in abuse of tobacco.

Equity provided a pliable substantive and procedural tool to meet new problems that the rigidities of the ancient legal writ system could not solve. The substantive branch of equity has largely solidified and been absorbed in the common law and statutes. But the procedural aspect of equity remains alive and pliant. Having been embodied in the flexible Federal Rules of Civil Procedure, which are largely dominated by equity, elasticity to provide just remedies remains unimpaired. This is particularly true of the class action practice, embodied in Rule 23 of the Federal Rules of Civil Procedure, a rule that is still largely nascent. See, e.g., Edwin B. Grayer,

11

Equity in Two Centuries Growth of American Law, 1701–1901, by Members of the Faculty of the Yale Law School, 125 (1901) (hereinafter Yale Law School) ("There has always been present a certain judicial discretion peculiar to equity."); Jay Tidmarsh and Roger H. Trangsrud, Complex Litigation, Problems in Advanced Civil Procedure 6–7 (2002) (assumption of our modern procedural system is a strong preference for judicial discretion. "The roots of this procedure lie in the system of equity, in which substantive merit rather than procedural nicety was supposed to dictate the outcome. This preference for merit over form . . . . would ensure that substantive justice was accomplished."). Chief among modern maxims is: "equity will not suffer a wrong without a remedy"—a scintillating compulsion of American procedure and remedial law. Yale Law School at 145; see also id. at 152 ("When the tricentennial of this University shall come [as it has], the present period will probably be taken as when the amalgamation of common law and Equity into a single system . . . of procedure consciously and definitely began."). Equity can of course be subject to abuse. See, e.g., Charles Dickens, Bleak House, *passim* (chronicling problems in English courts of equity). Modern safeguards are in place to prevent misuse.

The remedy now proposed conforms to the sound modern pattern of procedural law designed to secure the just determination of every action. See Fed. R. Civ. P. 1.

      2.    Punitive Damages

Challenging developments in the area of punitive damages create legal predicaments that, in the absence of controlling statutes, can find solution in our federal equity procedures. The number and size of punitive damages has so challenged the legal system that the Supreme Court is, as already pointed out, now developing a constitutional doctrine to control them through greater court supervision. See, e.g., BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct.

1589, 134 L.Ed.2d 809 (1996); Cooper Industries v. Leatherman Tool Group, 532 U.S. 424, 121

S.Ct. 1678, 149 L.Ed.2d 674 (2001).

Unrestrained and undirected overpunishment through civil litigation is the danger

because "the most serious problem with the award in the BMW case was that . . . the . . . jury was

not given instructions that would limit its discretion and ensure some predictability...." Cass R.

Sunstein, Reid Hastie, John W. Payne, David A. Schkade and W. Kip Viscusi, Punitive

Damages, How Juries Decide 244 (2002) (hereinafter How Juries Decide). In a pathbreaking

empirical multidisciplinary study, How Juries Decide, the authors demonstrated that, while jurors

can agree on the degree of moral and ethical failures of defendants who cause massive harm,

conscientious as they are, they have no criteria or standards enabling them to translate their

findings into dollar amounts. How Juries Decide, supra, at 29 (jurors cannot translate moral

judgments into dollar amounts; essentially the jury is standardless as to amount of punishment).

Based on this research, we can expect relatively uniform assessments of compensatory damages

in tobacco cases, but widely variant punitive damages that will be appreciably higher when

awarded by local juries than by juries in a national class action. How Juries Decide 1-2, 30, Ch.

2. A national punitive damages verdict will thus tend to be (a) less than the sum of local jury

verdicts, id. p. 30, and (b) more readily controllable than geographically diverse local verdicts

because of a greater universe of comparable decisions. See id. at 257; Geres v. Digital

Equipment, 980 F. Supp. 640, 653-60 (E.D.N.Y. 1997) (expanding upon Justice Ginsburg's

opinion on controlling jury verdicts in Gasperini v. Center for Humanities, 581 U.S. 415 (1996)).

The present case raises starkly the question of what are and should be the rationales for

punitive damages in mass torts, and how they can and should be controlled to avoid over- or

13

under-punishment in view of constitutional substantive and procedural due process limits. The compensatory phase of the jury trial plan described below can "serve as an anchor," reducing somewhat eccentricity in punitive awards. How Juries Decide, supra, at 241. Mechanical application of a crude fixed multiplier to compensatories is hard to justify on any theory of punitive damages. Id. at 257. Judges can add somewhat to stability and predictability by greater control, though the courts too need guidance. Id. at 248-51.

Today's punitive damages are subject to some of the same objections that Judge Marvin Frankel exposed in sentencing. See Marvin Frankel, Criminal Sentences, Law Without Order (1972). See also, e.g., Arthur W. Campbell, Law of Sentencing §§ 4.8, 4.9 (2d ed. 1991, pocket part 2002). The law must be careful not to overreact to problems with punitive damages, as it has responded to Judge Frankel's observation, by instituting a counterproductive overly Procrustean regime.

The class action now certified provides a reasonable and conservative solution consonant with legal and equitable tradition. Such a non-opt out punitive class provides an opportunity to effectively address problems of punitive damages in mass torts. The Tobacco litigation is a particularly useful vehicle because it addresses a mature tort with many cases already tried, providing some benchmarks for both compensatory and punitive damages. An immature mass litigation, where an early punitive damage class is assembled without any testing of what juries will do, does not permit the mega-analysis appropriate in this mature dispute approaching its closing stages. See generally Francis E. McGovern, Resolving Mature Mass Tort Litigation, 69 B.U. L. Rev. 659, 690-94 (1989) (defining and discussing mature actions).

B.  The Instant Case

14

This memorandum sets out a procedure for disposing by trial claims of smokers against cigarette manufacturers for punitive damages. The primary vehicle is a class action. Third party claims by Blue Cross/Blue Shield entities, by employee insurance trusts and on behalf of the government for its medicare payments as well as related litigations are discussed in Part IV.A, infra.

Nationwide individual and consolidated private litigations against the United States cigarette industry have been predicated upon allegations that over many years sustained and calculated fraud by the manufacturers and organizations working with them has resulted in smoking that would have been avoided or curtailed in the absence of that deception. It is claimed that the result of this tortious conduct has been premature death and disease for millions of Americans and added expense to those entities that covered their medical payments. Two major trials over many months in this court have revealed evidence from which juries could conclude that these charges are valid, providing a possible predicate for huge compensatory and punitive damage awards.

In staunch legal defenses over many years, the industry has successfully defended most of the lawsuits against it. Now there has come to a head a series of litigations in this court and elsewhere, described below, attempting to litigate — to the extent that statutes of limitations and statutory and appellate court limitations allow — remaining claims. Plaintiffs ask the court to utilize modern procedural tools, crafted from ancient remedies, designed to provide meaningful relief for huge numbers of plaintiffs claiming injuries caused by legally responsible industries. Defendants contend that each smoker's claim must be separately litigated, making compensation for the millions they have allegedly injured procedurally impossible.

15

The key to the most practicable approach to a workable litigation lies in the answer to three categories of questions — one substantive-legal, one factual and one procedural. First, substantive: is there a single applicable rule of law that governs the cases of the many allegedly harmed individuals from all the states and does it provide a basis for recovery? Second, factual: are there valid statistical approaches using the law of large numbers and available epidemiological and demographic date to avoid the need for individual fact finding for each injured person and do the facts as established provide a basis for, and amount of, damages? Third, procedural: are there procedures that will permit (a) a class action decision on total punitive damages, (b) a decision on total liability for compensatory damages by a jury, with division of the award among injured smokers on equitable grounds by the court, and (c) a class action, consolidation and other decisions to facilitate trial or other disposition?

The answers are, in general, affirmative. A viable trial and disposition of potentially millions of claims is desirable, appropriate and proper. Particularly as to procedural decisions, there are a substantial number of permutations from which the court can select those that appear most compatible with a decision on the merits, leaving alternates for selection later, should the court of appeals require reconsideration. The court is limited in the alternatives it can select by the contentions of the parties. For example, as indicated in parts VI and VII, <u>infra</u>, it might be preferable to have the jury decide both compensatory (opt-out) and punitive (non-opt-out) damages for the class, but the plaintiffs seek only punitive damages. If plaintiffs' theory is accepted, as this court has held that it should be, future plaintiffs in cases seeking compensatory damages will get no punitive award. The public interest in punishment will have been satisfied.

Because these litigations are so expensive, the court has recommended discretionary

acceptance of appeals by the court of appeals under Rule 23(f) of the Federal Rules of Civil Procedure and expanded interlocutory consideration by that court of related issues. It recommends that these appeals and a related pending appeal in the <u>Blue Cross</u> case be heard on an expedited basis by the same panel of the court of appeals so that the cases can proceed promptly and, if possible, on consistent theories. Should the substantive or procedural permutation chosen by the trial court be unacceptable to the appellate court, some alternatives are set out.

If the whole universe of possible claims should be embodied in the class, including people injured in the future and passive smoke inhalation, the complaint might be expanded, but no such broadening seems to be sought by named plaintiffs or defendants. No state actions are being enjoined.

For convenience of the reader, this memorandum incorporates parts of some of the prior memoranda issued by this court in related cases. Those memoranda are referred to in the order of September 19, 2002. See – F.Supp.2d –, – (E.D.N.Y. 2002) (listing prior memoranda and orders).

II.     Summary

The categories of cases originally commenced in this court are: A, plaintiffs as individual smokers, or their estates, claiming injury to themselves; B, Blue Cross/Blue Shield plaintiffs claiming added costs for medical treatment of smokers; C, Union medical funds claiming added costs for medical treatment of smokers; D, Asbestos related trusts claiming added costs due to synergistic injuries resulting from the combination of smoking and asbestos exposure; E, Individuals seeking recovery for medicaid payments made by the United States; and F, Foreign

entities suing for loss of taxes because of alleged "smuggling" by defendants. All categories except for A, the individual smoker class actions (Simon II) have been disposed of.

A.   Options Selected

The court has certified a punitive damages class essentially as proposed by plaintiffs. The punitive damages class consists of:

All persons residing in the United States, or who were residents of the United States at the time of their deaths, who smoke or smoked Defendants' cigarettes, and who were first diagnosed by a physician with one or more of the following diseases from April 9, 1993 through the date notice to the class is ordered disseminated: lung cancer; laryngeal cancer; lip cancer; tongue cancer; mouth cancer; esophageal cancer; kidney cancer; pancreatic cancer; bladder cancer; ischemic heart disease; cerebrovascular heart disease; aortic aneurysm; peripheral vascular disease; emphysema; chronic bronchitis; or, chronic obstructive pulmonary disease (also called chronic air flow obstruction).

The following persons are excluded from the class:

1.   Persons who have obtained judgments or settlements against any or all Defendants;

2.   Persons against whom any or all of the Defendants have obtained judgments;

3.   Persons who are members of the certified class in Engle v. R.J. Reynolds Tobacco Co. No. 94-08273 CA-22 (Circuit Court of the 11th Judicial Circuit, Dade County, Florida);

4.   Persons who should have first reasonably realized that they had the disease prior to April 9, 1993; and

5.   Persons whose diagnosis or reasonable basis for knowledge predates their use of

18

tobacco.

See Simon v. Philip Morris, – F.Supp.2d –, – (E.D.N.Y. 2002).

This constitutes a non-opt-out "limited punishment" class action for all punitive damages allowable under the constitution and law to members of the class. The trial stages are specified in the court's order of September 19, 2002. See id.

The possible definition of classes and subclasses has changed over the years. For example, on October 23, 2000, the court listed possible attorneys for the class and for proposed subclasses "A" to "G" in Simon II. It ordered publication of the names of the proposed counsel who were those listed in relevant complaints in cases then pending. The purpose was to determine whether any other attorneys or parties had any objection to the named counsel. No objections were received.

Since then the case has been narrowed by a variety of withdrawals of categories of complainants and by transfers. No subclasses are presently contemplated. Claims discovered in the future are not covered. Neither are passive breathers of tobacco smoke considered.

B.   Possible Permutations

1.      Punitive Damages

Punitive damages could be computed for residents in individual states using state law, distributing the fund by states. In the most complicated form they could be attributed to subclasses by disease in each state and administered on a state-by-state basis. They could be computed overall, taking into account variations by states, and then distributed by eliminating those states which do not allow punitive damages. They could be held available to be added on a pro-rata basis for those recovering compensatory damages in individual actions. They could be

utilized for the benefit of all smokers under a form of cy-pres for treatment, monitoring, research and anti-smoking activities. The punitive damage class could be free standing, or coordinated with the compensatory class as part of a combined compensatory-punitive damage class action with or without various forms of opt-out alternatives. Other variations are possible.

> 2. Compensatory Damages

Compensatory damages could be computed and allocated on a state by state basis with each state's law applied separately. States could be grouped into categories based on similarity of substantive law. A single trial on liability using one law with referral of cases to different states for computation of individual damages is possible. Allocation of compensatory damages on a matrix with some sums allocated for general cy-pres purposes as suggested for punitive damages above is another available elective. Basic liability issues could be tried for the class with a transfer of cases to the state of each member of the class for determination of individual liability and damages utilizing res judicata on issue principles. Other variations are possible.

> 3. Advantages and Disadvantages

One alternative considered at various stages of the litigation was a class action for "free floating" punitive damages. This route is available because punitive damages, unlike compensatory damages, need not in theory be tied to any specific monetary harm; rather, their purpose is primarily deterrence and compensation to society for uncompensated external costs of defendants' delicts. See section VI, infra (punitive damages); John C.P. Goldberg, Twentieth Century Tort Theory, 90 Geo. L.J. (2002) (harm of allowing antisocial behavior to go uncompensated); cf. John C.P. Goldberg, & Benjamin Zipursky, Unrealized Torts, 88 Va. L.Rev. n.62 (2002) (noting the regulatory effect of punitive damages).

The "free floating" alternative has benefits. With no need to determine compensatory damages, any trial would be less involved and burdensome, possibly minimizing difficult choice-of-law issues. It also has disadvantages. As a novel theory of law, it requires further detailed development; its potential repercussions are not known. There is literature suggesting that punitive damage awards work best when they accompany compensatory damage judgments, which may provide a jury with a useful gauge of how much of an award is appropriate. Cf. Cass R. Sunstein, Daniel Kahneman, & David Schkade, Assessing Punitive Damages (With Notes on Cognition and Valuation in Law), 107 Yale L.J. 2071, 2109 (1998) (suggesting that juries best determine punitive damages when they have a compensatory "anchor" to assist them).

A second option is a punitive damages class with a "generalized" finding of compensatory damages by a jury, in order to facilitate setting punitive damages. There are benefits to this approach. It may conserve judicial resources. With the jury already making the punitive determination, much of the work has been done, and it could make sense for it also to make a compensatory determination. While this procedure does involve some additional work, it is still less involved than a full trial of compensatory damages for individuals. Consequences would be more easily predicted. The award of punitive damages would have a compensatory hook, making it potentially less volatile.

This approach also has its drawbacks. Observers might wonder, if the jury is able to go so far as to find general compensatories, why not allow it to award compensatory damages? The question of what to do with the compensatory determination is also challenging. Should the court award these damages? Such a course might be seen as violating rights to individual damage determinations by the jury. Yet, awards by the court dividing a set sum among many

21

claimants have proved useful. Prior decisions in the Agent Orange, Dalkon Shield and Holocaust litigations, for example, have appropriately distributed damage awards through court fixed and administered schemes. The complex methods of providing a fair plan for distributing funds, finding the persons entitled to payment, and ensuring that beneficiaries receive awards promptly is illustrated in documents in those cases. See, e.g., Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds, Volumes 1 and 2, In re Holocaust Victim Assets Litigation, Case No. CV 96-4849 (E.D.N.Y. Sept. 11, 2000) (ERK)(MDG) (consolidated with CV 96-5161 and CV 97-461) (Judah Gribetz, Special Master); Final Report of the Special Master on the Distribution of the Agent Orange Settlement Fund, MDL No. 381, Sept. 1997 (Deborah Greenspan, Special Master).

A third approach would be a plain vanilla class action—a compensatory opt-out class, with a punitive component. Little new legal theory would be needed, making the approach appealing. Punitive damages would be manageable, since they could be related to actual, determined and awarded compensatory damages; they might be easier to calculate than free floating punitive damages. This approach also has problems. A large number of opt outs could cause problems, particularly in placing a constitutional cap on punitive damages. In addition, compensatory damages are often more fact-specific, necessitating a more lengthy and complicated trial. It could be necessary to divide the compensatory class into appropriate subclasses. And, since individual compensatory awards would be granted, more difficult choice of laws analysis might be presented.

Each of these permutations could provide for either an opt-out or a non-opt out type class. The decision on whether any class would be opt out or non-opt-out is also complicated.

22

Disallowing any opting out has the great advantage of allowing a punitive class to proceed on a limited punishment theory; punitive damages, with their constitutional cap, are a type of limited fund. This would allow the court to determine punitive damages once, for the vast majority of possible claimants, based on fraud by tobacco companies. The res judicata effect of any judgment would be addressed by this and other courts.

A comprehensive punitive class would not create substantial intra-class conflicts. Adequate instructions and control by the court should permit the jury to assess proportionate shares based on well established demographic and epidemiological criteria.

Allowing opting out obviates much of the need for a novel legal theory. It creates problems of its own. It becomes more important to calculate appropriate actual and potential offsets from any award. Calculation of offsets, if that is necessary, may be difficult and implicate choice-of-law and the laws of various states, adding to complexity. Moreover, if opt-outs are allowed, there is a less compelling case for adjudicating the punitive damages, since the determination may not resolve the constitutionally driven issue globally.

The decision on choice of laws presents another series of alternatives. The court could apply New York law. This may be justified since the tobacco harm originated in fraud primarily centered in New York. Such a course, however, might seem to violate other states' interests. Respecting those states' interests might require choice-of-law analysis. This could result in fifty different types of damage calculations, though probably states could be placed into groups which have similar laws. Relying on statistical modeling would simplify the task but would require application of a relatively new process.

In the event of certification of a compensatory class, choice of laws principles of

23

depecage might appropriately be used. For example, the court might determine liability according to the laws of New York, and then damages according to the law of a class member's forum state.

Another alternative would be to engage in a master trial followed by series of mini-trials similar to those envisaged for the Engle case.

None of the various alternatives seems decisively more attractive that the one chosen by plaintiffs. It was declared viable in the certifying decision of September 19.

## III. Facts

Set out below are some of the allegations relied upon by plaintiffs. While the court makes no factual findings, evidence introduced in two major trials and many motions suggest that there is ample basis for a trier of fact to find the relevant allegations of plaintiffs true; the discussion therefore proceeds as if, as a basis for the certification decision, facts alleged are established. The statements in this and other sections which follow are largely culled from references to the facts and the evidence in previous memoranda of the court without specific attribution. See, e.g., Falise v. The American Tobacco Co., 94 F.Supp.2d 316 (2000); Blue Cross v. Philip Morris, 113 F.Supp.2d 345 (E.D.N.Y. 2000). Citations to the factual record are available in these opinions and the transcripts of the trials.

### A. Physical Effect of Tobacco

Cigarette smoke contains hazardous levels of over 40 known chemical carcinogens. The carcinogenic agents in cigarette smoke include: arsenic, benzine, cadmium, chromium VI, vinyl chloride, and nickel. These materials are inhaled into the lungs of smokers, substantially contributing to premature morbidity and mortality for many of those exposed. In addition to the

diseases caused directly by smoking, the pervasive effect of degeneration of smokers' main body systems leads to increased healing complications in treatment of injuries not directly caused by smoking, such as broken bones in an auto crash.

Medically recognized harms caused by smoking are generally conceded. Smoking causes some forms of lung cancer, and increases the likelihood of cancer due to other substances such as asbestos. Pulmonary diseases such as bronchitis and emphysema are traced to smoking. Smoking leads to tens of thousands of deaths annually from cardiovascular diseases such as strokes, heart attacks, peripheral vascular disease, and aortic aneurysms. Smoking can also lead to cancer of the kidneys, bladder, brain, larynx, mouth, esophagus, stomach, pancreas, uterus, cervix, and colon. It can cause reproductive problems such as reduced fertility, increased rates of miscarriages and stillbirths, retarded uterine fetal growth and lowered infant birth weight.

The toll from smoking-related diseases is enormous. Statistics from the Centers for Disease control indicate that annually cigarette smoking leads to premature deaths of more than 400,000 Americans. This figure exceeds the combined totals for deaths resulting from automobile accidents, AIDS, alcohol, illegal drugs, homicide, suicide, and fires. Smoking-related illnesses have accounted for one out of every five deaths each year in the United States, making cigarette smoking the leading cause of premature death in the United States. The Supreme Court has said that "one of the most troubling public health problems facing our Nation today" is "the thousands of premature deaths that occur each year because of tobacco use." See Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Other mass health disasters such as those attributable to asbestos are relatively insignificant compared to the calamity brought about by tobacco use. Cf. In re

25

Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 736 (E.D.N.Y. 1991). According to the Centers for Disease Control, smoking costs the nation $150 billion per year in health care costs and lost productivity, or $3000 per smoker. See Erin McClam, CDC Estimates Cost of Smoking, Newsday, Apr. 11, 2002.

Compared to those people who never smoke, current smokers are almost 15 times more likely to develop lung cancer, 12.7 times more likely to develop chronic obstructive pulmonary disease, 7.5 times more likely to develop esophageal cancer, 4.1 times more likely to suffer Ischaemic Heart Disease, 2.2 times more likely to develop pancreatic cancer, and 1.4 times more likely to sustain a cerebral hemorrhage. See Doll, et al., Mortality in Relation To Smoking: 40 Years Observations On Male British Doctors, 309 British Medical J. 901-11 (1994). All told, carcinogenic chemicals inhaled by persons smoking defendants' products have been linked to 85% of all lung cancers, 80% of deaths from all pulmonary diseases, and 30% of all deaths from other cancers. See, e.g., J.M. McGinnis & W.H. Foege, Actual Causes of Death in the United States, J. of Am. Med. Assoc. 2707-12 (1993).

As anti-smoking measures, such as increased taxes, increased no-smoking areas, limits on youth's smoking, anti-smoking advertising, and social disapproval take hold, deaths and illnesses caused by smoking is expected to decline. See, e.g., New York Times, Anti-Smokers are Set Back by Success, April 3, 1994, at 13 (a study by the California Department of Health Services found that five years of intensive anti-smoking campaign led to triple the normal rate of quitting smoking).

Nicotine is the primary ingredient in cigarettes leading to continued use. It creates the "smoking high" smokers experience while progressively addicting them to cigarettes. It has been

recognized as addictive by the Food and Drug Administration, the Surgeon General's Office, the World Health Organization and the American Medical Association. Once in the blood stream, nicotine is carried almost immediately to the brain where it initiates a series of bio-chemical reactions that alter mood and produce feelings of both sedation and stimulation. It also activates the transmission of a natural chemical, dopamine, that generates pleasurable body sensations, ultimately creating a craving for nicotine. See FDA v. Brown & Williamson Tobacco Corp., 120 S.Ct. 1291, 1319-20 (2000) (Breyer, J., dissenting) (describing physiological reactions resulting from nicotine use). Cigarettes have been characterized as a highly efficient system of delivering nicotine to the body. As its effects wear off, the smoker reaches for another cigarette in order to maintain the craved level of nicotine.

So powerful is the force of nicotine that, in its absence, the addicted smoker suffers symptoms of physical withdrawal, including headaches, constipation, insomnia, depression, inability to concentrate and anxiety. According to the Surgeon General of the United States, nicotine addicts in much the same way as does heroin and cocaine. Many smokers are unable to quit until they suffer a heart attack or contract lung cancer, and even then, of those who survive the ordeal approximately one-half will return to smoking.

Smoking sharply increases the risks and severity of asbestos-related diseases. The combined synergistic effect of tobacco use and asbestos exposure on human health is far greater than the sum of their individual effects. Epidemiological studies demonstrate this effect. Such "studies seek to identify the patterns of disease occurrence in populations and factors which influence those patterns." Nancy Lee Firak, The Developing Policy Characteristics of Cause-In-Fact: Alternative Forms of Liability, Epidemiological Proof and Trans-Scientific

Issues, 63 Temp. L. Rev. 311, 328 (1990) (internal quotation marks omitted). There is a statistically significant correlation between asbestos-diseases and combined exposure to asbestos and tobacco smoke. For example, Dr. Piero Mustacchi concluded in 1996 that the incidence of lung cancer from combined asbestos-smoking exposure was 53 times that normally occurring in unexposed populations, and over 10 times that occurring in non- smokers who were occupationally exposed to asbestos. See Piero Mustacchi, M.D., Lung Cancer Latency and Asbestos Liability, 17 J. Legal Med. 277, 280- 97 (1996) (study conducted on 17,800 North American insulators and asbestos workers over a twenty-year period).

Unlike other drugs, some of which are harmful, tobacco has little beneficial therapeutic value. The Supreme Court has stated bluntly that "cigarettes and smokeless tobacco are an unsafe means to obtaining *any* pharmacological effect." Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 142, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (emphasis in original).

Though passive smoking claims are not at issue in this case, it is worth noting that extensive literature demonstrates the harm caused by non-smokers inhaling tobacco smoke. See generally In re Julie Anne, 2002 WL 2022117, Court of Common Pleas, Juvenile Division, Lakewood, Ohio, August 27, 2002 (collecting extensive literature on harm caused by secondhand smoke, including studies by the Surgeon General, the World Health Organization, and the Environmental Protection Agency); Editorial, Smoking Looks Even Worse, New York Times, June 24, 2002, at 18 (citing reports and studies); Chicago Tribune, Secondhand Smoke Sharply Increases Risk of Stroke, Chicago Tribune, August 18, 1999, at 19 (citing study that secondhand smoke can increase chances of stroke by 82%); "Passive Smoking May Harm Fertility," BBC,

Sept. 29, 2000, available online at http://news.bbc.co.uk/l/hi/health/947246.stm. Tobacco smoke has similar deleterious effects on many kinds of animals. See, e.g., Vicki Croke, Where There's Smoke, There's Danger for Kitty, Boston Globe, Aug. 24, 2002, at C1 (reporting on study linking secondhand smoke to feline cancer).

Econometric and other models which satisfied Daubert requirements introduced at the Blue Cross trial demonstrated that the health care costs to treat illness associated with smoking are huge. According to plaintiff's witness Dr. Wendy Max, one plaintiff alone, Empire Blue Cross, incurred some $750 million in added costs from treating smoking caused disease since 1994. Dr. Glenn Harrison testified that the figure is even higher when the costs associated with treating smokers for non-smoking caused illness were taken into account. Using an econometric model, he testified that the total economic damages to Empire since 1994 were almost one billion dollars. (The jury, however, only found damages under twenty million). His calculations showed that a person whose respiratory or cardiovascular system is weakened by smoking would, in general, respond less readily to treatment for other diseases. The fact that a particular smoker might heal more readily than a particular nonsmoker is not decisive; the law of large numbers eliminates the effect of such discrepancies or anomalies. See also K.E. Warner, T.A. Hodgson, & C.E. Caroll, Medical Costs of Smoking in the United States: Estimates, Their Validity, and Their Implications, 9 Tobacco Control, 290-300 (1999) (applying econometric model); J.C. Bartlett, L.S. Miller, D.P. Rice, W. Max, Medical Care Expenditures Attributable To Smoking: United States, 43 Morbidity and Mortality Wkly. Rep. 469-72 (1994) (applying econometric model).

The introduction of such statistical models is proper even when all models do not provide

29

exactly the same result. See Blue Cross & Blue Shield of N.J. v. Philip Morris Inc., No. 98 CV 3287, 2000 WL 1738338 at *1–*3 (E.D.N.Y. Nov. 1, 2000) (finding both models comply with Daubert); cf. Gerden v. Sandals Int'l., 262 F.3d 195, 199 (2d Cir. 2001) ("For purposes of admissibility it is not required that a witness's account of an event be consistent with the same witness's other accounts of the same event.").

The evidence supports the conclusion that extra costs result from treating smokers for diseases not caused directly by smoking. Supporting testimony in Empire Blue Cross was based on reliable medical records. Experts were highly qualified to testify; their models were subject to extensive Daubert hearings and determined to be consistent with sound scientific norms. See Blue Cross v. Philip Morris, 178 F.Supp.2d 198, 247–49 (discussing appropriateness of statistical evidence for trial). While the court was in a position to consider a subclass for this kind of claim, the plaintiffs did not seek such compensation.

The court suggested that the class not be divided into subclasses for passive smokers or to cover those who would suffer diseases in the future. These groups would have complicated the case. The plaintiffs' class definition excludes these possible subclasses.

B.  Industry Conspiracy

1.  Formation and Execution

While the most persuasive evidence of defendants' wrongdoing pertains to years up to the early 1990s, evidence of its illegal activities continued well beyond any statute of limitations bar. This was particularly true with respect to misleading smokers about the favorable effects of smoking "light" cigarettes. Many smokers who switched to lighter tar and nicotine cigarettes changed their smoking habits to obtain the amount of nicotine they were used to. This resulted in

deeper and more dangerous inhaling of cigarette smoke. The earlier illegal activities were evidence of later continuing conspiracies and misleading practices.

Plaintiffs allege, and can provide supporting evidence, that, beginning with a clandestine meeting in December 1953 at the Plaza Hotel in New York City among the presidents of Philip Morris, R.J. Reynolds, American Tobacco, Brown & Williamson, Lorillard and U.S. Tobacco, tobacco companies embarked on a systematic, half-century long scheme to (according to the complaint and evidence in the Blue Cross litigation):

> (a) stop competing with each other in making or developing less harmful cigarettes; (b) continue knowingly and willfully to engage in misrepresentations and deceptive acts by, among other things, denying knowledge that cigarettes caused disease and death and agreeing not to disseminate harmful information showing the destructive effects of nicotine and tobacco consumption; (c) shut down research efforts and suppress medical information that appeared to be adverse to the Tobacco Companies' position that tobacco was not harmful; (d) not compete with respect to making any claims relating to the relative health-superiority of specific tobacco products; and (e) to confuse the public about, and otherwise distort, whatever accurate information about the harmful effects of their products became known despite their [efforts to conceal such information.]"

Blue Cross Compl. ¶ 104; see also Falise v. American Tobacco Co., 94 F.Supp.2d 316, 329-33 (E.D.N.Y. 2000).

This meeting was called in response to a series of epidemiological and toxicological reports linking tobacco consumption with lung cancer. See also Kenneth R. Foster, David E. Bernstein, & Peter W. Huber, Phantom Risk: Scientific Inference and the Law 4 (1994) ("Epidemiologic studies by Doll and Hill (1952) conducted in the early 1950s strongly indicated that a pack-a-day smoker has a tenfold higher chance of developing lung cancer than a nonuser."); see generally David L. Faigman, David H. Kaye, Michael J. Saks, & Joseph Sanders,

2 Modern Scientific Evidence: The Law and Science of Expert Testimony §§ 27-1.0 to 28-2.4 (1997) (epidemiological studies and toxicological studies); Linda A. Bailey, Leon Gordis and Michael Green, Reference Guide on Epidemiology, in Federal Judicial Ctr., Reference Manual on Scientific Evidence 121 (1994) (hereinafter Reference Manual 1994); Bernard D. Goldstein and Mary Sue Henifin, Reference Guide on Toxicology, in Reference Manual 1994, supra, at 181. These studies threatened dramatic reduction in tobacco product sales and industry stock prices.

To carry out their conspiracy to mislead as to health risks of smoking, Philip Morris, R.J. Reynolds, Brown & Williamson, American Tobacco, Lorillard and U.S. Tobacco — with the assistance of the New York-based public relations firm of Hill and Knowlton — formed the Tobacco Industry Research Committee ("TIRC") in January 1954. Renamed the Council for Tobacco Research ("CTR") in 1964 when Liggett became a member, it was designed and operated to create the false impression that defendants were carrying out "objective, independent, and unbiased" research into the health effects of tobacco consumption, all the while actually "conduct[ing] a campaign of deceit, misrepresentation and misinformation . . . about the [real] health risks of smoking."

In support of their claims that the TIRC, and later the CTR, were integral to the alleged conspiracy to deceive the public, plaintiffs in other trials relied heavily on the "Frank Statement to Cigarette Smokers," a joint statement by five of the tobacco manufacturers. It was published in newspapers in virtually every city with a population of 50,000 or more, reaching more than 43 million Americans out of a population at the time of approximately 150 million. Signed by the presidents of the defendant tobacco manufacturers, it denied that cigarette smoking was

hazardous to health and promised that the tobacco industry would conduct independent research to address questions surrounding smoking and disease. It explicitly announced that:

- Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings. Although conducted by doctors of professional standing these experiments are not regarded as conclusive in the field of cancer research.

- [T]here is no proof that cigarette smoking is one of the causes of lung cancer.

- [Tobacco companies] always have and always will cooperate closely with those whose task it is to safeguard the public health.

- [Tobacco companies are] pledging aid and assistance to the research effort into all phases of tobacco [product] use and health.

- For this purpose [tobacco companies are] establishing a joint industry group . . . . This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE." (capital letters in original).

- In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry.

It is plaintiffs' contention, supported by evidence, that tobacco companies intended the public to rely upon the reports, research, and communications of the TIRC — and the companies generally — in assessing the dangers of tobacco use. As support for their allegation that the TIRC was never intended as the objective research council advertised, plaintiffs have relied on disclosures in internal documents such as the following:

- [TIRC] was set up as an industry shield in 1954. That was the year statistical accusations relating smoking to diseases were leveled at the Industry; litigation began; and the Wynder/Graham reports were issued. [TIRC] has helped out legal counsel by giving advice and technical information, which was needed at trials . . . . [T]he public relations value of [TIRC] must be considered and continued. . . . It is very important the industry continue to spend their [sic] dollars on research to show that we don't agree that the case against smoking is closed.;

- Historically, the joint industry funded smoking and health research programs have not been selected against specific scientific goals, but rather for various purposes such as public relations, political relations, position for litigation, etc. . . . In general, these programs have provided some buffer to public and political attack of the industry, as well as background for litigious [sic] strategy.;

- To date, the TIRC program has carried its fair share of the public relations load in providing materials to stamp out brush fires as they arose. While effective in the past, this whole approach requires both revision and expansion. The public relations program . . . was like the early symptoms of diabetes — certain dietary controls kept public opinion reasonably healthy. When some new symptom appeared, a shot of insulin in the way of a news release . . . kept the patient going.; and

- For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts — litigation, politics, and public opinion. While the strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not — nor was it intended to be — a vehicle for victory. On the contrary, it has always been a holding strategy, consisting of creating doubt about the health charge without actually denying it.

To complement the fraudulent efforts of the TIRC and CTR, defendants in 1958 formed The Tobacco Institute ("TI") — a New York non-profit corporation that operated in New York and Washington, D.C. — as a lobbying arm for the industry. In 1969, U.S. Tobacco, the largest manufacturer of smokeless tobacco products in the United States, formed a third organization, The Smokeless Tobacco Council, Inc. ("STC"), as a propaganda and lobbying agent. Though ostensibly focused on protecting the interests of smokeless tobacco manufacturers, plaintiffs allege, with supporting evidence, that STC operated in conjunction with the tobacco industry generally, receiving financial support from Brown & Williamson, Lorillard and R.J. Reynolds.

When significant medical research indicated a statistical relationship between smoking and cancer in the early 1940s and 1950s, defendants embarked on a campaign to discredit this research and reassure the public that their products were safe. Defendants recognized that the

34

publication in the early 1950s of retrospective epidemiological studies showing a link between smoking and lung cancer, as well as mouse skin painting studies that confirmed the results of earlier research, threatened cigarette sales and tobacco stock prices. See generally David L. Faigman, David H. Kaye, Michael J. Saks, & Joseph Sanders, 2 Modern Scientific Evidence: The Law and Science of Expert Testimony §§ 27-1.0 to 28-2.4 (1997) (epidemiological studies and toxicological studies); Michael D. Green, D. Michal Freedman, & Leon Gordis, Reference Guide on Epidemiology, in Federal Judicial Ctr., Reference Manual 333 (2000); Bernard D. Goldstein and Mary Sue Henifin, Reference Guide on Toxicology, in Reference Manual 1994 at 181. Documents prepared by Hill & Knowlton, a representative of the tobacco industry, reveal:

> As another indication of how serious the problem is, the officials stated that salesmen in the industry are frantically alarmed and that the decline in tobacco stocks on the stock market has caused grave concern . . .

> This is, of course, the most challenging problem our organization has ever faced – and perhaps the most challenging problem that ever faced a great industry, one with annual sales of almost 5 billions [sic] at retail, and with economic roots that reach clear back to the farm.

> To meet the "grave nature" of this threat, the evidence suggests, defendants developed a

joint plan to rebut the mounting proof indicating that cigarettes were hazardous and to reassure the American public that the defendants would assume responsibility for bona fide research to determine whether smoking was dangerous to health:

> The underlying purpose of any activity at this stage should be reassurance of the public through wider communication of facts to the public. It is important that the public recognize the existence of weighty scientific views which hold there is no proof that smoking causes cancer.

Statements of defendants' good faith were belied by internal documents from the defendants' own scientists suggesting that they possessed significant proof of the causal relationship between

smoking and disease, contradicting their denials. The incongruity between defendants' public statements and internal documents lasted from the 1950s into the late 1990s.

2. Public statements from the 1950s to the present

The evidence supports the inference that in public speeches, press releases, stockholder reports, television interviews, scientific studies, and letters to consumers and potential smokers, the defendants consistently denied the causal relationship between smoking and disease and argued to the public that more research was needed before a finding of danger was justified. In May 1957, George Weissman, vice president of Philip Morris, stated:

> Being as close to the picture as we are, we know that most of the attack is a lot of sound and fury. Without rehashing the arguments I'll merely assert that there's not one shred of conclusive evidence to support the link between cigarette smoking and lung cancer, certainly a lot less than the evidence concerning the inhalation of exhaust fumes from the automobiles driven around New York City and the smog fumes in Los Angeles.

The Tobacco Information Committee, an arm of the TIRC, issued bi-monthly newsletters and press-releases to doctors, public health officials and members of the public. Early resulting publicity by tobacco companies in the 1950s and 1960s included statements that cast doubt on ties between smoking and cancer. Statements included: "Six experts state doubts on smoking-cancer theory" (1957); "Study suggests that bronchitis may be the prime factor in lung cancer" (1958); "Many Scientific Reports Show Uncertainties, Doubts About Causation of Lung Cancer" (November-December 1959); "Smoker's Personality Key To Cancer" (October 1960); "Lung Cancer Rare in Bald Men" (March-April 1964); "Genetic Factors Affect Heart, Lung Syndromes. Smoking Is Probably Not Associated With Coronary Disease." (Winter 1967-68).

Deliberately misleading materials promulgated by tobacco companies appeared all over the country in various forms. In a 1964 press release, George Allen on behalf of the defendants

36

stated:

> If there is something in tobacco that is causally related to cancer or any other disease, the tobacco industry wants to find out, what it is and the sooner the better. . .

> Research to date has not established whether smoking is or is not causally involved in such diseases as lung cancer and heart disease, despite efforts to make it seem otherwise. The matter remains an open question – for resolution by scientists.

In 1969, the American Tobacco Company mailed to more than 140,000 of its share

holders a booklet entitled "The Cigarette Controversy." The accompanying press release

concluded:

> Despite the volume and virulence of anti tobacco propaganda, the cold fact remains that no clinical or biological evidence has been produced which demonstrates how cigarettes relate to cancer or any other disease in human beings.

In 1969, representatives of the defendants published "The Cigarette Controversy Eight

Questions and Answers," which stated in part:

> For many adults, cigarette smoking is one of life's pleasures. Does it cause a difference – even death. No one knows.

> The case against smoking is based almost entirely on inferences drawn from statistics and no causal relationship has actually been established. Many respected scientists find that cigarette smoking has not been shown to cause any human disease.

> From these developments have come many public warnings:

> "Don't smoke." "Stop smoking." A concerned public needs the truth about smoking and health. This requires that both sides of the controversy must be known. Statistics are not enough. If smoking does cause disease, why has it not been proved, after 15 years of intensive research, how this occurs?"

> . . .

> Does smoking cause disease? That question is still an open one.

That same year, representatives of Brown & Williamson stated in the advertising copy for

"Project Truth:"

Ten years ago, there was a cancer scare over the wax in milk cartons. And over using iodine to get a suntan. These theories are about as valid as the one that says toads cause warts.

And they're about as valid as today's scare tactics surrounding cigarettes. Because no one has been able to produce conclusive proof that cigarette smoking causes cancer. Scientific, biological, clinical or any other kind.

According to an internal document produced from the files of defendant Liggett Group that discusses the defendants' response to the 1964 Surgeon General report critical of smoking, the approach of the tobacco industry was to speak on these issues in a united voice:

It is considered to be of prime importance that the industry maintain a united front and that if one or more companies were to conduct themselves as a matter of self interest, particularly in advertising, obvious vulnerability would be the result.

Public pronouncements continued into the 1970s, 1980s, and 1990s. In anticipation of the 1979 Surgeon General Report on Smoking and Health, which defendants knew would be adverse to them, representatives of the defendants released, "Smoking and Health: The Continuing Controversy." The 168 page text included the following statements:

Indeed, many scientists are becoming concerned that the preoccupation with smoking may be both unfounded and dangerous. Unfounded because evidence on many critical points is conflicting. Dangerous because it diverts attention from other suspected hazards. . .

Scientists have not proven that cigarette smoke or any of the thousands of constituents as found in cigarette smoke cause human disease. . . .

Examples of such post 1980 denials also included statements widely disseminated through television, conferences, and letter campaigns. Among them are the following material submitted in the Blue Cross case:

–    On October 20, 1983, Tobacco Institute spokesperson, Anne Browder, referring to smoking causation, told a national audience on the ABC program "20/20": "The case is still open. The jury has not come in."

- The next year, the Tobacco Institute published a pamphlet, entitled, "The Cigarette Controversy: Why More Research Is Needed," which stated: There is a cigarette controversy. The causal theory – that cigarette smoking causes or is the cause of the various diseases with which it is reported to be related statistically – is just that, a theory."

- On May 16, 1988, the Tobacco Institute published a press release titled, "Claims That Cigarettes Are Addictive Contradict Common Sense," which stated: Smoking is a truly personal choice which can be stopped if and when a person decides to do so."

- In a January 11, 1989 interview on the ABC program, "Good Morning America," Tobacco Institute representative Brennan Dawson stated the following on behalf of the tobacco industry: "[T]he causative relationship has not been established . . . I can't allow the claim that smoking is addictive to go unchallenged. . . . It's a matter of willpower."

- Walker Merryman, Vice President of Tobacco Institute, wrote the following in an article published on April 27, 1989, in the Washington Times: "The difference between cigarette smoking and true addictions to hard drugs is stark and compelling."

- In 1992, Philip Morris published a pamphlet entitled, "Tobacco Issues and Answers," that stated: Those who term smoking an addiction do so for ideological, not scientific reasons."

- On April 15, 1994, the day after its and other CEOs from the industry testified before Congress that smoking was not addictive, Philip Morris placed an advertisement in the New York Times that stated: "Fact: Philip Morris does not believe smoking is addictive."

Letters were sent to consumers all across the country, including many New York residents. Articles like the "Continuing Controversy" written in the 1970s denying causal connection between smoking and cancer were re-circulated in mailings after 1980. Letters included the following statements:

- Despite all the research going on, medical science has not found any conclusive evidence that any element in cigarettes, tobacco, or tobacco smoke causes human disease.

- We firmly believe that cigarettes have been unfairly blamed as a cause of human disease.

- With the numerous attacks being made on smoking, it is indeed refreshing to read a letter such as yours and to be reassured that not everyone has accepted without question the adverse publicity the tobacco industry has received. . . Throughout the years, the public has received a largely one-sided view of the questions that have arisen about tobacco . . .

Through a series of messages appearing in national newspapers and magazines, we are attempting to provide our side of such public issues as . . . passive smoking, smoking courtesy and smoking and health.

- [I]n the absence of the identification of the processes or mechanisms involved in cancer causation, together with experimental animal evidence which raises questions regarding causation, we believe that scientific proof that cigarette smoking causes chronic diseases in humans is still lacking.

Communications reached elementary school teachers and principals. A 1990 form letter responding to inquiries from fifth grade students at a New York elementary school reads in relevant part:

[T]he simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The answers to many unanswered smoking and health questions – and the fundamental causes of the diseases often statistically associated with smoking – we believe can only be determined through much more scientific research.

These communications were part of a general policy for the 1980s and beyond. A summary of plans in conference titled "Marketing in the 80's" stated "Overall marketing policy will be such that we maintain faith and confidence in the smoking habit, whether brand choice is traditional or not in particular markets. This means that B.A.T. [a British holding company] will not remain on the defensive, by simply reacting to alleged 'health' hazards and related competitive challenges: instead we shall actively seek out all worthwhile prospects for brand and product reassurance in marketing throughout the world."

    3.    Knowledge from the 1950s to the present

Although the representatives of the defendants continued to release public statements and reports suggesting that smoking neither caused adverse health effects nor was addictive – as well as to finance purported research to support these inappropriate claims – evidence demonstrated

40

that defendants knew the contrary to be true: that smoking is both lethal and addictive.

Internal documents from defendants indicate that through independent company research and the sharing of this research through the TIRC and CTR, each of the major tobacco product manufacturers was aware that tobacco contributed to lung cancer. For example, a 1956 confidential memorandum from a Philip Morris Vice President of Research and Development to top executives at the company regarding the advantages of "ventilated cigarettes" stated: "Decreased carbon monoxide and nicotine are related to decreased harm to the circulatory system as a result of smoking .... [D]ecreased irritation is desirable ... as a partial elimination of a potential cancer hazard."

Similarly, a British American Tobacco Company (BATCo) document produced in 1958 following a series of meetings between BATCo representatives and twenty American scientists and researchers--including at least nine representatives of the tobacco companies and the Scientific Advisory Board of TIRC--stated that all of the tobacco company researchers with whom they met in the United States (and all but one of the outside people) "believed that smoking causes lung cancer" and noted that there was "general acceptance [among the group] that the most likely means of causation is that tobacco smoke contains carcinogenic substances present in sufficient quantity to promote lung cancer when acting for a long time in a sensitive individual." That same year, a Philip Morris Vice President of Research, who later joined its Board of Directors, stated in a confidential internal memorandum that "the evidence . . . is building up that heavy cigarette smoking contributes to lung cancer either alone or in association with physical and physiological factors." A 1963 confidential internal memorandum from Liggett's research consulting firm admitted: "Basically we accept the inference of a causal

41

relationship between the chemical properties of ingested tobacco smoke and the development of carcinoma . . ."

In addition to knowing that smoking is linked to lung cancer, it can be concluded that defendants were aware of other major deleterious health effects caused by smoking, including bronchitis, emphysema, and cardiovascular disease. Supporting this contention, plaintiff in <u>Blue Cross</u> introduced among other documents the following excerpts from internal company materials:

–  A 1963 confidential memorandum to Philip Morris's President and CEO describes components of cigarette smoke as "known carcinogens" and states: "Irritation problems are now receiving greater attention because of the general medical belief that irritation leads to chronic bronchitis and emphysema. Emphysema is often fatal either directly or through other respiratory complications. A number of experts have predicted that the cigarette industry ultimately may be in greater trouble in this area than in the lung cancer field."

–  An internal memo produced for a B.A.T. Group Conference (e.g., BATCo, Brown & Williamson, and other subsidiaries of B.A.T. Industries) in November 1970 that states "nicotine may be implicated in the aetiology of cardiovascular disease."

Defendants understood at least for the past four decades that many smokers continue to smoke not by choice, but because of nicotine addiction. The evidence includes confidential BATCo documents related to BATCo's "Project Hippo" that indicate that at least as early as 1962 defendants were aware of the physiological and pharmacological effects of nicotine. Copies of Project Hippo reports were circulated to TIRC, BATCo, Brown & Williamson, and R.J. Reynolds.

A 1963 memorandum written by Addison Yeaman, General Counsel at Brown & Williamson, concludes by stating that the company is "in the business of selling nicotine, an addictive drug." Similarly, a 1978 internal Brown & Williamson memorandum acknowledges

42

that "very few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison." Evidence that tobacco companies were aware of nicotine's addictive properties is incorporated in a 1972 report by Philip Morris presented at a CTR conference; it states:

–   [N]icotine is the active constituent of cigarette smoke;

–   Without nicotine . . . there would be no smoking.;

–   Why then is there not a market for nicotine per se, to be eaten, sucked, drunk, injected, inserted or inhaled as a pure aerosol? The answer, and I feel quite strongly about this, is that the cigarette is in fact among the most awe-inspiring examples of the ingenuity of man.;

–   The cigarette should be conceived not as a product but as a package. The product is nicotine . . .;

–   Think of the cigarette pack as a storage container for a day's supply of nicotine ....;

–   Think of the cigarette as a dispenser for a dose unit of nicotine.

Other internal memoranda suggest that the defendants knew that nicotine addiction could lead smokers of low-tar cigarettes to compensate, that is take longer and deeper puffs of cigarettes or to smoke more until the health benefits of these marketed products became negligible. A 1976 Lorillard memorandum stated:

The consensus of opinion derived from a review of the literature on the subject indicates the most probable reason for the addictive properties of smoke is nicotine. Indications are that the smoker adjusts his smoking habits to satisfy the desire for nicotine, either by frequent or large puffs on the cigarette, or smoking a large number of cigarettes.

Another inside document says, "given a cigarette that delivers less nicotine than he desires, the smoker will subconsciously adjust his puff volume and frequency, so as to obtain and maintain his per hour, per day requirement for nicotine . . . ."

43

All the while the TIRC, CTR, and TI continued to release public statements and reports indicating smoking neither caused adverse health effects nor was addictive — as well as to finance research to support these claims — defendants in fact knew that the contrary was true: that smoking is both lethal and addictive, that it contributed not only to lung cancer but to harm to the circulatory system.

4.     Coverup

Despite knowing that tobacco use is injurious and addictive, evidence suggests that defendants — in part through the efforts of the TIRC, CTR, TI and STI — intentionally engaged in a campaign of deceit, misrepresentation and misinformation directed at misleading the public about the health risks and addictiveness of smoking.

Efforts undertaken by defendants to hide this information include what is suggested as the termination and destruction of Philip Morris research regarding nicotine's addictive properties. For example, in the early 1980s researchers working at a Philip Morris laboratory in Richmond confirmed that nicotine demonstrated addictive qualities and that the laboratory research animals self-administered the substance by pressing levers to obtain nicotine. Less than a year after a briefing to top Philip Morris executives on these findings by the director of the research, Dr. Victor J. DeNoble, Philip Morris representatives instructed the researchers to stop work, to kill all the laboratory animals, to turn in their security badges, and to withdraw a paper on the addictive qualities of nicotine that had been accepted for publication by a scientific journal. Philip Morris then closed the laboratory, and discharged the researchers, requiring them to agree to remain quiet about their work with the sanction of legal action if they published their findings.

Plaintiffs can also point to confidential research conducted by Brown & Williamson's

British affiliate on behalf of Brown & Williamson. In the course of this research, Brown & Williamson suppressed confidential findings of a "causal relation" between ZEPHYR, Brown & Williamson's code name for cancer, and tobacco smoking.

As part of the central role the TIRC and CTR played in defendants' deceptive coverup, TIRC established a "Special Projects" division where research revealing the dangers and addictiveness of smoking was secreted from the public and concealed from discovery in litigation. A 1970 advertisement placed in newspapers around the nation by the TIRC at the direction of tobacco companies claimed that there was no known link between cigarettes and disease despite, according to the advertisement, decades of "totally independent research." A public statement in 1982 by Edward A. Horrigan, Jr., then Chairman of the Executive Committee of the TI, claimed:

> After three decades of investigation and millions of dollars invested by the government, the Tobacco Industry and private organizations, the smoking and health controversy remains unresolved. The net result of all of this effort has been that no causal link between smoking and disease has been established. That is not merely the opinion of Tobacco Industry executives. That is scientific fact readily available to anyone willing to make an objective, unemotional study of the existing evidence.

Defendants funded scientific studies to discredit scholarship demonstrating causation. Evidence at the Blue Cross trial also suggested that defendants never intended to fund and produce the objective research it had advertised. Internal documents such as the following acknowledged that research grants and studies sponsored by TIRC and CTR were intended to reassure the public, driven by litigation, and designed to sow doubts about the hazards associated with smoking:

> It has been stated that CTR is a program to find out 'the truth about smoking and health.'

45

What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as "truth." Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes disease... [A]ll caveats and platitudes aside, we must assume that CTR exists for the good of the [tobacco] industry.

Defendants deliberately refrained from conducting in-house biological research demonstrating the causal relationship between smoking of commercially produced cigarettes and cancer. They agreed to refrain from conducting biological testing, of its products as marketed, on animals, allegedly in order to suppress research that was expected to lead to scientific confirmation that cigarettes being smoked by the public were hazardous. It included internal memoranda which referred to a "gentlemen's agreement" not to conduct animal laboratory experiments. An internal document, written by Associate Director of Scientific Issues for R.J. Reynolds, Frank G. Colby, dated December 9, 1981, states:

Information was obtained that Philip Morris U.S.A. does not live up to the alleged "gentlemen's agreement" of not having animal laboratory facilities on their premises in this country.

Evidence also showed the tobacco industry purposefully concealed research in the United States. As one industry document stated, "[t]he burden of proof has shifted. It is no longer up to the scientists to prove that cigarettes cause lung cancer. It is the duty of all concerned to prove that they do not." (internal quotations omitted). Other documents reveal members of the industry diverted correspondence through lawyers that contained "contentious information" – i.e., adverse health information sought to be covered up. There was a "mechanism for [] sending scientific information to B&W. In principle it will mean [] mailing contentious information to a legal man called Maddox ... with a covering letter ... saying that Millbank has asked that [Maddox] receive it."

46

Documents directed subordinates to "root out" adverse information that would generate negative implications and to produce information that would encourage consumers to continue to smoke. One reads: "RD&E is interested in information pertaining to the role of nicotine in the smoker's subjective perception of smoke quality. If the reports stick to research data, the reports would be interesting. However, if the reports include discussions of pharmacological effects of nicotine, the information will not be interesting and would be helpful to the plaintiff. RD&E will begin receiving reports from this activity and be prepared to inform BAT to cease sending the data to B&W if the science is not interesting."

Some reports were to be withheld from the United States Surgeon General as well as from TIRC members if one of the defendants was disturbed at the report's "implications [regarding] cardiovascular disorders." "TIRC agreed to withhold disclosure [of] Battelle Reports to TIRC members or SAB until further notice ... [and submission of] Battelle or Griffith Developments to [the] Surgeon General [is] undesirable and ... continuance of Battelle work [is] useful but [the company is] disturbed at its implications [regarding] cardiovascular disorders." Information pertaining to the "carcinogenicity" of tobacco smoke was vetted from reports.

5.    Other Deceptive Conduct

In addition to covering up the health risks and addictiveness of smoking, defendants are alleged to have intentionally enhanced nicotine concentration in cigarettes to increase smoker-addiction. They misled the public to believe smoke from "lighter" cigarettes contained reduced levels of tar and nicotine relative to that released by conventional cigarettes, and suppressed research into less harmful cigarettes. By now almost all smokers have switched to "lighter" cigarettes on the premise that they are not substantially dangerous to health, when in fact

47

defendants withheld their knowledge that such cigarettes as actually used were lethal.

Supporting their contention that tobacco companies manipulated nicotine levels, the plaintiffs can identify various patents filed by defendants that provide the technological capability to manipulate nicotine levels in cigarettes "to an exacting degree." Examples include the following:

-    A Philip Morris patent application for an invention that "permits the release . . . in controlled amounts and when desired, of nicotine in tobacco smoke.";

-    Another Philip Morris patent application explaining that the proposed invention is "particularly useful for the maintenance of the proper amount of nicotine in tobacco smoke" and noting that "previous efforts have been made to add nicotine to Tobacco Products when the nicotine level in the tobacco was undesirably low."; and

-    A 1991 R.J. Reynolds patent application stating that "processed tobaccos can be manufactured under conditions suitable to provide products having various nicotine levels."

In addition to covering up the health risks and addictiveness of smoking, evidence can be introduced to show that defendants misled the public into believing that smoke from "lighter" cigarettes, containing reduced levels of tar and nicotine relative to that released by conventional cigarettes, would result in substantially less danger. The defendants suppressed research into less harmful cigarettes allegedly as part of the cover-up of the continuing danger from low tar cigarettes.

Evidence can be used to demonstrate that defendants fraudulently promoted filtered and low-tar cigarettes as safer or healthier cigarettes than conventional ones. "Light" cigarettes, the evidence showed, often lacked significant health benefits over conventional cigarettes, and in many instances may have increased the risk of emphysema, heart disease, and other diseases caused by smoking. This is because of an effect called compensation: smokers of light cigarettes

48

tend to smoke more, inhale more deeply, and hold the smoke in their lungs longer, in order to maximize their absorption of nicotine. A jury could find that any real health benefit was far less than defendants led the public to believe and that their conduct was particularly insidious and effective in misleading smokers.

One goal in designing new products was, plaintiff's evidence could show, to "intercept" quitters. As a 1978 Brown and Williamson internal memorandum put it: "Perhaps answers to another question 'How do people stop smoking?' could lend insight into the creation of new products. Having answers to this latter question, we might then design products to 'intercept' people who are trying to give up smoking." Another internal memorandum stated:

> All work in this area should be directed towards providing consumer reassurance about cigarettes and the smoking habit. This can be provided in different ways, for example, by claimed low deliveries, by the perception of low deliveries and by the perception of mildness. Furthermore, advertising for low delivery or traditional brands should be constructed in ways so as not to provoke anxiety about health but to alleviate it and enable the smoker to feel assured about the habit and confident in maintaining it over time.

Advertisements for low tar cigarettes had express or implied health messages. It was not seriously disputed at a prior trial that defendants failed to inform the public about their knowledge of the limited health benefits of low tar cigarettes and their knowledge of smoker compensation by a change in the smoker's habits.

The evidence in <u>Blue Cross</u> could be found to have demonstrated that a second reason to delay the development of "safer" cigarettes stemmed from a general fear by defendants that over-aggressive marketing of low-tar products would alert the public to the dangers of stronger cigarettes. For example, documents from B.A.T. Industries, the parent company of Brown and Williamson, revealed that in 1978 Chairman Sir Patrick Sheehy, warned its affiliates against

49

attempting to develop truly safer products:

> I thought I should write to explain why it is that I cannot support your contention that we should give a higher priority to projects aimed at developing a 'safe' cigarette (as perceived by those who claim our product is unsafe), by either eliminating, or at least reducing to acceptable levels, all components claimed by our critics to be carcinogenic...

> [I]n attempting to develop a safe cigarette you are, by implication, in danger of being interpreted as accepting that the current product is 'unsafe' and this is not a position that I think we should take.

Documents illustrated that this practice of delaying attempts to improve cigarette safety could be traced back to the 1950s. For example, a 1953 Hill and Knowlton memorandum to defendants' representatives entitled "Some Things To Do" states:

> Develop some understanding with companies that, on this problem, none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a brand any less likely to cause you-know-what. No "Play-Safe-with-Luckies" idea – or with Camels or with anything else.

The tactic of broad denials of knowledge of harm by the industry could be found to have been reflected in its research strategy. Evidence revealed that despite the continuing growth of each defendants' in-house research efforts, the defendants as a whole continued throughout the 1980s and 1990s to adhere to a "gentlemen's agreement" to avoid actual marketing of any significant risk reducing innovation that would redound to one defendant's benefit. Potentially innovative risk reducing products were actually developed, but never, it might be argued, seriously marketed. Others were introduced but without much attention to the fact that they might reduce health risks.

Testimony through depositions confirmed that through defendants' misstatements and omissions, defendants were successful in influencing some people to purchase and smoke low tar

cigarettes (rather than quitting) in reliance upon the supposed health benefit communicated by defendants. A jury could conclude that this strategy had a misleading "informational effect" on emerging markets of tobacco consumers. It could have misled more "health conscious" consumers to continue to smoke a product just about as dangerous as regular tar brands, while limiting the total information available to the public about the relative risks of smoking.

Plaintiffs can contend that tobacco companies knowingly designed so-called "light" products so that advertised tar and nicotine levels understate the amounts of tar and nicotine actually ingested by human smokers. It has already been noted that such design features include a technique called filter ventilation in which nearly invisible holes are drilled in the filter paper, or the filter paper is made more porous. Many smokers of advertised low-tar and nicotine cigarettes block the tiny, laser generated perforations in ventilated filters with their fingers or lips, thereby resulting in greater tar and nicotine yields to those smokers than those measured by the Federal Trade Commission's smoking testing machines.

It can be claimed by plaintiffs that tobacco companies knew that the ability to block ventilation holes allows smokers to 'compensate' for nicotine losses that would otherwise be caused by tar-reducing modifications. Tobacco companies allegedly studied smoker behavior in order to design cigarettes that allow smokers to compensate for lower nicotine yields while appearing to deliver less nicotine in FTC tests. To support this contention, a research study presented at a 1974 BATCO conference concluded that "'whatever the characteristics of cigarettes as determined by smoking machines, the smoker adjusts his pattern [of smoke inhalation] to deliver his own nicotine requirements (about 0.8 mg. per cigarette).'"

Rather than actually develop a less-harmful cigarette, as light cigarettes were advertised

to be, defendants may be shown to have conspired by way of a "gentlemen's agreement" to suppress independent research, development and marketing of such a cigarette. According to plaintiffs' theory, defendants recognized a difference between "health-oriented" cigarettes, which were never marketed on a wide basis, and "health-image" cigarettes, such as low-tar and low-nicotine products. The latter were arguably only a marketing tool to give the illusion of a safer product.

As plaintiffs may describe it, the situation among the six major tobacco manufacturers represented a dilemma: no company wanted a "safer" cigarette, but any company, by being the first to produce such a cigarette, stood to gain substantial market share. Lorillard's Director of Research and Development wrote to Lorillard's president in 1966 regarding the development of a safer cigarette: "if we fail to pursue this research and/or a competitor marketed a cigarette whose smoke condensate gives little tumorigenic response, . . . a significant sales loss could result." This is a variant of the classic prisoner's dilemma.

Production of such a "safer" cigarette by even one manufacturer would have represented an indictment of the whole industry, potentially unleashing litigation for earlier injuries and illnesses due to conventional cigarettes. As Jeffrey Wigand, a former Vice President for Research and Development for Brown & Williamson testified at a prior trial, "'[a]ny research on a safer cigarette would clearly expose every other product as being unsafe and, therefore, present a liability issue in terms of any type of litigation.'"

Allegedly faced with the choice between abandoning the conspiracy and developing a less harmful cigarette on the one hand, or maintaining the conspiracy and avoiding potential liability for injuries resulting from conventional cigarettes on the other, the major tobacco manufacturers

arguably opted to maintain the scheme, aided in part by the highly concentrated industry market structure. Such a conscious decision to trade-off decreased public injury from smoking for maintenance of its corporate profits could be inferred from a confidential internal Philip Morris memorandum regarding its decision not to market a less harmful cigarette:

> [A]fter much discussion we decided not to tell the physiological story [regarding the health effects and addictiveness of conventional cigarettes] which might have appealed to a health conscious segment of the market. The product as test marketed . . . was unacceptable to the public ignorant of its physiological superiority.

Plaintiffs may identify two additional areas of deceptive conduct central to the conspiracy: the target marketing of cigarettes and other tobacco products to children; and the intentional deflecting of tobacco-related healthcare costs to smokers and their health plan providers. Plaintiffs can contend that defendants — with the use of sophisticated marketing tools such as Joe Camel — "systematically targeted" youth to encourage them to purchase cigarettes in violation of various state laws, including New York's, in order to replace dying adult smokers. Support for this contention can come from a 1974 R.J. Reynolds marketing plan that highlighted as an "opportunity area" a plan to "increase our young adult franchise," with "young adults" described as including those children 14 to 17 years of age. This evidence was excluded at the Blue Cross trial on grounds that it was too prejudicial under Rule 403 of the Federal Rules of Evidence, but it may have more salience in computing punitive damages.

Recent media reports suggest that tobacco companies also opposed marketing of drugs designed to help smokers stop smoking. See Kenneth Chang, Tobacco Industry Fought Drugs' Marketing, New York Times, August 14, 2002, at A17.

C.   Consumer Harm from Deceptive Practices

53

Evidence has been found to demonstrate that defendants knew such deceptive practices

would cause – and that their practices did cause – plaintiffs' harm.

1.  Knowledge that Consumers Would Act Upon Deceptive Practices

The tobacco industry can be charged with knowing that the consequences of prolonging

the debate over the adverse effects of smoking would be to reassure addicted consumers in order

to induce them to continue using their products.  Documents substantiate this view of defendants'

program designed to mislead and string along smokers.  Proof includes such defendants'

statements as follows:

- The CTR (then TIRC), was formed in the early 1950's in response to published reports linking cigarette smoking with various diseases.  The primary purpose for the initial formation was a public relations one. . . . The CTR, with the help of others, has kept certain questions open when a large body of anti-tobacco scientists claimed the easy answers had been found.

- The long established policy of CTR, carried out through [the Scientific Advisory Board is to] . . . maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco; and . . . the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco.

- The BAT objective is and should be to make the whole subject of smoking acceptable to the authorities and to the public at large since this is the real challenge facing the Industry. Not only . . . is [this] the right objective but . . . it is an achievable one.

A public relations campaign was suggested to "describe more or less truthfully the

dramatic efforts" of Philip Morris to safeguard the public.  The company also sought to take steps

so that the public could be

Assured that Parliament (Marlboro) would immediately bring them any tar and nicotine reducing innovations that were consistent with good smoking and that [Philip Morris] would do this no matter how much effort and expense were required. . . . [T]he attempt would be made to build an image of the brand as a brand that was made and sold by

people who were genuinely concerned about the health of their customers and did not believe in taking chances with the health of their customers.

### 2. Evidence that Misrepresentations Caused Consumers Harm

Evidence in the form of documents, lay and expert testimony, and depositions may establish that plaintiffs will meet their burden of proving that defendants' deceptive practices caused them injury. A key question was whether plaintiffs' smoking behavior would have been different if defendants had been truthful rather than deceitful.

Expert witnesses in a prior trial testified that: (1) members of the American public underestimated the health risks of smoking at the time they started smoking and afterward; and (2) early public acknowledgment by the tobacco companies that they believed smoking causes lung cancer and other diseases would have led the American public not to start smoking, or to smoke less, or to quit smoking earlier.

#### a. Expert testimony

Defendants' objections to plaintiff's experts' testimony in the Blue Cross litigation was ruled on repeatedly at that trial. Critical aspects need only be summarized here. The legal basis for utilizing the statistical analysis of plaintiff's and defendants' experts is set out in Part V.E., infra. Plaintiffs in the instant case may provide different types of statistical and other analysis to support their claim.

##### (1) Dr. Jon Krosnick

The testimony of Dr. Jon Krosnick, a behavioral scientist and leading expert on survey methodology, at the Blue Cross trial was to the effect that defendants' misrepresentations affected subscribers of that insurer plaintiff. Dr. Krosnick presented detailed empirical data that

smokers significantly underestimated the health risks and addictiveness of smoking, that the misrepresentations of the tobacco companies had a substantial impact on smokers' perceptions of these risks, and that if the defendants had not engaged in deceptive conduct fewer would have started to smoke and more would have quit sooner. Dr. Krosnick was qualified by training, experience, and his published studies supporting his views. He employed standard survey procedures and analysis.

Dr. Krosnick's conclusions were based on statistical analysis of three types of data. First, he supervised a two thousand person telephonic survey conducted by an independent national survey research firm, Schulman, Ronca, Bucuvalis, Inc., to assess the impact of smoking related information on consumers. This survey was conducted according to acceptable survey techniques. Second, he compared these results with a comprehensive literature review of pre-existing surveys and articles assessing people's perceptions and attitudes concerning the health risks of smoking. Third, he relied on a randomized sample of 156 Empire Blue Cross's subscriber depositions, and over three hundred depositions of other Blue Cross plan members, to extrapolate statistically meaningful inferences about the population as a whole. Depositions were taken in person for up to three hours, with standardized questions, and without witness preparation to preserve the integrity of the sample. Subscribers were either current or former smokers of plaintiff or other Blue Cross plans, all of whom had submitted health care costs to these plans. The sampling procedure conformed to standard practice.

Dr. Krosnick had each of the relevant depositions reviewed by neutral coders who were appropriately selected, instructed and supervised. They coded the transcripts according to set instructions and inquiries. These questions, which were divided into five groups, focused on (1)

what deponents now believed about the health risks and addictiveness of smoking regularly; (2) what deponents believed about the health risks and addictiveness of smoking at any other time after they had become regular smokers; (3) the deponents' beliefs about their exposure to statements made by the tobacco companies about the health risks of smoking; (4) the deponents' beliefs about their exposure to statements made by the tobacco companies concerning the addictiveness of smoking; and (5) the deponents' beliefs about how certain tobacco company statements would have affected their smoking behavior if they had been made to the public prior to, or during, the time that the witness smoked regularly.

The analysis of the depositions and the jury's view on a large screen of videos of the witnesses being deposed, as well as their own analysis of transcripts of relevant depositions, could lead the jury to find that: (1) a substantial percentage of smokers believed that, at the time they started smoking regularly, smoking was not risky to their health or addictive; and (2) many would have changed their smoking behavior if the tobacco companies had made timely candid statements about what defendants knew were the health risks and addictiveness of smoking.

The results obtained from analyzing the plaintiff's members' depositions were confirmed by the results of the depositions taken of members of plans other than Empire Blue Cross. Dr. Krosnick also relied upon other surveys that had been conducted by reputable survey and polling organizations. Employing different methodological approaches to reach like results alleviated the potential limitations of any one approach. See David H. Kaye and David A. Freedman, Reference Guide on Statistics, Reference Manual, supra, at 97 ("Sometimes several experiments or other studies, each having different limitations, all point in the same direction. . . Such convergent results strongly suggest the validity of the generalization."); Hans Zeisel & David

Kaye, Prove It With Figures: Empirical Methods in Law and Litigation 68-78 (1997) ("Still more powerful support comes when studies based on distinct research approaches (or employing the same general research approach but having differing strengths and weaknesses) reach comparable results. . . ."); Shari S. Diamond, Exploring Sources of Sentencing Disparity, The Trial Process 387 (1981) (comparing simulated methods and actual case analysis to determine disparities among federal sentences); Harry Kalven & Hans Zeisel, The American Jury (1966) (separate approaches to assess impact of unanimity requirement on hung juries).

Dr. Krosnick concluded that smokers underestimate the relative risks of smoking, and that but for the misleading misrepresentations of the tobacco industry in the 1980s and afterward, more smokers would have changed their smoking behavior. He provided quantitative bases for his opinion.

(2)  Dr. Jeffery Harris and others

Dr. Jeffery Harris, a medical doctor and an economist, provided statistical evidence about the effect of the defendants' misleading statements on smoking behavior. Tracing populations of smokers around the country exposed to different levels of information, Dr. Harris modeled the impact of the defendants' misrepresentations on smokers. He traced the effects of two types of misconduct: 1) the health consequences which resulted from defendants' misrepresentations (an "information effect"); and 2) the consequences of defendants' "gentlemen's agreement" not to compete to produce less hazardous products or to delay their introduction (an "innovation effect").

Dr. Harris's opinion and analyses and the bases for his conclusions were sufficient to allow a jury to find that smokers relied on publically available information in deciding whether to

start and stop smoking and that the smoking behavior of Blue Cross members would have been different had it not been for defendants' fraud. His study showed how information "moves smoking rates," demonstrating that as consumers were exposed to different information about smoking, their smoking behavior changed. Empirical evidence further demonstrated that, according to this witness, consumption of cigarettes has historically decreased after significant disclosure about the dangers of smoking. He testified that based upon data from many peer reviewed studies, accurate and timely information increased smokers "quit rates" and reduced teenage "initiation rates."

Using economic and statistical tools, Dr. Harris created a counterfactual model to graph what smoking patterns would have looked like had the industry not misrepresented the hazards of its product to the public. He then calculated a "conduct attributable fraction" for each year – one based on the "informational effect" and the other on the "innovation effect" representing the portion of medical costs due to smoking related illnesses resulting from defendants' fraud. Under this information effect, Dr. Harris found that the rate of smokers quitting smoking would have increased by 4.5% per year (as opposed to a rate approximating 3% per year) in the absence of a conspiracy to deceive the public. He reported that his 4.5% figure was conservative, and that had he mechanically relied upon the results of the underlying studies, quit rates could have increased to as high as 10%.

Dr. Harris used a separate model to determine the effects that resulted from defendants' attempt to suppress the introduction of safer cigarettes into the market. To measure this "innovation" effect, Dr. Harris consulted surveys, studies, and epidemiologic data to determine the rate at which the health risks of smoking had actually declined since the 1950s. He then

measured how much faster the risks of smoking would have declined with the use of a safer technologically available cigarette. His measurements were also based on case-studies of risk reducing technologies that were never marketed, as well as defendants' rate of spending on research and development compared with those in other benchmark industries.

Dr. Harris's reliance on a combination of research techniques – mathematical models, statistical regression analysis methods, analysis of data from relevant benchmark industries, and reasoned judgments based upon available data – were consistent with data and research methods of other professional economists.

The smoking attributable costs calculated by other experts were utilized in combination with Dr. Harris's calculations to determine damages on a per annum basis. Several thorough and prolonged hearings (in this case and in related actions) established that these statistical models and the experts who developed them satisfied Daubert and could be used in combination with individualized evidence to satisfy each element of the plaintiffs' claims.

b.      Videotaped depositions

Videotaped depositions of smoker subscribers in the Blue Cross case substantiated the effect defendants' misstatements had on consumers. Relevant portions of 71 depositions relied upon in Dr. Krosnick's study were played to the jury. Some of these depositions showed that plaintiff's members underestimated the health risks of smoking at the time they started smoking (and afterward) and that public acknowledgment by the tobacco companies that they believed smoking causes lung cancer and other diseases would have led them not to start smoking, to smoke less, or to quit smoking earlier.

Many testified that the misrepresentations created doubt in the consumers' minds about

60

the effects of tobacco use and reassured addicted users that it was safe to continue smoking.

See, e.g.:

> A: But at the time that these warnings came out is the same time the advertisement came out saying there was no proof. . . . So we're trying to weigh it on our own.
>
> . . .
>
> Q: Understanding that, what was it about the statement from the tobacco industry that you believe influenced you away from quitting?
>
> A: Probably that tests weren't conclusive.
>
> . . .
>
> Q: And having seen this warning, the warning didn't make you stop smoking, did it?
>
> A: No, I was very healthy. You know, we all thought, everyone really, I can't speak for the whole world, but . . . my circle of friends all thought that . . . they [the public health community] don't know what they're talking about. They're just doing this to get on a bandwagon of some sort.
>
> . . .
>
> A: . . . I remember watching on television. It was [an] R.J. Reynolds . . . CEO type . . . saying that he smoked, you know, and that he sees nothing wrong with it and it doesn't impact his health at all.
>
> . . .
>
> Q: Did you take the same comfort?
>
> A: Yes, I did.

Other testimony indicated that subscribers were affected by defendants' failure to fund

and produce the objective research it advertised it would:

> Q: Did you know that as of February 2nd, 1953, that R.J. Reynolds had indicated in its documents . . . that studies of clinical data tend to confirm the relationship between heavy and prolong tobacco smoking and the incidence of cancer of the lung?

A: Absolutely not.

. . .

Q: And if R.J. Reynolds had disclosed to you and to the public that studies of clinical data tend to confirm the relationship between heavy and prolonged tobacco smoking and the incidence of cancer of the lungs, do you think that would have affected you?

A: Very much so.

Q: How so.

A: It would have scared me to death.

Other deposition statements included such statement as the following:

They were making available to us teens other information. I don't understand if it was available why we wouldn't have seen stuff like this on TV. If they were showing one part, and this indeed was available to the public, why weren't we seeing this part of it? . . . I can honestly say if I had this in front of me, I think I would have chosen not to smoke. If they would have came forward to say that the product had some bad effects, long term effects, I would have probably looked upon it as that . . . in . . . [the] long term that it would be bad for me."

Many testified that they were reassured by the non-verbal messages associated with smoking, while others verified the supposed effect of low tar products on intercepting quitters.

Examples include:

Q: Do you recall any statements or ad by the tobacco companies that provided some reassurance to you that smoking might not be bad for you?

A: Well, like I said earlier before when the guy – I believe the guy is carrying the girl and they look like they're happy, it's like the guy can smoke and he still has his – he is giving the girl a piggyback ride and I guess he smokes, like hey you know, if smoking was bad for you you wouldn't be able to do this. You know.

. . .

Q: Any statement from the tobacco industry that you believe influenced you not to quit?

A:  I would say when they started to come out with the light cigarettes, low tar cigarettes.

This deposition testimony in the <u>Blue Cross</u> case was far from universal, but it was nonetheless probative, and subject to skilled cross examination.  The jury could find that significant portions of the deposition testimony corroborated statistical studies, extrapolations, and the conclusions of experts.

        c.        Surveys, medical and psychological literature and documents

Surveys and literature were also provided to the jury in the <u>Blue Cross</u> litigation.  These included studies from the American Cancer Society, studies published in established psychological and medical journals, and Surgeon General reports.  These documents would support plaintiffs' contention about the kind of impact defendants' misrepresentations had on the population as a whole.  <u>See, e.g.</u>, Reducing the Health Consequences of Smoking: A Report of the Surgeon General 345 (1989) ("Another possible reason for some smokers' insensitivity to smoking risks is that they have not always been given the full message, or they have been given mixed messages from the cigarette industry.  Factors that impede public awareness and acceptance of the health hazards of smoking include cigarette advertising and promotion and cigarette companies' public relations and lobbying activities.").

It was only during the last few years that defendants through advertising and electronic access to internet statements began to concede that serious diseases were caused by cigarettes in their light form.  Even then, the advertising campaigns and other activities were arguably continuing to mislead smokers and potential smokers.  As a result, more people continued to start smoking, become addicted, and not quit than would have been the case absent defendants' misleading activities.

While information divulged by public and private groups about continuing smoking dangers has reduced the harm caused by defendants' conduct, arguably it has not eliminated it. Enforcement of no smoking bans in public and private places and universal higher taxes and charges per pack have been particularly effective in reducing smoking. Substantial damages may still be shown by those with an appropriate theory and procedure for compelling legal compensation.

Most of the damages that might have been uncovered had appropriate suits been brought at an earlier date are no longer available. In many respects this is almost the end-of-the-line for viable anti-tobacco suits of any significance.

Defendants strongly deny the conclusions sought to be drawn by plaintiffs. In fact they have succeeded in defending against most suits by smokers or third party payers of medical expenses. Nevertheless, there still remains a large residuum of possibly valid claims that can still be prosecuted with some hope of plaintiffs for success. While the sun is setting on the battlefield of tobacco litigation, and it is unlikely that anyone can successfully implore a higher authority to stay its apparent movement across the sky, much might be accomplished on behalf of injured plaintiffs by this class action in the lingering twilight.

## IV. Procedural History

Set out below is a brief procedural history of related cases brought in this litigation.

A. Individual Plaintiff cases

1. Simon I

Sturgeon v. Philip Morris, 99 CV 01988, was filed on April 9, 1999 on behalf of cigarette smokers with personal injury claims. The magistrate judge provided a motion schedule and

organization for pretrial adjudication An amended complaint was filed on October 15, 1999.

The amended complaint changed the name from Sturgeon to Simon. In addition, the nature of

the class changed. Simon I was a national class action on behalf of:

> All persons residing in the United States, or who were residents of the
> United States at the time of their deaths, who have a 20 pack-year history
> of smoking Defendants' cigarettes and who, individually or through an
> estate or other legal representative, had a timely claim as of April 9,
> 1999 for personal injury damages or wrongful death arising from cancer
> of the lung. A pack-year is one package of cigarettes consumed per day
> per year.

A series of dispositive and discovery motions were then decided.

In April 2000, the court met with the parties and settlement negotiations between

plaintiffs and one defendant took place. While these parties appeared close to a settlement,

ultimately no agreement could be reached.

The court issued an order on May 9, 2000, presenting the parties with various questions

including whether or not punitive damages for a class should be handled on a non-opt-out basis.

On September 6, 2000, the plaintiffs filed the related Simon II complaint to determine liability

for punitive damages. Further briefing and oral argument followed.

On November 6, 2000, the court denied class certification in Simon I. It stated, "even

though Simon I is a viable class action, the motion for certification in Simon I is denied because

it would better preserve court resources to certify the broader Simon II class for trial."

2. Decie

William Decie, et al. v. American Tobacco, et al., 2000 CV 02340, was filed on April 21,

2000. It sought class action treatment of claims by smokers for personal injury, plus punitive

damages, medical monitoring, and recovery of insurance premiums.

It has not proceeded. Punitive damage aspects were stayed pursuant to an order in <u>Simon II.</u> In its Memorandum of April 23, 2002, the court suggested that <u>Decie</u> be realigned within <u>Simon II.</u> In a conference on April 30, 2002, the plaintiffs agreed with that suggestion and stated that they would omit increased premium and insurance claims to permit that integration of cases. Transcript of May 1, 2002, at 35. Subsequent filings have included <u>Decie</u> as part of <u>Simon II.</u>

      3.     Ebert

<u>James Ebert v. Philip Morris, Inc. et al.</u>, 2000 CV 04632, was filed on August 9, 2000. That case sought class treatment for product liability, fraud, conspiracy, RICO, and unjust enrichment. It has not proceeded appreciably. Punitive damage aspects were stayed pursuant to a <u>Simon II</u> order. In its Memorandum of April 23, 2002, the court suggested that <u>Ebert</u> be realigned within <u>Simon II.</u> This was agreed upon in a conference of April 30, 2002. Transcript of May 1, 2002, at 37. Subsequent filings have included <u>Ebert</u> as part of <u>Simon II.</u>

      4.     Browne

<u>Clara Browne v. Philip Morris et al.</u>, 02 CV 599, was filed pursuant to the court's suggestion that "test cases" might be appropriate for resolving some questions in the litigation. It was filed on behalf of thirteen injured persons from the state of Florida on January 28, 2002.

The court did not find the <u>Browne</u> case helpful. See Tr. of May 1, 2002; <u>see also</u> discussion of <u>Simon II,</u> below. On May 31, 2002, the plaintiffs stipulated to discontinue the action without prejudice, but to include the claims in <u>Simon II.</u>

      5.     Simon II

<u>Simon et al. v. American Tobacco</u>, 2000 CV 05332 (Simon II) was filed on September 6, 2000, and included as subclasses all the tobacco cases pending. It sought both compensatory and

punitive damages.

On December 7, 2000, the court issued an order anticipating that trials would take place in Simon II, and suggesting that choice-of-law analysis indicated "tentatively, that it is the unitary and substantive law of New York and the unitary federal procedure that will govern much of Simon II." Simon II, 124 F.Supp.2d at 77.

On December 22, 2000, plaintiffs filed a motion for class certification and suggested the trial of certain "test cases." See discussion of Browne v. Philip Morris, ¶ 4, supra.

B. Blue Cross Cases

1.    Empire Blue Cross

In April 1998, numerous Blue Cross health plans from across the nation, including New York's Empire Blue Cross and Blue Shield ("Empire") filed suit against the major tobacco companies to recover the extra money they were forced to spend on patients harmed by tobacco as a result of alleged fraud by defendants. Blue Cross and Blue Shield of N.J., et al. v. Philip Morris Inc., et al., 98 CV 03287.

Litigation was extensive, lasting over three years. The trial consumed 44 trial days. It required 34 witnesses, 10 of whom were daubertized—Daubert screened experts; there were 1,632 demonstratives and exhibits, and over 100 depositions utilized in court. Over 300 video depositions of subscribers and others were taken; many were heard at trial. Twenty-nine defendants' executives and employees were also deposed. The parties filed over 150 legal memoranda and argued many applications. The docket sheet contains over 1400 entries. Computer technicians were able to quickly access data, diagrams, charts and depositions and display them on a huge screen for the jury. The parties used questionnaires, surveys, statistical

evidence and modeling, and other advanced and often novel but appropriate statistical techniques. Reproduction of hundreds of thousands of pages of documents from Empire's files for the many defense counsel and the court was needed.

Plaintiff made a number of claims including antitrust, conspiracy, RICO, New York Consumer Protection Act ("Act"), and common law fraud. A continuing conspiracy was proved for evidentiary purposes, warranting evidence both before and after 1980—the effective date for the litigation of the Consumer Protection Act—with damages based solely on post 1980 actions of defendants and reliance by smokers. The jury verdict established, apparently for the first time, that the tobacco industry had engaged in deceptive practices banned by New York statutes harming a third party payor and its subscribers. The jury returned a verdict of $17 million for the plaintiff on the claim under section 349 of the General Business Law and just over $11 million on a subrogated claim under section 349. The other claims were unsuccessful.

On September 19, 2001, plaintiff's counsel Dewey Ballantine filed a motion for award of attorney's fees under section 349(h) of the New York General Business Law, seeking $39,086,223 in attorneys fees. On February 28, 2002, the court awarded $37,841,054.22 in attorneys fees.

Both the trial verdict and the fee award have been appealed.

2.    Other Blue Cross plans

The other twenty-five Blue Cross health care plans located across the country had claims similar to Empire's. Those plans have expressed a desire to wait until the court of appeals for the Second Circuit answers the question of whether section 349 may be used in these cases before proceeding.

At the request of the plaintiffs the court stayed further proceedings in the cases on July 16, 2002 pending the appeal in Empire. Defendants did not object. Nevertheless, the court indicated that it was dubious about continuing any but the claims of New York Blue Cross cases. In its July 16, 2002 memorandum, it wrote:

> It should be noted that the New York Court of Appeals has recently ruled that section 349 cannot be relied upon by plaintiffs injured in other states. Goshen v. The Mutual Life Insurance Company of New York, 2002 WL 1418408 (N.Y. Court of Appeals, July 2, 2002). Counsel for plaintiffs concede that the out-of-state Blues cannot rely on section 349, but will have to plead the statutes and common law of the states where they and their smokers were injured. This court will almost certainly not want to try these non-New York cases: the laws involved are, in general, not clear; certifications for clarification of state law may be required; and convenience of witnesses will suggest transfer to a more appropriate district court. Upon completion of the pending appeal a motion for dismissal or transfer of these non-New York Blues will be entertained.

In Re Simon II Litigation, 212 F.Supp.2d 56, 57 (E.D.N.Y. 2002).

C.   Union Health fund cases

1.   National Asbestos Workers

National Asbestos Workers Medical Fund v. Philip Morris, Inc., et al., 98 CV 01492, was filed on February 27, 1998. It was brought as a class action on behalf of some four thousand "collectively-bargained" health and welfare trust funds. The putative class members are "all self insured, multi-employer benefit plans . . . in the building trades and their trustees" seeking to recover money expended for health and welfare benefits for fund beneficiaries injured by tobacco.

Discovery commenced and class certification was denied with leave to renew. Punitive damage aspects were stayed, and, in effect, the parties held the case in abeyance.

At a hearing the court pointed out to plaintiffs that the case would have to be prosecuted

or dropped. It noted the huge costs of the litigation were it pressed.

On May 31, 2002, the parties agreed to voluntarily terminate the litigation. The case was dismissed. This decision was fully justified and did not prejudice the rights of any party or persons not represented.

2.    Bergeron

Bergeron, et al. v. Philip Morris, Inc., et al., 99 CV 06142, was filed on September 29, 1999. Plaintiffs, trustees of the Massachusetts State Carpenters Health Benefits Fund, brought this action alleging a violation of sections 349 and 350 of New York General Business Law. A series of disposition and discovery motions were decided. The punitive damages aspects were stayed, as in other cases.

Plaintiffs' first class certification motion was denied. A motion for transfer by defendants was denied by order of June 8, 2000, because the case raised issues similar to those in the pending National Asbestos cases. See Bergeron v. Philip Morris, 2000 WL 748144 (E.D.N.Y. June 8, 2000). After National Asbestos was dismissed on consent, on June 3, 2002, plaintiffs filed for class certification.

On July 2, 2002, the court orally denied class certification in Bergeron; this decision was confirmed by an order dated July 10, 2002.

Following the decision in Goshen the court suggested:

The plaintiff may wish to amend the complaint to plead Massachusetts law. If so, the case should be transferred to the district court of Massachusetts for the convenience of parties and witnesses, in the interest of justice, where amendment may be sought. See 28 U.S.C. § 1404. If the plaintiff wishes the case transferred, it should submit an order of transfer within 10 days. Otherwise the complaint will be dismissed for failure to state a cause of action on an order to be submitted by defendants.

70

In re Simon II, 212 F.Supp.2d 57, 59. The parties then stipulated to voluntary dismissal of all claims. Stipulation of Dismissal, August 2, 2002.

D.  Asbestos cases

1.  H.K. Porter

H.K. Porter Co. v. B.A.T. Industries, et al., 97 CV 07658, was filed on December 31, 1997. Plaintiff paid substantial sums in prior actions to persons injured by its asbestos products. It sought to recover the portion of those damages attributable to tobacco smoking by plaintiffs who were harmed by both asbestos and tobacco. The case was subject to various pretrial motions including motions to dismiss for failure to state a cause of action, for lack of jurisdiction and to settle discovery disputes. A writ of mandamus sought by defendants was denied by the court of appeals.

The punitive damage aspects were stayed with the view that they could be dealt with in Simon II. See Simon v. Philip Morris, 124 F.Supp.2d 46 (E.D.N.Y. 2000).

On May 4, 2001, this action was dismissed pursuant to a stipulation between the parties.

2.  Raymark

Raymark Industries v. American Tobacco, et al., 1998 CV 0675, an asbestos case similar to other cases seeking recovery from tobacco manufacturers for harm caused by tobacco and asbestos, was filed on January 30, 1998. Pretrial motions including jurisdictional challenges were decided. As with other cases, punitive elements were stayed by the court's December 7, 2000 order in Simon II.

The court expressed the view that this case had "not proceeded expeditiously." Simon II, 172 F.Supp.2d 375 (E.D.N.Y. 2001). Its order of March 28, 2002 noted the "lack of dispatch" of

this and other cases and asked the parties to decide whether it should be dismissed. In re Simon II, 2002 WL 522984 at *1 (E.D.N.Y. slip op. March 28, 2002).

In its April 23, 2002 Memorandum for Discussion Purposes, the court suggested that it might be "appropriate for plaintiff . . . to follow the lead of Manville [Falise] and withdraw," In re Simon II, 2002 WL 862553 at *9 (E.D.N.Y. slip op. Apr. 23, 2002), and that the case should either be set for trial or dismissed. Id. at *15. On May 31, 2002, the parties stipulated to discontinue the litigation.

> 3. Falise

Falise, et al. v. American Tobacco, et al., 99 CV 7392, was filed on November 12, 1999 by trustees of the Manville Trust set up to compensate people injured by asbestos. The case was tried over a period of many weeks after the court of appeals denied mandamus. A hung jury resulted in a mistrial. Plaintiffs then withdrew from the litigation.

This decision to close the case was justified since the trustees had a fiduciary obligation requiring them to balance the limited prospects of a final award in favor of the trust against the enormous cost of trying these cases. The theory of asbestos "synergy" with tobacco, increasing the probability of disease, is credible and might provide a basis for recovery. Falise v. American Tobacco Co., 94 F.Supp.2d 316, 327–30 (E.D.N.Y. 2000). Juries and courts have been reluctant, however, to endorse this legal theory in claims by asbestos producers or their successors against tobacco companies since tort based payments by the asbestos industry have generally been discounted to reflect the tobacco causative factor.

> E. Mason (Medicare)

This class action, James Mason, et al. v. American Tobacco, et al., 2000 CV 0442, was

transferred from the Northern District of Texas (97 CV-293-R) in August 2000. Mason plaintiffs

sought to recover under the Medicare Secondary Payor Act, on the theory that defendants, as

tortfeasors, attained the status of "self-insured plans" for insurance of individuals they harmed in

tort, and that a quasi-qui-tam action was appropriate to recover funds which had been spent by

Medicare. These funds should have, under plaintiffs' theory, instead been paid by tobacco

company defendants, the "self-insured plans" which were the primary insurers for harm to

Medicare subscribers caused by their torts. See Plaintiff's Memorandum of June 28, 2002

(setting out proposed legal theory).

Plaintiffs moved for class certification in April 2002. They also sought a severance from

the Simon II umbrella of cases. Defendants opposed both class certification and severance, and

moved for transfer of the case to the District Court for the District of Columbia.

The court indicated to the parties that dispositive motions would be appropriate.

Defendants declined to file dispositive motions, both by letter of June 25, 2002, and orally at a

conference of July 2, 2002. When the court indicated that it would then consider a dispositive

motion sua sponte and without the defendants' assistance, defendants agreed to make such a

motion.

On July 11, 2002, the court denied defendants' motion to transfer and granted plaintiffs'

motion for severance. On July 26, 2002, after receiving briefing from both sides on a motion for

dismissal, the court dismissed the case. The court ruled that "defendants' status as accused

tortfeasors, standing alone, does not convert them under the statute into primary plans or self-

insured plans for Medicare beneficiaries injured by using their products." Mason v. Am.

Tobacco Co., 212 F.Supp.2d 88, 92 (E.D.N.Y. 2002). This case is on appeal.

F.   Foreign Entities

Other claims involving foreign countries based, among other theories, on claims that American tobacco companies were engaged in a conspiracy to avoid foreign taxes, have been transferred to other judges in the court. These cases have been dismissed. See, e.g., European Community v. Japan Tobacco, 02-CV-00164, European Community v. RJR Nabisco, 01-CV-05188, and Department of Amazonas v. Philip Morris, 00-CV-02881.

G.   Tobacco Cases Nationwide

Nationwide, a large number of tobacco lawsuits have been brought. According to tobacco manufacturers, approximately 1500 lawsuits were pending in 2001. See Philip Morris Annual Report, 2001, at 50. Their presence is a factor which must be considered. Most litigation has resulted in a successful defense on legal grounds or because juries found for the defendants.

(Note that in some instances in this section the court cites to some of the extensive information on tobacco litigation available online through the Tobacco Control Resource Center at Northeastern University School of Law, http://www.tobacco.neu.edu. Citation to this web site is for informational purposes, since consolidated information is otherwise difficult to locate; it is not an endorsement of the positions that organization has taken in lawsuits.)

Among the prominent suits are the following:

State Settlements. On November 20, 1998, forty-six states settled with the five biggest cigarette makers, in which the latter agreed to pay $206 billion over twenty-five years. The participating companies include: Philip Morris, R.J. Reynolds, Lorillard Tobacco, and Brown & Williamson. The fifth largest cigarette maker, Liggett & Myers, was not a party to the

negotiations but participated in the agreement. The abstaining states were: Florida, Minnesota, Mississippi, and Texas. These states had previously settled with the companies for a total of $40 billion to be paid over twenty-five years. Except for Minnesota, which settled while the case was being tried before it was to go to the jury, the states settled prior to the start of trials. See 46 States Agree to $206 Billion Tobacco Settlement, Liability Week, Vol. 13, No. 44, Nov. 23, 1998 available at 1998 WL 12498764. Materials made available from discovery in the Minnesota case and released by Congress form a large part of the evidence supporting Part III, Facts, supra See Emily Heller, Documents Led to Tobacco Win, National L.J., April 15, 2002, at B10.

The settlement replaced an earlier proposed (1997) more comprehensive agreement calling for the companies to pay $368.5 billion over twenty-five years; that proposal required Federal participation. Id. Congress failed to act, preventing what might have resulted in a settlement ending all tobacco litigation. See generally Brown & Williamson Tobacco Corp., et al. v. Stanley M. Chesley, et al., No. 117050/01, N.Y. Sup. Ct. (N.Y. Co.), Sept 25, 2002 (background of settlement in a litigation to reduce excessive legal fees). The concord with the states obligated the companies to pay $13 billion upfront through 2003, and $9 billion in each subsequent successive year. Pete du Pont, Tobacco Lawyers Target HMOs, and Kids Still Smoke, National Center for Policy Analysis, available at http://www.ncpa.org/~ncpa/oped/dupont/dup121800.html.

The understanding also contained guidelines targeted at the companies' sales practices. First, sales and distribution of apparel and merchandise with cigarette brand logos was prohibited. Id. This includes extended restrictions on outdoor and stadium/arena advertising. Second, complimentary packs are now only permissible in adult establishments. Third, pack size

75

was capped. Fourth, in order to prevent children-targeting in advertising, the use of cartoon characters in advertisements was prohibited. Id. Fifth, the companies agreed to provide $50 million to an enforcement fund for states to pursue violators of the settlement. Finally, the companies agreed to contribute $1.5 billion to a public education fund over five years and to pay $250 million for a teen smoking reduction program. Liability Week, supra, at *2.

Some of the states have been criticized for their unwillingness to do more in furtherance of the settlement's goal to reduce smoking. Collectively, they have earmarked $1.45 billion (less than one percent of the total settlement) as their contribution to a five year educational campaign. Alicia Lukachko, Philip Morris Antismoking Campaign and Tobacco Settlement, The Wall Street Journal, April 22, 1999, available at http://www.acsh.org/press/editorials/antismokcam042299.html. Although state leaders declared that the money would be spent on tobacco prevention and health priorities, there were no such express obligation on the states in the settlement. See Liz Chandler, N.C. Spends Settlement on Tobacco, Not Health, The Charlotte Observer, June 23, 2002, available at http://www.charlotte.com/mld/charlotte/news/3526693.htm. According to the Government Accounting Office, states are collectively using less than a tenth of the settlement money on anti-smoking programs. Dave Barry, In War on Tobacco, Money Goes Up in Smoke, The Miami Herald, Sep. 15, 2002, available at http://www.miami.com/mld/miamiherald/living/columnists/dave_barry/4069054.htm. The majority of the money is going toward projects quite unrelated to discouraging smoking, such as highways, bridges, museums, and subsidization of tobacco growers. Id.; Chandler, supra. Meanwhile, the most recent statistics from the Center for Disease Control estimate that the

percentage of eight, tenth, and twelfth grade students who smoke daily has not changed much in the last twenty years.

United States v. Philip Morris Inc. et al. The federal government sued Philip Morris and ten other major tobacco companies, seeking both monetary and injunctive relief. United States v. Philip Morris Inc. et al.,116 F.Supp.2d 131 (D. D.C. 2000). The government asserted four claims pursuant to three federal statutes. The first, the Medical Care Recovery Act ("MCRA") authorizes the government to recover costs expended on behalf of victims of tortious conduct. The second, the Medicare Secondary Payer provisions ("MSP") permits the government to obtain reimbursement for certain Medicare expenditures when another entity is primarily responsible for those expenditures. The governments remaining two claims alleged RICO violations. The government's MCRA and MSP claims were dismissed on defendants' motion because the MCRA claim was contrary to statutory design and the MSP claim was unsupported by the evidence. Id. RICO counts remain active and the subject of intense discovery and motion practice. The government was permitted to pursue its request for disgorgement of all defendants' profits from 1953 until the present.

Bullock v. Philip Morris. In October 2002, a jury awarded $28 billion in punitive damages to former smoker plaintiff Bullock, as well as close to $1 million in compensatory damages. The plaintiff argued theories of conspiracy and fraudulent concealment. See Gary Gentile, California Jury Awards Former Smoker $28 Billion in Punitive Damages, Brooklyn Daily Eagle (Associated Press), October 7, 2002, at 2. Defendants are likely to file post-verdict motions and appeal any award upheld by the trial court.

Burton v. R.J. Reynolds Co., 208 F.Supp.2d 1187 (D.Kan 2002). In February 2002, a

federal jury in Kansas City awarded compensatory damages of $198,400 to plaintiff Burton, who lost his legs to peripheral vascular disease as a result of smoking. Burton, 208 F.Supp.2d 1187; see also Court Orders Tobacco Firms to Pay Amputee, Wall Street Journal, Feb. 25, 2002. After a hearing on punitive damages, held on May 16, 2002, the judge then awarded plaintiff $15 million in punitive damages. See Burton v. R.J. Reynolds Tobacco Co., 205 F.Supp.2d 1253; see also Dan Margolies, Punitive Damages Urged in Kansas City Smoker's Verdict Against R.J. Reynolds, Kansas City Star, May 17, 2002; Burton, 208 F.Supp.2d at 1214 (ordering parties to appear for punitive damage hearing). Among the theories plaintiff asserted were "fraud and misrepresentation, negligence, strict liability, breach of express warranty, conspiracy and violation of consumer protection statutes." Burton v. Reynolds Tobacco Co., 884 F.Supp. 1515, 1517–18 (D.Kan. 1995). The judge imposed exceptional punitive damages, exceeding the normal cap permitted under state law, because defendant's behavior was judged "particularly nefarious." Burton, 205 F.Supp.2d at 1256.

Henley v. Philip Morris Inc., 113 Cal. Rptr.2d 494 (Cal. App. 1 Dist 2001). A California jury awarded $1.5 million in compensatory damages and $50 million in punitive damages, which was later reduced to $25 million by the judge; that reduced verdict was upheld by the appellate court. Id.; see also Myron Levin, $26.5-Million Award Is Upheld in Smoking Case, Los Angeles Times, November 8, 2001. The Henley jury found defendants liable for product liability, failure to warn, negligence, fraud, false promise, warranty breach, and conspiracy. See generally http://www.tobacco.neu.edu/upcoming.html (background information on several cases including Henley).

Schwarz v. Philip Morris, Circuit Court of the State of Oregon Docket # 0002-01376

(2002). The jury awarded $168,000 in compensatory damages and $150 million in punitive damages. Plaintiff claimed the defendants mislead consumers by suggesting that low tar cigarettes were less hazardous. See Oregon Smoker's Estate wins Second largest award, The Seattle Times, March 23, 2002. The punitive damages were later reduced to $100 million by the court. See Bloomberg News, Judge Cuts Damages against Philip Morris, Los Angeles Times, May 11, 2002.

Boeken v. Philip Morris, 2001 WL 1894403 (Cal. Super. 2001). A Los Angeles jury found the defendant liable for plaintiff's lung cancer. Plaintiff claimed that the company portrayed smoking as "cool" but hid the dangers. Boeken was awarded $5.5 million in compensatory damages and $3 billion in punitive damages. The court reduced the punitive award to $100 million. See The Associated Press, Judge: $3B Smoking Verdict Excessive, Newsday (New York, NY), August 10, 2001.

Engle, et al. v. RJ Reynolds et al., Florida 2000. The jury awarded the Florida class $144 billion in punitive damages. Pending appeal, in order to avoid a prohibitive appeal bond, the tobacco companies stipulated to pay at least $700,000,000 even if they win on appeal. See Myron Levin, 3 Tobacco Firms to Forfeit Funds, Los Angeles Times, May 8, 2001. Compensatory awards will be made in mini-trials.

Whiteley et al. v. Philip Morris Inc., Sup. Ct. of CA, SF Case No 303184 (2000). A San Francisco jury found the defendants liable for negligence and fraud. The plaintiff was awarded $1.72 million in compensatory damages and $20 million in punitive damages. Plaintiff won the case, despite having started smoking after tobacco companies were required to put warning labels on cigarette packs. See Gina Piccalo, Cancer Patient Savors Victory in Tobacco Suit, Los

Angeles Times, April 13, 2000.

Connor v. Lorillard et al., No 97-210501/CX1634 (Md Cir Court 1999). Plaintiff was awarded $2.2 million in damages. The jury found the defendants liable for the mesothelioma the plaintiff suffered as a result of the asbestos in the filters of a particular brand of cigarettes made by defendants. See Myron Levin, Smoker wins $2.2 million in asbestos case, Los Angeles Times, May 1, 1999.

Joann Williams-Branch v. Philip Morris, No 9705-03959 Circuit Court for the County of Maryland (Portland 1999). A Portland jury awarded the plaintiff $81 million in punitive damages for wrongful death caused by lung cancer. See Saundra Torry, Record $81 million award in Tobacco Case; Oregon jury orders Philip Morris to pay high punitive damages to Smoker's family, The Washington Post, March 31, 1999. The trial judge lowered the punitive damages to $32 million, but the Court of Appeals of the State of Oregon reversed, remanding with instructions to reinstate the original punitive damage award. See Williams v. Philip Morris Inc. et al., 9705-03957; A106791 (Or. Ct. App. 2002).

Kenyon v. RJ Reynolds, Florida 2001. A Tampa jury found the defendant liable for $165,000 compensatory damages. No punitive damages were awarded. The jury found that the defendant had "marketed a defectively designed product by selling Camel and Salem brand cigarettes." http://www.tobacco.neu.edu/PR/backgrounders/kenyon_verdict.htm

McCabe v. British American Tobacco, Australia 2002. A Melbourne jury awarded the plaintiff $700,000 Australian in damages. The jury did not consider liability because the judge found that the company had purposefully destroyed documents necessary for a proper trial. McCabe was the first Australian smoker to win a lawsuit against a global cigarette company. See

Reuters, World Business Brief: Australia: Verdict for Smoker, New York Times, April 12, 2002.

Hundreds of millions of dollars have been awarded in these and other tobacco lawsuits. One effect of this large number of scattered suits in different courts across the country is to create a possibility of disparate verdicts, or of one or more large awards exhausting funds available to plaintiffs through constitutionally limited punitive damages.

H.   Difficulty in Prosecuting Tobacco Lawsuits

Notwithstanding the lawsuits sampled above, some of which have resulted in recovery against tobacco companies, tobacco lawsuits remain difficult to prosecute. The District Court in Haines v. Liggett Group explained in some detail the financial problems involved in prosecuting claims against tobacco. See Haines v. Liggett Group, Inc., 814 F.Supp. 414 (D.N.J. 1993). That court noted tobacco's policy of expending vast sums in litigation while avoiding settlement in any case. See id. at n.13 (citing statement of Murray Bring, Vice President and General Counsel of Philip Morris, in the Summer 1988 *Philip Morris Magazine*, that "[a]lmost 200 lawsuits have been brought in the last five and a half years and the cigarette manufacturers have not . . . paid a penny to settle one."). The Haines court noted that plaintiffs had incurred several million dollars in out-of-pocket costs, which eventually bankrupted plaintiffs' attorneys and led to their withdrawal from the case, after they had prevailed on preemption before the Supreme Court. Id. at 418–25.

The costs of trials is immense. A recently developed counterbalance, not as strongly present when Haines was litigated, is the existence of well-funded plaintiffs' firms. Large settlements with manufacturers of tobacco, asbestos, and other mass torts, in private and public litigation, have enhanced the finances of leading plaintiffs' firms. A small number of plaintiffs'

81

firms now have great resources. In addition, publicly accessible documentation supporting claims is now generally available on line or even in litigation kits. Defendants are still able to conduct debilitating litigation against individual plaintiffs.

V.     Substantive Law

A.     Fraud and Conspiracy

The common law of New York, like that of other states, recognizes common law fraud as a valid claim against a deceptive merchant. See, e.g., New York Pattern Jury Instructions § 3:20 (2002); McGregor v. Dimou, 422 N.Y.S.2d 806 (Civ. Ct. 1979). That fraud or deceit resulting in damages will give rise to a cause of action is a fundamental principle of tort law. See, e.g., In Re St. John's Estate, 296 N.Y.S. 613, 621 (Sur. Ct. 1937); Restatement (Second) of Torts, §525, Liability for Fraudulent Misrepresentation ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."); id. §557A, Fraudulent Misrepresentations Causing Physical Harm ("One who by a fraudulent misrepresentation of nondisclosure of a fact that is his duty to disclose causes physical harm to the person . . . of another who justifiably relies upon the misrepresentation, is subject to liability to the other."); id. §310, Conscious Misrepresentation Involving Risk of Physical Harm ("An actor who makes a misrepresentation is subject to liability to another for physical harm which results from an act done by the other or a third person in reliance upon the truth of the representation, if the actor (a) intends his statement to induce or should realize that it is likely to induce action by the other, or a third person, which involves an unreasonable risk of physical harm to the other, and (b) knows (i) that the statement

is false, or (ii) that he has not the knowledge which he professes").

American fraud theory can be summed up in its simplest form: "It is sufficient to show that the defendant knowingly uttered a falsehood intending to deprive the plaintiff of a benefit and that the plaintiff was thereby deceived and damaged." Channel Master Corp. v. Aluminium Limited Sales, Inc., 4 N.Y.2d 403, 406-07, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958). Inducing the plaintiff to refrain from acting is actionable. Id. ("One who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act or refrain from action in reliance thereon . . . is liable for the harm caused by the other's justifiable reliance upon the misrepresentation." (citations and quotation marks omitted)). The ingenuity of humanity in devising frauds, and the need to deter them, has led to the creation of a common law and statutory net sufficiently wide to ensnare an enormous and ever-expanding universe of frauds. Cf., e.g., Moore v. PaineWebber, Inc. 189 F.3d 165, 167 (2d Cir. 1999) ("tricking" plaintiffs into buying life insurance with funds that they would otherwise have used for IRAs is actionable fraud under RICO).

In an action alleging fraud, plaintiff must in general prove: 1) either a misrepresentation or material omission of a fact by defendant; 2) the fact asserted was known by defendant to be false; 3) defendant's assertion was made intending that plaintiff rely on it; 4) plaintiff justifiably relied on the misrepresentation or omission, and 5) plaintiff was injured as a result. See, e.g., Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (1996). Stated somewhat succinctly, these five elements essentially are: 1) representation of a material fact; 2) falsity; 3) scienter; 4) reasonable reliance; and 5) damages. See Small v. Lorillard Tobacco Co., 679 N.Y.S.2d 593, 604 (App. Div. 1st Dep't 1998). If any of these elements are missing, plaintiff's

83

claim fails. See, e.g., McClurg v. State, 613 N.Y.S.2d 71 (App. Div. 4th Dep't 1994).

False representation is the most important element of a claim of common law fraud. Cf. Noved Realty Corp. v. A.A.P. Co., 250 A.D. 1, 6 (App. Div. 1st Dep't 1937). Essentially it means deliberately producing a false impression in the mind of the aggrieved party. Id. Express assertions are not the only manner in which fraud can be perpetrated. Schemes, tricks, and concealments may also constitute actionable fraud. See, e.g., Hall v. Naylor, 18 N.Y. 588, 589 (1859) (acquiring goods with intent not to pay constitutes fraud); Int'l Union Bank v. Nat'l Surety Co., 245 N.Y. 368, 372 (1927) (forgery may constitute actionable fraud); Security Trust Co. v. Voxakis, 323 N.Y.S.2d 810, 811 (N.Y. Sup. Ct. 1971) (any "trick, device, or scheme calculated to injure another" may constitute a fraudulent misrepresentation) (quoting 24 N.Y. Jur., Fraud & Deceit, § 26).

In Small, plaintiffs claimed common law fraud on the part of multiple cigarette manufacturers. Pursuant to the first prong of the five-prong test, plaintiffs alleged that two statements constituted false representations. The first was a 1954 newspaper advertisement placed by the Council for Tobacco Research describing its predecessor (which was associated with the tobacco companies) as an independent, objective research committee. The second was a pronouncement by an unnamed Tobacco Institute spokesman who stated that it was "meaningless to speak of cigarettes as addictive." Small, 679 N.Y.S.2d at 604. Without much analysis, the court found that "[n]either of these is sufficient to support a prima facie case that defendants defrauded plaintiffs by means of affirmative misrepresentations about the addictive properties of nicotine in their cigarettes." Id.

A partial disclosure accompanied by a willful concealment of material and qualifying

facts can constitute a misrepresentation. See, e.g., Coral Gables v. Mayer, 271 N.Y.S. 662, 664 (App. Div. 1st Dep't 1934). Even if everything one says is true, if something is omitted which would qualify the assertion, then it may amount to a false representation. Moreover, if the defendant speaks at all, it is obliged to make a full and fair disclosure. Cf. Downey v. Finucane, 205 N.Y. 251, 264 (1912). A fraudulent representation may be effected by a half-truth calculated to mislead. See Andres v. LeRoy Adventures, Inc., 607 N.Y.S.2d 261, 262 (App. Div. 1st Dep't 1994).

Element number two of the test is whether defendant knew its statements (or actions) were fraudulent. If defendant's misrepresentation comes in the form of a positive assertion, then it is likely that defendant will be responsible if it happens to be false. See 60 N.Y. Jur. Fraud & Deceit § 123. If defendant claims that the truth of its representation is derived from the assertion of a third-party then defendant will only be responsible for misrepresenting that it reasonably believed it to be true. See, e.g., Abel v. Paterno, 281 N.Y.S. 58, 63 (App. Div. 1st Dep't 1935).

The third element that must be proven is scienter. That is, the defendant must have had a mental state embracing an intent to deceive, manipulate, or defraud. See, e.g., Ernst and Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). A misrepresentation unaccompanied by an intent to communicate it to others so that they will act upon it to their detriment will not give rise to an action based on fraud or deceit. See Ultramares Corp. v. Touche, 255 N.Y. 170, 187 (1931).

It is not necessary that the misrepresentation be made directly to the party claiming to be defrauded. See Cooper v. Weissblatt, 277 N.Y.S. 709, 714 (Sup. Ct. App. Term 1st Dep't 1935). Thus, while some connection between accuser and the accused must exist, a cause of action will

not fail merely because the party making misrepresentations did not communicate directly to those who relied on them to their detriment. Misrepresentations made to the public at large may give rise to a claim of fraud so long as the plaintiff was part of the class of persons intended to receive the misrepresentations. See Kuelling v. Roderick Lean Mfg. Co., 183 N.Y. 78, 85-86 (N.Y. 1905).

The misrepresentation need not be communicated by defendant directly. "If he authorized and caused it to be made it is the same as though he made it himself." Id. at 85.

Reliance by the receiver of the communications is the fourth necessary element to be proved in an action based on fraud or deceit. Reliance must be reasonable, so that the aggrieved person is justified in taking action based on the communications. See, e.g., Lanzi v. Brooks, 388 N.Y.S.2d 946, 948 (App. Div. 3d Dep't 1976).

New York follows the general rule that receivers of misrepresentations who subsequently receive extraneous corrective information before relying on the misrepresentations will not be permitted to recover for fraud. New York Jur. Fraud & Deceit § 142. Thus, if the communicant makes independent inquiries as to the veracity of the communicator's assertions, then the former is deemed not to have relied on the latter's assertions. See, e.g., 200 East End Ave. Corp. v. Gen. Elec. Co., 172 N.Y.S.2d 409, 412 (App. Div. 1st Dep't 1958).

In Small, plaintiffs' contention that they relied on defendants' alleged misrepresentations was found untenable by the court. The plaintiffs had testified that they were so addicted (during the time the alleged misrepresentations were made) to nicotine that no amount of warnings could break their habit. Because they were already addicted, the court found the notion that plaintiffs relied on defendants' assertions on the non-addictive nature of tobacco to be specious. Small,

679 N.Y.S.2d at 604.

The final element of a common law fraud or deceit claim entails an injury of some sort suffered by plaintiff. Causation must have been "proximate." N.Y. Jur. Fraud & Deceit § 169. Speculative or conjectural damages will not suffice. See Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 156 N.Y.S.2d 585, 587 (App. Div. 3d Dep't 1956). While pecuniary loss usually suffices, other tangible losses, if significant, may satisfy this prong. See, e.g., Kujek v. Goldman, 150 N.Y. 176, 180 (1896) (damages sustained by way of loss of consortium in claim alleging fraud).

Suits founded on the law of fraud present significant legal obstacles for individual consumers. Among other elements, a consumer-plaintiff has the burden of proving the seller's intent, reasonable reliance, and that representations were not mere "puffery." Jeff Sovern, Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Rule Model, 52 Ohio St. L.J. 437, 438 (1991).

New York also has a consumer protection statute, section 349 of the General Business law, which provides similar protection. Section 349 is preferred in many cases since it is broader than common law fraud. See Gaidon v. Guardian Life Ins. Co. of America, 94 N.Y.2d 330, 343 (1999). Section 349 claims have been brought in related litigation. See Blue Cross, 178 F.Supp.2d at 230–47. They are not relied upon in the instant case because section 349 does not give rise to punitive damages. Id. at 231–32.

B. Preemption

This case is not preempted under the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. sections 1331-40 ("FCLAA"). The reasons are summarized below, recapitulating this

court's decision in <u>Blue Cross v. Philip Morris</u>, 178 F.Supp.2d 198, 262–65 (E.D.N.Y. 2001).

State law that conflicts with federal law is without effect. <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 541, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001). The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl.2.

Because plaintiff's claims involves a subject at the heart of the states' traditional police powers – fraud and conspiracy – plaintiff's claims are "not to be superseded by [a] Federal Act unless that [is] the clear and manifest purpose of Congress." <u>Reilly</u>, 533 U.S. 525 at 542 (quoting <u>California Div. Of Labor Standards Enforcement v. Dillingham Constr., N.A. Inc.</u>, 519 U.S. 316, 325 (1997) (internal citation omitted)); <u>see</u> <u>also</u> <u>Cipollone v Liggett Group, Inc.</u>, 505 U.S. 504, 533, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992) (plurality) (<u>citing</u> <u>Maryland v. Louisiana</u>, 451 U.S. 725, 746 (1981)); <u>In re Methyl Tertiary Butyl Ether Prods. Liab. Litig</u>, 2001 WL 936210, *10 (S.D.N.Y. Aug. 20, 2001) (citing cases). The purpose of Congress is the "ultimate touchstone" of preemption analysis. <u>Malone v. White Motor Corp.</u>, 435 U.S. 497, 504 (1978) (quoting <u>Retail Clerks v. Schermerhorn</u>, 375 U.S. 96, 103 (1963)). The scope of the preemption provision must "give effect to a reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." <u>Reilly</u>, 533 U.S. at 592 (Stevens, J., concurring in part, concurring in the judgment in part, and dissenting in part) (quoting <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 486 (1996)).

The FCLAA's preemption provision reads:

(a) Additional statements

No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.

(b) State regulations

No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

15 U.S.C. § 1334 (1994).

The Supreme Court has interpreted this current language more broadly then the original version. Cipollone, 505 U.S. at 520 ("the plain language of the preemption provision in the 1969 Act is much broader" then the 1965 Act). The provision preempts state laws with respect to all "advertising and promotion." Reilly, 533 U.S. at 545.

Boundaries were defined in Cipollone. Giving the clause a "fair but narrow reading," the court ruled a common law damages action alleging a failure to provide adequate warnings was preempted, but that the Act did not preempt "claims based on express warranty, intentional fraud, and misrepresentation, or conspiracy." Cipollone, 505 U.S. at 524, 530-31 (emphasis added). Thus Federal preemption by the Cigarette Labeling and Advertising Act does not apply to the deliberate acts to deceive alleged by plaintiff. See id. at 529 ("In the 1969 Act, Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud. . . . Thus, we conclude that the phrase 'based on smoking and health' fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements."); see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 7 F. Supp. 2d 277, 287 (S.D.N.Y. 1998) ("Cipollone expressly held that claims of fraud by intentional misstatement are

89

not preempted"), rev'd on other grounds, 191 F.3d 229 (2d Cir. 1999).

The plaintiffs in Cipollone alleged that the manufacturers had engaged in two distinct types of misrepresentation. The Court found that a claim for fraudulent misrepresentation premised upon an allegation that the advertising practices of the cigarette manufacturers neutralized the effect of federally-mandated warning labels was preempted by the 1969 Act. It held that such a theory of fraudulent misrepresentation was inextricably related to a theory of failure to warn and was preempted. The Court recognized an important distinction between fraudulent misrepresentation claims associated with advertising and other forms or venues of misrepresentation. Examples of the latter type of misrepresentation, such as evidence that the cigarette manufacturers concealed material facts from administrative agencies, or that they included false statements of material fact, e.g., carbon monoxide or tar levels, in their advertising, would not be preempted by the 1969 Act. The Court reasoned that this second type of fraudulent misrepresentation claim was predicated on more general state law duties to disclose material facts, rather than on advertising and promotion. To further clarify the distinction, the Supreme Court stated that the former type of alleged fraudulent misrepresentation, such as billboards, print media and the like, were "obligations with respect to advertising or promotion" so that state law claim premised upon the breach of that duty would be preempted. Claims that an advertisement contains a false statement of a material fact, in contrast, are not "predicated upon a duty based on smoking and health, but rather on a more general obligation--the duty not to deceive." Cipollone, 505 U.S. at 527-29.

The more recent decision in Reilly reaffirmed the distinction set out in Cipollone between advertising fraud, which was preempted, and other types of fraud, which were not. In Reilly the

Supreme Court distinguished between a Massachusetts law regulating the outdoor and point of sale advertising of cigarettes, and laws of general applicability. The Court found the Massachusetts law targeted an area expressly preempted by Congress – advertising connected to smoking and health – by attempting to limit youth exposure to cigarette advertisements.

> Congress prohibited state cigarette advertising regulations motivated by concerns about smoking and health. . . . At bottom, the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette advertising is intertwined with the concern about smoking and health.

Reilly, 533 U.S. at 548. The Court emphasized that generally applicable obligations and laws were not preempted:

> Although Congress has taken into account the unique concerns about cigarette smoking and health in advertising, there is no indication that Congress intended to displace local community interests in general regulations of the location of billboards or large marquee advertising, or that Congress intended cigarette advertisers to be afforded special treatment in that regard. Restrictions on the location and size of advertisements that apply to cigarettes on equal terms with other products appear to be outside the ambit of the pre-emption provision. Such restrictions are not "based on smoking and health."

Id. at 552.

Manufacturers are subject to state laws prohibiting fraud and conspiracy. Such a cause of action – one based on the duty not to deceive – is permitted by Cipollone. The instant case, alleging fraud and conspiracy, falls within the scope of Cipollone allowed claims not preempted under Federal law.

C. Statute of Limitations

1. In general

The statute of limitations inquiry first requires a determination of "when the [plaintiffs] sustained the alleged injur[ies] for which they seek redress." In re Merrill Lynch Ltd.

Partnerships Litig. ("Merrill Lynch II"), 154 F.3d 56, 59 (2d Cir. 1998) (per curiam).

Determination of the limitations period turns on when the injuries were discovered or first discoverable by each class member. See Insurance Co. of N.Am. v. United States, 561 F.Supp. 106, 119 (E.D.Pa. 1983); see also Allstate Ins. Co. v. Mazzola, 175 F.3d 255, 260 (2d Cir. 1999) (insurer-subrogee's claims are "subject to whatever defenses the tortfeasor has against the insured") (quoting Great Am. Ins. Co. v. United States, 575 F.2d 1031, 1034 (2d Cir. 1978)). Statistical extrapolation may be utilized to address this factual issue.

To toll the limitations bar using the fraudulent concealment doctrine, a plaintiff must establish three things: (1) that it diligently and thoroughly investigated its claims in a timely manner; (2) that the defendants actively thwarted its investigation; and (3) that, despite its diligent investigation and other knowledge chargeable to it, the plaintiff had no notice of its claims throughout the limitations period. See Klehr v. A.O. Smith Corp., 521 U.S. 179, 194-96 (1997). A defense of fraudulent concealment fails if the plaintiff had either actual notice or its inquiry, or an inquiry it reasonably should have made, was not diligent and thorough. See, e.g., In re Merrill Lynch Ltd. Patnerships Litig. ("Merrill Lynch I"), 7 F.Supp.2d 256, 265-66 (S.D.N.Y. 1997) (dismissing claims of fraud against Merrill Lynch where investors were put on notice by prospectuses and reports). There is notice when, under the totality of the circumstances, "a reasonable [person] of ordinary intelligence would have discovered the existence of the fraud." Merrill Lynch II, 154 F.3d at 60 (quoting Dodds v. Cigna Securities, Inc, 12 F.3d 346, 350 (2d Cir. 1993)). A plaintiff's sophistication in the subject areas is relevant in determining reasonableness. See, e.g., Kinley Corp. v. Integrated Resources Equity Corp., 851 F.Supp. 556, 568 (S.D.N.Y. 1994) ("The Plaintiffs' sophistication in financial matters can be

considered in determining when inquiry notice was triggered."). Once the plaintiff is confronted with "evidence contradicting representations made to [it]," it is put on notice of its duty to investigate. Congregacion de la Mision Provincia de Venezuela v. Curi, 978 F.Supp. 435, 444 (E.D.N.Y. 1997); Kinley Corp., 851 F.Supp. at 567–68.

State laws' elements of a claim for fraudulent concealment, while not uniform, share many attributes of New York's law. See Restatement (Second) of Torts, §§ 550, 551 (1977). A plaintiff must prove that: (1) the defendant had a duty to disclose; (2) the defendant suppressed material facts; (3) the suppression induced the plaintiff to act or to refrain from acting; and 4) the plaintiff suffered damages as a proximate result of the defendant's conduct. See In re Prudential Insurance, 148 F.3d 283, 315 (3rd Cir. 1998) (claims for fraud are "substantially similar and any differences fall into a limited number of predictable patterns"); In re Cordis, 1992 WL 754061 at 14 (S.D. Ohio 1992) ("Although there are differences in the standards which govern . . . fraud, the similarities outweigh the differences.").

There are some variations. At least three alternative predicates create a duty to disclose: superior knowledge, partial disclosure, and fraudulent concealment. See California Jury Instructions (BAJI 12.36) (requiring duty to disclose); Georgia Pattern Jury Instructions (Chapter XIV, Sec. C) (same); Michigan Standard Jury Instructions § 128.02 (same); Wisconsin Jury Instructions § 2401 (same). Second, jurisdictions split over whether reliance is determined objectively or subjectively. Alaska, Michigan and Mississippi require that a plaintiff only prove that he or she relied on the misrepresentation. Georgia, Colorado, California, the District of Columbia, Illinois, Alabama and Maine also impose the more objective standard of justifiable reliance. See generally Simon v. Philip Morris, 124 F.Supp.2d at 72.

Equitable tolling is recognized throughout the law. Cf. National R.R. Passenger Corp. v. Morgan, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (allegation of hostile work environment may recover for entire time of harassment as long as one contributing act occurs within filing period).

    2.      Relation Back

Pleadings may be amended under the Federal Rules of Civil Procedure. Rule 15 provides a liberal rule of relation back that is limited primarily by whether defendants were misled to their detriment by a failure originally to fully plead the case. Under Rule 15(c):

> An amendment of a pleading relates back to the date of the original pleading when
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted . . . .

Although primarily invoked against attempts to add new defendants, Rule 15(c) applies to the addition of plaintiffs as well if defendants could reasonably have expected them to be added. Staggers v. Otto Gerdau Co., 359 F.2d 292, 297 (2d Cir. 1966); In re Integrated Resources Real Estate Ltd. Partnership Sec. Litig., 815 F.Supp. 620, 642 (S.D.N.Y. 1993) (Rule 15(c) extends to plaintiffs as long as defendants had reasonable notice of the existence of the proper party); SMS Financial, Ltd. Liability v. ABCO Homes, Inc., 167 F.3d 235, 244-45 (5th Cir. 1999). Although granted less frequently than amendments adding claims, Rule 15(c)(3) amendments adding defendants are granted when the following criteria are satisfied: 1) the claim or defense asserted in the amended pleading must arise from the same conduct, transaction, or occurrence as did the original pleading; 2) the new party named must have received adequate notice in order to avoid prejudice; 3) the new party must have known, or should have known, that the action would have

94

been brought against it but for a mistake; and 4) the notice and "should have known" factors must be satisfied within the period prescribed for service of process.

Where a new plaintiff party is added the same conduct, transaction or occurrence originally alleged as a basis for the action must be relied upon by the added plaintiff. Unfair prejudice to defendants from the naming of the new plaintiff seeking to join the action can block an amendment — that is essentially the obverse of 2), 3), and 4) must be shown as indicated below.

a.     Same conduct, transaction, or occurrence

The claim asserted for or against the newly added party must arise out of the same conduct, transaction, or occurrence as did the claim against the former parties. Fed. R. Civ. Pro. 15(c)(2), (3).

For example, although a worker had allegedly suffered both back and respiratory problems during his employment at sea, one claim could not relate back to the other because the injuries were unrelated and occurred at different times. See Mackensworth v. S.S. American Merchant, 28 F.3d 246, 251–52 (2d Cir. 1994). The same conduct test is satisfied if the claim involving the new party arose from the "same core of operative fact" as did the claim with respect to the former parties. See Clipper Express v. Rocky Mountain Motor Tariff Bureau, 690 F.2d 1240, 1259 n.29 (9th Cir. 1982). If the claim asserted with respect to the new party is based on the same set of facts, with only a different legal theory the test is satisfied. See Koal Inds. v. Asland S.A., 808 F.Supp. 1143, 1158 (S.D.N.Y. 1992). "Amendments that amplify or restate the original pleading or set forth facts with greater specificity should relate back." Moore, supra, at § 15.19[2]; see also, In re Chaus Sec. Litig., 801 F.Supp. 1257, 1264 (S.D.N.Y. 1992) (no relation

95

back when amendment contains new claims based on new facts and different transactions, but relation back if it amplifies facts in the original complaint).

> b.      Notice

The purpose of this requirement is to ensure that former parties are not unduly prejudiced by addition of a new party. See Fed. R. Civ. Pro. 15(c)(3)(A). Where a new plaintiff is named, prejudice to the defendants who could not reasonably expect this change will bar the amendment. In Main Street Associates v. Manko, 897 F.Supp. 1507 (S.D.N.Y. 1993), thirty-six plaintiffs were added in a RICO case subsequent to the expiration of the statute of limitations. Over defendants' objections, the court held that "late filed claims properly relate-back to timely filed claims as long as the amendment does not produce an unfair surprise to the defendant." Id. at 1521.

In Benfield v. Mocatta Metals Corp., 26 F.3d 19 (2d Cir. 1994), plaintiff, an options purchaser, sued a group of defendants for allegedly aiding and abetting a futures merchant who committed a fraud on the plaintiff. Plaintiff subsequently amended the complaint in order to add a RICO count to his charge, and to add as another plaintiff a purchaser who was similarly aggrieved. Although some of their claims were found to be time-barred, the court of appeals for the Second Circuit held that defendant could not assert the statute of limitations as a defense to the new plaintiff's RICO charge. For 15(c) to apply, the Court stated

> [T]here must be a sufficient commonality between [defendant's] alleged acts of commodity wrongdoing and [new plaintiff's] allegation of RICO violations to preclude a claim by [defendant] of unfair surprise. The allegations in the instant complaint satisfied this requirement. To a large extent, proof of [new plaintiff's] RICO cause of action would require evidence of the same or similar wrongful acts and the testimony of the same or similar witnesses as would proof of [defendant's] alleged Commodity Exchange Act violations. Although RICO requires more in the

96

way of evidence, proof of the RICO cause of action nonetheless involves evidence of the underlying fraudulent acts pleaded by [original plaintiff]. [Defendant] therefore was placed on notice that a RICO claim, based in large part on the fraud already alleged, might be made against it.

Id. at 23 (citations omitted).

        c.      Mistake

This provision, by its express language, appears not to be relevant when adding a plaintiff. The classic application of this criterion is when the proper defendant is already present, however, it was mis-named. Moore, supra, at § 15.19[3][d]. Another common situation involves mistaken identity, that is, plaintiff sues one defendant thinking it is the proper one, but later discovers that the proper defendant is actually different. In such instances, most courts allow relation-back. See Rebecca S. Engrav, Relation Back of Amendments Naming Previously Unnamed Defendants Under Federal Rules of Civil Procedure 15(c), 89 Cal. L. Rev. 1549, 1566 (2001). When new defendants are added because the plaintiff believes they too are liable, and when plaintiff substitutes the actual identity of the proper defendant after formerly labeling it "John Doe," relation-back is not permitted unless the actual substituted defendant was aware that it was the "John Doe." Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 469-70 (2d Cir. 1995); compare Byrd v. Abate, 964 F.Supp. 140, 145–46 (S.D.N.Y. 1997) (permitting substitution).

The addition of new plaintiffs will not be permitted if their addition would surprise and frustrate reasonable possibilities for a defense. In In re Bennett Funding Group, 194 F.R.D. 98, 100 (S.D.N.Y. 2000), the court held "that plaintiffs invoking the relation back doctrine [must] demonstrate that their failure to add new plaintiffs was the product of some mistake, rather than a deliberate decision." In that case, the plaintiffs were a class of investors who sought to amend

their complaint by changing their class to include other investors. Because the court found that their failure to add these plaintiffs originally was a calculated, strategic decision, it denied their motion. Id., See also Levy v. United States GAO, 1998 U.S. Dist. LEXIS 5567 (S.D.N.Y. 1998) (same).

The burden is on defendants to prove that it will suffer substantial prejudice in a legal sense as a result of adding new plaintiffs in a class action. Being amenable to greater awards is not "prejudicial" if the conduct relied upon does not change appreciably, defendants' opportunity to defend is not appreciably adversely affected, and the defendant should have appreciated that the new plaintiff's claims were similar to the ones originally stated and might well be prosecuted. In Sokolski v. Trans Union Corp., 178 F.R.D. 393, 398 (E.D.N.Y. 1998), the court held that:

> Where the asserted claims of the proposed additional plaintiffs are identical to those of the original plaintiff and arise from the same conduct, defendants will not be prejudiced in defending their claims. Defendants had adequate notice in the original complaint of the potential additional claims arising from their conduct. Consequently, defendants should be prepared to defend the class action against them and will not be prejudiced by the addition of the amendment. "As long as defendant is fully apprised of a claim arising from specific conduct and has prepared to defend the actions against him, he will not be prejudiced by the addition of new plaintiffs."

Id. (citations omitted).

d.     Service of Process

Service requirements when there is a newly added plaintiffs are not applicable.

Addition of different plaintiffs in the class definition do not implicate relation back limitations in the instant case since defendants have known from the outset that a global class and settlement was being attempted through this litigation. As indicated in Part IV, supra, the scope of the class has been gradually reduced as various plaintiffs' claims were dismissed. The class

involves essentially a narrowing of the plaintiff class rather than its expansion. Thus relation back to a time earlier than certification of the present class is appropriate.

D.  Res Judicata

The res judicata effects of the certification have not been briefed. These issues include the possibility of offsets or credits for punitive damage awards already paid in prior actions. Consideration of these issues should await decision of the Rule 23(f) appeal.

E.  Individualized Proof of Causation and Damages

Plaintiff's use of aggregate proof does not violate defendants' Constitutional rights. It is consonant with New York law. The appropriateness of such proof has been analyzed in numerous memoranda by this court. See, e.g., Blue Cross, 178 F.Supp.2d 198. Three years of coordinated discovery among nine related tobacco cases and two full trials, has strengthened the conclusion that statistical proof combined with other evidence is a necessary, pragmatic and evidentiary approach that reflects full due process in this and many other massive tort cases. It is consistent with the defendants' Constitutional rights and legally available to support plaintiffs' state law claims.

The idea that due process and jury trial rights require a particularized traditional form of evidence for each element would make this case and cases like it impossible to try. There is little harm in retaining a requirement for "particularistic" evidence of causation and damages in sporadic individual accidents where there are few medical histories and witnesses; such evidence is almost always available and convenient in such litigation. See, e.g., In re Agent Orange Prod. Liab. Litig., 597 F. Supp. 740, 832-34 (E.D.N.Y. 1984). Even in such cases, of course, use of almost any experts, whether doctors or DNA masters, depend upon implied or express

probabilistic underpinning of their professional judgments.

In mass exposure cases with hundreds of thousands or millions of injured the cost of one-on-one procedures is insuperable and unsuitable for either a jury or a bench trial. The consequence of requiring individual proof from each smoker would be to allow defendants who have injured millions of people and caused billions of dollars in damages, to escape almost all liability. As Professor Rosenberg noted almost a score of years ago, such restrictions in the form of admissible evidence is impractical and unnecessary:

> The concept of "particularistic" evidence suggests that there exists a form of proof that can provide direct and actual knowledge of [the parties' conduct]. "Particularistic" evidence, however, is in fact no less probabilistic than is the statistical evidence that courts purport to shun.

David Rosenberg, The Causal Connection in Mass Exposure Cases: A 'Public Law' Vision of the Tort System, 97 Harv. L. Rev. 851, 870 (1984) (footnotes omitted). Many commentators agree. See, e.g., Peter Tillers, Symposium: Artificial Intelligence and Judicial Proof, 22 Cardozo L. Rev. 1365 (2001) (describing tendency of evidence scholars to rely on mathematical and quantitative methods, such as probability theory, statistics, and decision theory); Louis Kaplow & Steven Shavell, Fairness Versus Welfare, 114 Harv. L.Rev. 961, 1203 n.580 (2001); Laurens Walker & John Monahan, Sampling Liability, 85 Va. L. Rev. 329 (1999) (using statistical evidence is a reliable and practical method for mass trial); Robert G. Bone, Statistical Adjudication: Rights, Justice, and Utility in a World of Process Scarcity, 46 Vand. L.Rev. 561 (1993); Johnathan J. Koehler & Daniel Shaviro, Veridical Verdicts: Increasing Verdict Accuracy Through the Use Of Overtly Probabilistic Evidence and Methods, 75 Cornell L. Rev. 247, 248 (1990) (although courts should carefully determine the validity of probabilistic evidence, "overtly

probabilistic evidence is no less probative of legally material facts than other types of evidence"); Michael J. Saks & Robert F. Kidd, Human Information Processing and Adjudication: Trial By Heuristics, 15 L. & Soc'y Rev. 123, 151 (1989-1990) ("Much of the testimony that is commonly thought of as particularistic only seems so. It is far more probabilistic than we normally allow jurors (or judges) to realize."); cf. The Evolving Role of Statistical Assessments as Evidence in the Courts 78- 79 (Report of the American Academy of Science Panel on Statistical Assessments as Evidence in the Courts) (Stephen E. Feinberg ed. 1989) (noting the contradiction between some courts' insistence on evidence that seems certain, and such "probabilistic" institutions as plea bargaining, in which decisions are made on the basis of "probable" outcome). But see the objections subsequently mainly rejected by academics and courts, in Laurence H. Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L. Rev. 1329 (1971). See generally Federal Judicial Center, Manual for Complex Litigation (Third) 99–108 (1995).

The Federal Rules of Civil Procedure and the Federal Rules of Evidence grant district judges broad authority to shape the nature and scope of admissible evidence for trial. Scientific evidence – such as the sampling and statistical extrapolations – is well suited to mass tort actions. It is particularly appropriate in massive consumer fraud cases – so long as it passes the gate-keeping criteria described in the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) and related cases.

Many states have provided special mechanisms for handling consumer fraud claims in the aggregate, recognizing that many such claims cannot be economically tried individually. When, as in the case at bar, the plaintiffs are a widely spread group suffering injury from a common action of defendants, statistical analysis may provide a more accurate and comprehensible form

of evidence than would the testimony of millions of individual smokers. See Blue Cross & Blue Shield of N.J., Inc, 133 F. Supp. 2d at 172 (explaining propriety of statistical extrapolation for entity suffering damages in aggregate); Blue Cross & Blue Shield of N.J., Inc, 36 F. Supp. 2d at 575 (E.D.N.Y. 1999) ("[t]he aggregation of millions of alleged injuries in the instant suit can be expected to yield more accurate results with respect to the causation issue since projections based upon a large statistical base will be available, thus reducing the size of the possible error"). Extrapolated claim yields in the aggregate can with appropriate approximations provide a reliable estimate of total health care costs based upon individual claims. Laurens Walker & John Monahan, Sampling Liability, 85 Va. L. Rev. 329 (1999).

Resolving mass tort disputes on a case-by-case basis may create a systematic bias against plaintiffs because, "[w]hile defendants spread the risk of adverse judgments across all test trials, each trial decides the fate of each plaintiff party on a single roll of the dice." David Rosenberg, Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't, 37 Harv. J. on Legis. 393, 430 (2000); Marc Galanter, Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change, 9 L. & Soc'y Rev. 95 (1974) (importance of defendants role as repeat players). The defendant who successfully resolves a mass tort dispute with aggregate tools enjoys the economic benefit of a final resolution to all proceedings, not just a single case. Cf. Simon v. Philip Morris Inc., 200 F.R.D. 21, 43-46 (E.D.N.Y. 2001) (discussing public policy supporting aggregation).

 1. Federal Rules of Civil Procedure and Evidence

A trial court has wide discretion to manage pre-trial discovery. See Cruden v. Bank of New York, 957 F.2d 961, 972 (2d Cir. 1992). The Federal Rules of Civil Procedure grant a

district court judge flexibility to shape the type and scope of information available before and during a complex trial. See Manual For Complex Litigation, Third § 21.422 (2000). The Rules contemplate the trial or magistrate judge's setting time limits and restrictions on the quantity, scope, and the sequencing of discovery. See Fed. R. Civ. P. 1 (Rules to be construed and administered to secure "just, speedy, and inexpensive determination of every action"); Fed. R. Civ. P. 16(b) (limiting the time for, and other aspects of, discovery in pretrial conference); Fed. R. Civ. P. 26(b)(2) (court to limit "frequency or extent of use of discovery methods."); Fed R. Civ. P. 30(a) & 33 (establishing presumptive limits for depositions and interrogatories); cf B.F. Goodrich v. Betkoski, 99 F.3d 505, 523-24 (2d Cir. 1996) (not abuse of discretion to limit discovery in CERCLA case involving more than 1,000 parties when extensive discovery would make litigation expense disproportionate to cost of cleaning up landfill).

The Manual For Complex Litigation specifically recommends "limiting discovery that is cumulative, duplicative, more convenient or less burdensome or expensive to obtain from another source, or seeks information the party has had ample opportunity to obtain." Manual For Complex Litigation, Third § 21.421. A balance must be struck between the burden and expense of discovery sought and its potential benefit. Limiting discovery under the Federal Rules confronts litigants with hard choices. Some discovery necessarily must be foregone or structured in complex litigation if massive cases are to be expeditiously resolved. The goal in a federal court should be to fairly decide claims based on the merits, not on informational costs associated with the deposition of millions of witnesses. See Laurens Walker & John Monahan, Sampling Liability, 85 Va. L. Rev. 329, 350 (1999) (promoting methods to overcome high information search costs to reach merits). According to the Manual For Complex Litigation:

> In determining the appropriate limits, the court will need to confront difficult questions of balancing efficiency and economy against the parties' need to develop an adequate record for summary judgment or trial. The difficulty of this task should not deter the judge from undertaking it, but it underlines the importance of clarifying and understanding the issues in the case before imposing limits.

Manual For Complex Litigation, Third § 21.422 (2000). It is particularly important not to deny the courts the ability to take advantage of cost saving through modern scientific techniques for acquiring information. See, e.g., Federal Judicial Center, Reference Manual, supra; Introduction by Steven Breyer, id.; Margaret A. Berger, The Supreme Court's Trilogy on the Admissibility of Expert Testimony, id; William W. Schwarzer & Joe S. Cecil, Management of Expert Testimony, id.; David H. Kaye & David A. Freedom, Reference Guide On Statistics, id.; Shari Seidman Diamond, Reference Guide on Survey Research, id.

The trial judge is a primary protector against excessive transactional costs in litigation. She or he has broad powers under the Federal Rules of Evidence to regulate the admission of expensive cumulative evidence at trial. See Fed. R. Evid. 403 (restricting cumulative evidence); Fed. R. Evid. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence"); Fed. R. Evid 1006 (allowing writings, recordings, or photographs which cannot be conveniently examined in court to be presented in the form of "chart[s], summar[ies] or calculation[s]").

Although the manner of presenting evidence is best left to counsel, Rule 611 of the Federal Rules of Evidence entrusts the trial judge with the "ultimate responsibility" for the efficient ascertainment of truth by authorizing the exercise of reasonable control over the presentation of evidence. See Margaret A. Berger, et al., Evidence § 611.02 (2000); Original Advisory Committee Note to Fed. R. Evid. 611 ("ultimate responsibility for the effective

working of the adversary system rests with the judge"); Civil Trial Practice Standard 16 ABA (1998) (court should encourage multiple parties to cooperate in, coordinate, and streamline the presentation of evidence). The wording of Rule 611 is broad enough to authorize innovations in the presentation of evidence provided the court considers ways to limit prejudice to the parties. Berger, et al., Evidence § 611.02 (citing cases). Trial court decisions under Rule 611 of the Federal Rules of Evidence are virtually immune from attack on the grounds of Constitutional due process – particularly in the civil context – and are only challengeable upon a finding that the abuse of discretion substantially denigrated a party's right to a fair trial. United States v. Vinson, 606 F.2d 149, 155 (6th Cir. 1979); United States v. Wiener, 578 F.2d 757, 766 (9th Cir. 1978).

2.    Appropriateness of Sampling and Survey Techniques

Sampling and survey techniques are a well-accepted alternative for the trial judge facing crippling discovery and evidentiary costs. Manual for Complex Litigation, Third § 21.422 ("statistical sampling techniques may be used to measure whether the results of the discovery fairly represent what unrestricted discovery would have been expected to produce"), § 21.493 ("The use of acceptable sampling techniques in lieu of discovery and presentation of voluminous data from the entire population, may produce substantial savings in time and expense."); David H. Kaye & David A. Freedom, Reference Guide On Statistics, supra.; Shari Seidman Diamond, Reference Guide on Survey Research, supra; Hans Zeisel & David Kaye, Statistics for Social Science and Public Policy, Empirical Methods in Law and Litigation (1997); see, also, e.g., Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (using statistical data to prove discrimination in jury selection); Zippo Manufacturing Co. v. Roger Imports, 216 F. Supp. 670 (S.D.N.Y. 1963) (relying on sampling methodology) (Feinberg, J.); United States v.

449 Cases Containing Tomato Paste, 212 F.2d 567 (2d Cir. 1954) (approving inspector's testing of samples, rather than requiring the opening of all cases); Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 653-57 (5th Cir. 1983) (using census data in gender discrimination case); Exxon Corp. v. Texas Motor Exch., Inc., 628 F.2d 500 (5th Cir. 1980) (using statistical sampling in trademark infringement suit); Stewart v. General Motors Corp., 542 F.2d 445 (7th Cir. 1976); In re Estate of Ferdinand Marcos, Human Rights Litigation, 910 F. Supp. 1460 (D.Haw. 1995) (using sampling to determine compensatory damages through extrapolating "exposure" element of liability), aff'd sub nom Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996); Ageloff v. Delta Airlines, Inc., 860 F.2d 379 (11th Cir. 1988) (using evidence of life-expectancy tables to determine damages); G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1538-40 (11th Cir. 1985) (using expert testimony for profit projections based on industry norms); Newberg on Class Actions § 10.05 (when aggregate proof of damages is sought to be proved on behalf of a class, no special or unique rules of evidence are involved.). In some cases sampling techniques may prove the only practicable way to collect and present relevant data. See Harold Stores v. Dillard Dep't Stores, 82 F.3d 1533, 1544 (10th Cir. 1996); Manual for Complex Litigation, Third § 21.493 (2000).

Surveys and sampling techniques have been admitted in a large variety of actions to establish causation so long as they accord with Daubert and Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702; Daubert, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); see also Reference Manual, supra; Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (statistical data to prove discrimination in jury selection); Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F. Supp. at 670 (survey data in trademark infringement case); Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F.Supp. 1189 (E.D.N.Y. 1983) (factors for examining

the trustworthiness of a survey); <u>Friesland Brands, B.V. v. Vietnam National Milk Co.</u>, –

F.Supp.2d – (S.D.N.Y. 2002) (relying on <u>Toys R Us</u>). The <u>Toys R Us</u> factors are whether:

> (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured.

<u>Toys R Us</u>, 559 F. Supp. at 1205. "The Toys R Us criteria are typically used by courts to analyze

the weight to be accorded a survey, not its admissibility under Rule 403." <u>Friesland</u>, – F.Supp.2d

– at n.1.

Properly developed survey evidence is admissible subject to arguments regarding its

weight and probative value. <u>Schering Corp. v. Pfizer, Inc.</u>, 189 F.3d 218, 224 (2d Cir. 1999)

(citing cases); <u>McNeilab Inc. v. American Home Prods. Corp.</u>, 848 F.2d 34, 38 (2d. Cir. 1988).

The question of whether such surveys in combination with other evidence is sufficiently

probative is to be left to the jury in accordance with the "general standards for judgment as a

matter of law," once the court has determined the study is viable under Federal Rule of Evidence

702. <u>In re Joint E. & S. Dist. Asbestos Litig.</u>, 52 F.3d 1124, 1132 (2d Cir. 1995) (permitting

statistical evidence to go to jury); <u>see generally</u> Michael O . Finklestein & Bruce Levin, <u>Statistics</u>

<u>for Lawyers</u> vii (2d ed. 2001) (wide expansion of statistics used in trials over past decade).

The use of statistical evidence and methods in the American justice system to establish

liability and damages is appropriate, particularly in mass injury cases such as this one. <u>See, e.g.</u>,

<u>In re Chevron U.S.A., Inc.</u>, 109 F.3d 1016, 1019-20 (5th Cir. 1997) (use of statistics to draw

inferences about the claims of 3,000 plaintiffs and intervenors who claimed wrongful death,

personal injury, and property contamination from defendant's storage of hazardous substances which had leaked from crude oil waste pits and migrated into the plaintiffs' drinking water supply). But see Hilao v. Estate of Marcos, 103 F.3d 767, 788 (9th Cir. 1996) (Rymer, J., dissenting) ("I cannot believe that a summary review of transcripts of a selected sample of victims who were able to be deposed for the purpose of inferring the type of abuse, by whom it was inflicted, and the amount of damages proximately caused thereby, comports with fundamental notions of due process."); In re Fibreboard Corp., 893 F.2d 706, 710 (5th Cir. 1990) ("[T]he assumption of plaintiffs' argument is that its proof of omnibus damages is in fact achievable; that statistical measures of representativeness and commonality will be sufficient for the jury to make informed judgments concerning damages.") (emphasis in original).

Greater reliance on statistical methods is required by the profound evolution in our economic communication and data compilation and retrieval systems in recent decades. See generally Deborah R. Hensler & Mark A. Peterson, Understanding Mass Personal Injury Litigation: A SocioLegal Analysis, 59 Brook. L. Rev. 961 (1993). Manufacturers now mass produce goods for consumption by millions using new chemical compounds and processes, creating the potential for mass injury. Modern adjudicatory tools must be adapted to allow the fair, efficient, effective and responsive resolution of the claims of these injured masses. See, e.g., In re DES Cases, 789 F. Supp. 548 (E.D.N.Y. 1992) (market share liability applied in suits for defective design of diethylstilbestrol (DES)); In re Joint E. & S. Dist. Asbestos Litig., 726 F. Supp. 426 (E. & S.D.N.Y. 1989) (computation of damages for Brooklyn Navy Yard asbestos victims); In re "Agent Orange" Product Liability Litig., 689 F. Supp. 1250 (E.D.N.Y. 1988) (distribution scheme for victims of agent orange); see also Manual for Complex Litigation, Third

§§ 33.21-29 (2000) (mass torts); Kenneth R. Feinberg, <u>Lawyering in Mass Torts</u>, 97 Colum. L. Rev. 2177, 2177 ("mass torts [litigation] requires something more than the traditional view of lawyering ...."); <u>see generally</u> Howard M. Erichson, <u>Mass Tort Litigation and Inquisitorial Justice</u>, 87 Geo. L.J. 1983, 1986 (1999) ("[R]ecent trends in mass tort litigation may hint at an evolution toward greater use of inquisitorial tools within the context of the U.S. adversary system."); Richard A. Nagareda, <u>In the Aftermath of the Mass Tort Class Action</u>, 85 Geo. L.J. 295 (1996).

State legislatures, courts, and commentators have recognized that tools for aggregation are especially helpful in the context of consumer fraud, when the relatively low value of specific claims or the litigation advantages of a well-financed defendant can discourage individuals from pressing their claims in court. <u>See</u> Fla. Stat. Ann. §409.910 (West 1998) (responsibility for payments on behalf of Medicaid-eligible persons when other parties are liable); Md. Code Ann., Health-Gen. I §15-120 (West 1998) (same); Vt. Stat. Ann. tit. 33, §1911(f)(5) (same); <u>see also</u> <u>Group Health Plan v. Philip Morris Inc.</u>, 621 N.W.2d. at 15 ("To impose a requirement of proof of individual reliance in the guise of causation would reinstate the strict common law reliance standard that we have concluded the legislature meant to lower for these statutory actions."); <u>Walker v. Nat'l. Recovery Inc.</u>, 200 F.3d 500 (7th Cir. 1999); <u>Agency for Health Care Admin. v. Associated Indus. of Florida</u>, 678 So. 2d 1239 (Fla. 1996) (aggregation of fraud claims to recover medical expenses conformed to due process); Samuel Issacharoff, <u>Group Litigation of Consumer Claims: Lessons From the U.S. Experience</u>, 34 Tex. Int'l L.J. 135 (1999) (limited resources and incentives for consumers acting individually); Laurens Walker & John Monahan, <u>Sampling Liability</u>, 85 Va. L. Rev. 329 (1999).

<u>City of Birmingham v. American Tobacco Co.</u>, 10 F. Supp. 2d 1257 (N.D. Ala. 1998), heavily relied upon by defendants, does not apply because that case does not address the issue of statistical sampling. The court held – at the pleading stage – that the city could not recover for all employees under its state statute, only for some. The denial of summary judgment as to some of the city's claims in that case did not disallow the use aggregate proof to try the remaining issues.

In the bulk of the third-party tobacco cases that contemplated discovery and trial, courts have properly limited the level of individual proof available. <u>Northwest Laborers Employers Health and Sec. Trust Fund v. Philip Morris Inc.</u>, No. C97-849 (W.D. Wash. Mar. 18, 1999) (Order On Defendants' Motion to Compel Discovery Re Individual Fund Participants) ("[d]efendants' motion to compel discovery regarding individual fund participants would impose an enormous burden on all parties and effectively would bring the litigation to a halt"); <u>West Virginia-Ohio Valley Area IBEW Welfare Fund v. American Tobacco Co.</u>, No. 97-0978 (S.D.W.Va., May, 1999) (rejecting defendants' motion to depose every member of union trust fund); <u>In re Mike Moore, Attorney General ex rel. State of Mississippi Tobacco Litigation</u>, No. 94-1429 (Miss. Apr. 18, 1996) (Order on Defendant's Motion to Compel Initial Discovery Limited Number of Medicaid Recipients on Health Care Provided by the State of Mississippi) (permitting disclosure of identity and information of limited number of Medicaid recipients); <u>State v. Philip Morris Inc.</u>, No. Cl.-94-8565 (Minn. Dec. 21, 1995) (Order to Compel Limited Depositions of Medicaid Recipients) (limiting depositions for defendants); <u>see</u> Laurens Walker & John Monahan, <u>Sampling Liability</u>, 85 Va. L. Rev. 329 (1999) (approving the use of sampling in pre-trial and at trial in tobacco litigation). Limits on individualized proof are recognized in other types of cases. <u>See</u> Howard Ross Cabot & Alan A. Matheson Jr., <u>The Use of Statistics to Wrest</u>

110

Control Over the Trial of Mass Damage Claims, 7 Inside Litig. at 16 (Mar. 1993) (dealing with approximately 17,000 property damage subrogation lawsuits arising from a chemical explosion, proposed trial plan would use stratified sampling of the insurance claims at issue).

Against this backdrop, the use of statistical evidence in the instant case violates neither the Constitutional guarantee of due process nor the Constitutional right to a jury trial. See In re Chevron U.S.A., Inc., 109 F.3d at 1020 ("[t]he applicability of inferential statistics have long been recognized by the courts"; collecting cases); Laurens Walker & John Monahan, Sampling Damages, 83 Iowa L. Rev. 545, 546 (1998) ("[A] complete solution of the numbers problem in mass torts can only be achieved by . . . randomly sampling damages without apology."); cf. In re Matter of Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1304 (7th Cir. 1995) (noting with approval idea of a "sample of trials"); Consorti v. Armstrong World Industries, 72 F.3d 1003, 1006 (2d. Cir. 1995) ("consolidation permits the federal court to furnish trials in hundreds, even thousands of cases it might otherwise not reach for many years. If carefully and properly administered . . . consolidation is also capable of producing, with efficiency and greatly reduced expense for all parties, a fairer, more rational and evenhanded delivery of justice."), rev'd on other grounds, 518 U.S. 1031 (1996); Malcolm v. National Gypsum, Co., 995 F.2d 346, 355 (2d Cir. 1993) (Walker, J., dissenting) ("Consolidated trials are an indispensable means of resolving the thousands of asbestos claims flooding our state and federal courts, as well as claims arising from other types of mass torts."). The Supreme Court has spoken favorably of the science behind sampling and statistical analysis. See Utah v. Evans, – U.S. –, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002) (noting extensive technical literature on sampling); United States v. Fior D'Italia, Inc., – U.S. –, 122 S.Ct. 2117, 153 L.Ed.2d 280 (2002) (using aggregate estimation).

3.    Due Process

"'Due Process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) ("The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."). Whether a procedural device utilized where a private party invokes state authority to deprive another person or entity of property comports with due process is determined by a balancing of interests:

> [F]irst, consideration of the private interest that will be affected by the [procedure]; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, . . . principal attention to the interest of the party seeking the [procedure], with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections.

Connecticut v. Doehr, 501 U.S. 1, 11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); see also Hilao, 103 F.3d at 786.

Consideration of the private interests at issue counsels in favor of utilizing statistical methods. Tobacco companies admittedly have an interest in not paying for damages in excess of what alleged misconduct may have caused; that interest would be furthered by their confronting (before a jury) each of the hundreds of thousands of plaintiffs who suffered smoking-related illnesses with respect to their reliance on tobacco company misstatements and omissions, and about their discovery of their injuries (so as to precisely determine in each instance when the statute of limitations started to run).

Practical considerations temper the weight of tobacco companies' interest, however. If

such an individualized process were undertaken, it would have to continue beyond all lives in being. Assuming tobacco companies were willing to expend the resources and monies necessary both in discovery and at trial to mount such an undertaking, the litigation costs in doing so would far exceed any monies saved by avoiding erroneous payments especially given appropriate statutes of limitations. See supra Part V.C. (discussing statutes of limitations).

Transactional costs would be enormous. Much of these costs would be borne by the public through financing of a court system that would require expansion.

The interest of plaintiffs in avoiding the additional litigation costs that would arise if defendants were permitted to confront each possible plaintiff at trial is enormous. The necessary additional litigation costs plaintiffs would have to bear would consume much of any recovery from defendants, making continued pursuit of the litigation fruitless. See, e.g., Hilao, 103 F.3d at 786 ("[Plaintiffs'] interest in the use of the statistical method . . . is enormous[] since adversarial resolution of each class member's claim would pose insurmountable practical hurdles.").

The interests of the injured plaintiffs must be considered. Requiring individual proof as to each claim would unnecessarily intrude on the lives of hundreds of thousands of people. Examining each grain of sand is too burdensome in a survey of a beach.

The second element of the due process balancing test — examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards — also supports allowance of the proffered statistical proof, subject to appropriate Daubert challenges. See Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); see also Falise v. American Tobacco Co., 107 F.Supp.2d 200 (E.D.N.Y. 2000); cf. International Bhd. of Teamsters, Local 734 v. Philip Morris

113

<u>Inc.</u>, 196 F.3d 818, 823 (7th Cir. 1999) ("Statistical methods could provide a decent answer —

likely a more accurate answer than is possible when addressing the equivalent causation question

in a single person's suit.").

Experts have developed appropriate modeling techniques for reaching statistically

significant and reliable conclusions. <u>See</u> Michael O. Finkelstein & Bruce Levin, <u>Statistics for

Lawyers</u> §§ 5.6-5.12, at 170-86 (1990) (confidence intervals); <u>id.</u> §§ 9.1-9.8, at 258-83

(sampling); <u>id.</u> §§ 12.1-12.37, at 323-464 (1990) (regression modeling); David H. Kaye and

David A. Freedman, Reference Guide on Statistics, <u>in</u> <u>Reference Manual 1994</u>, <u>supra</u>, at 331;

Daniel L. Rubinfeld, Reference Guide on Multiple Regression, <u>in</u> <u>Reference Manual 1994</u>, <u>supra</u>,

at 415; <u>see generally</u> Geoffrey R. Norman & David L. Streiner, <u>PDQ Statistics</u> 27-77 (1986)

(statistical inference and regression analysis).

In the <u>Blue Cross</u> case, such techniques were employed to ensure that the ultimate

damages projected by statistical models was within a narrow percent (either higher or lower) of

the actual damage caused by defendants' alleged misconduct. <u>See</u> <u>Blue Cross</u>, 178 F.Supp.2d at

286–89. The jury's evaluation of this data was conservative and helpful to defendants.

In addition to statistical evidence, parties will be permitted to present to the jury relevant

lay testimony, expert testimony, and documentary evidence — subject to the constraints of the

Federal Rules of Evidence and the practical considerations of trial management.

The third due process consideration — regard for any interest the government may have in

procedures — heavily weighs in support of allowing plaintiffs to rely on statistical evidence. A

consolidated trial with full presentation of the individual facts of each of plaintiffs' claims

relating to smoking-related illnesses before a single jury would be unmanageable. <u>See</u> <u>Manual

for Complex Litigation § 22.3, at 136 ("Although the presentation of the evidence at trial is normally controlled by the strategies and tactics of counsel, in complex litigation other considerations also require attention, primarily jury comprehension and the length of the trial. These are not unrelated concepts, since a shorter trial promotes jury comprehension, and effective presentation saves time."); Joe S. Cecil, Valerie P. Hans & Elizabeth C. Wiggins, Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials, 40 Am. U. L. Rev. 727, 764 (1991) ("[T]he overall picture of the jury [in complex cases] that emerges from the available data indicates that juries are capable of deciding even very complex cases, especially if procedures to enhance jury competence are used."). Hundreds-of-thousands of separate trials brought by individuals who suffered a smoking-related illness would prove unnecessarily burdensome; it would "clog the docket of the district court for years." Hilao, 103 F.3d at 786-87; see also Laurens Walker & John Monahan, Sampling Liability, 85 Va. L.Rev. 329, 343 (1999) ("Individualized information should be used where it is practical — i.e., cost effective — to obtain. If individual information is not practical to obtain, however, sampling should be used so that a judgment can be reached efficiently and expeditiously.").

Under the balancing test set forth in Doehr, the use of statistical evidence (subject to satisfaction of the Daubert criteria) by plaintiffs does not violate due process strictures. See Michael J. Saks & Peter David Blanck, Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts, 44 Stan. L.Rev. 815, 826-832 (1992) (statistical sampling comports with due process in mass aggregation cases).

The interests of the private parties, the accuracy of the procedures, and an efficient use of court resources argue in favor of using statistical models along with individual deposition lay

testimony, expert testimony, and documentary evidence. See Connecticut v. Doehr, 501 U.S. 1, 11 (1991); see, also e.g., Hilao, 103 F.3d at 786 (balancing due process interests); Michael J. Saks & Peter David Blanck, Justice Improved, 44 Stan. L. Rev. 815, 826-32 (1992) (statistical sampling comports with due process in mass aggregation cases).

Several thorough and prolonged hearings in the Blue Cross litigation established that the statistical models used there satisfied Daubert and could be used in combination with individualized evidence to satisfy each element of that plaintiff's cause of action. See, e.g., Blue Cross & Blue Shield of N.J., Inc v. Philip Morris Inc., et al., No. 98 CV 3287, 2000 WL 1880283 (E.D.N.Y. Dec. 27, 2000); Blue Cross & Blue Shield of N.J., Inc v. Philip Morris Inc., No. 98 CV 3287, 2000 WL 1805359 (E.D.N.Y. Dec. 11, 2000); Blue Cross & Blue Shield of N.J., Inc v. Philip Morris Inc., No. 98 CV 3287, 2000 WL 1738338 (E.D.N.Y. Nov. 1, 2000); Falise v. The Am. Tobacco Co., No. No. 99 CV 7392, 2000 WL 1804602 (E.D.N.Y. Nov. 30, 2000); Falise v. The Am. Tobacco Co., 107 F. Supp. 2d 200 (E.D.N.Y. July 28, 2000). Since the plaintiffs' claims were ultimately based on consolidated proof of their clients' individual claims, there appears to be no good reason why the proofs in the Blue Cross trial should not be available in the current case.

### 4. Jury Right

The use of aggregated proof in plaintiffs' claims does not violate the Seventh Amendment. A contrary view would require concluding that the Constitution establishes fixed limitations on the methods of proof a particular party may offer. Requiring such a horse and buggy interpretation for trials in a computer-guided-rocket age seems somewhat far-fetched. Courts cannot ignore and deny themselves what the rest of the world relies upon in fact-finding.

The Seventh Amendment of the Constitution protects the right to a jury trial. It reads:

> In suits at common law, where the value in controversy shall exceed twenty Dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII. The Amendment "was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions." See Galloway v. United States, 319 U.S. 372, 392, 63 S.Ct. 1077, 87 L.Ed 1458 (1943); Ex parte Peterson, 253 U.S. 300, 309-12, 40 S.Ct. 543, 64 L.Ed. 919 (1920).

Over the past two centuries, the primary concern in interpreting the Seventh Amendment has been to preserve the jury's role as a finder of fact, without constitutionally freezing evidentiary and trial procedures. Justice Brandeis expounded on the necessity of adapting the jury trial right to contemporary realities in Ex parte Peterson:

> [The Seventh Amendment] does not prohibit the introduction of new methods for determining what facts are actually in issue, nor does it prohibit the introduction of new rules of evidence. . . . New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. Indeed, such changes are essential to the preservation of the right. The limitation imposed by the Amendment is merely that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with.

Id. at 309-10 (citations omitted); see also Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 436 n.20, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("If the meaning of the Seventh Amendment were fixed at 1791, our civil juries would remain, as they unquestionably were at common law, twelve good men and true.") (internal citations and quotations omitted); Margaret L. Moses, What The Jury Must Hear: The Supreme Court's Evolving Seventh Amendment Jurisprudence,

68 Geo. Wash. L. Rev. 183, 199-208 (2000) (citing cases); Austin Wakeman Scott, <u>The Reform of Civil Procedure</u>, 31 Harv. L. Rev. 669, 671-78 (1918) (describing historical evolution of jury trials).

The historical record demonstrates that the framers' main objective in drafting the Seventh Amendment was to limit the ability of an appellate court to overturn a civil jury's finding of fact. There is no indication they intended to constrain the trial judge's substantial discretion to employ appropriate procedural mechanisms in managing a trial so as to permit the jury to arrive at the truth – or as near to the truth as time and humankind's limitations allow. <u>See</u> <u>Simon v. Philip Morris Inc.</u>, 200 F.R.D. 21, 33 (E.D.N.Y. 2001).

Chief Justice Rehnquist has observed that whatever procedural changes are made, they cannot be allowed to invade the "jury's province" – its fact-finding power. <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 345-46, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting). Yet, the jury has unquestionably had much of its fact-finding authority attenuated indirectly through various evolving "procedural devices." Fed. R. Evid. 104(a) (judicial discretion to bar evidence that fails conditional relevancy); Fed. R. Evid. 403 (judicial discretion to bar cumulative, irrelevant, prejudicial information); Moses, <u>What The Jury Must Hear</u>, 68 Geo. Wash. L. Rev. at 205; Edward J. Imwinkelried, <u>Trial Judges – Gatekeepers or Usurpers? Can the Trial Judge Critically Assess the Admissibility of Expert Testimony Without Invading the Jury's Province to Evaluate The Credibility and Weight of the Testimony?</u>, 84 Marq. L. Rev. 1 (2000) (<u>Daubert</u> may limit jury's fact finding role); Lisa S. Meyer, <u>Taking the "Complexity" Out of Complex Litigation: Preserving the Constitutional Right to a Civil Jury Trial</u>, 28 Val. U. L. Rev. 337 (1993) (juries replaced by bench trials in complex cases). The increasing use of bench trials,

<u>Daubert</u> hearings, summary judgments, and directed verdicts – as authorized by appellate courts – to limit fact finding and set aside verdicts poses a threat to the continued viability of the Seventh Amendment jury trial. The development of new fair procedures that accord with modern statistical and informational gathering techniques for making factual determinations does not.

Courts must be especially careful not to hobble the jury system by excluding potential evidence. Prematurely cutting off the flow of evidence to the jury generally favors defendants, who do not have the burden of proof on most issues, leading not only to a violation of the Constitution, but a tilting of the scales of justice. <u>See</u>, <u>e.g.</u>, John Caher, <u>Court Seen As Slow In Expanding Tort Claims, Criminal Defendant's Rights</u>, N.Y. L.J., Jul. 24, 2001, at 1 (describing trend against private litigants in decisions by New York Court of Appeals); Margaret A. Berger, <u>Upsetting the Balance Between Adverse Interests: Expert Testimony in Toxic Tort Litigation</u>, 64 L. & Contemp. Probs. 289, 326 (2001) (discussing <u>Daubert</u>; "The Supreme Court's trilogy on expert proof has empowered federal judges to adjust the balance in toxic tort cases to favor defendants . . . by . . . converting rulings on the admissibility of evidence into rulings on the sufficiency of evidence. The result is that the critical issue of causation in toxic tort is being decided by federal judges, not . . . jurors, and in pretrial proceedings, rather than at trial."); Kevin M. Clermont & Theodore Eisenberg, <u>Appeal from Jury or Judge Trial: Defendants' Advantage</u>, 3 Am. L. & Econ. Rev. 125, 128 (2001) (appellate courts are more inclined to overturn plaintiff's verdicts because of perceived pro-plaintiff bias by juries); Kevin M. Clermont & Theodore Eisenberg, <u>Anti-Plaintiff Bias in the Federal Appellate Courts</u>, 84 Judicature 128 (2000) (same); Lucinda M. Finley, <u>Guarding the Gate To The Courthouse: How Trial Judges are Using Their</u>

Evidentiary Screening Role to Remake Tort Causation Rules, 49 DePaul L. Rev. 335, 337 (1999) (evidentiary gate-keeping "substantially increases plaintiffs' burden of proving individual causation, and it also furthers the trend in toxic tort cases to shift the allocation of power away from juries to judges"); Samuel Issacharoff & George Lowenstein, Second Thoughts About Summary Judgment, 100 Yale L.J. 73, 75 (1990) ("[L]iberalized summary judgment inhibits the filing of otherwise meritorious suits and results in a wealth transfer from plaintiffs as a class to defendants as a class."); Jeffrey W. Stempel, A Distorted Mirror: The Supreme Court's Shimmering View of Summary Judgment, Directed Verdict, and the Adjudication Process, 49 Ohio St. L.J. 95, 99 (1988) (describing Supreme Court's 1986 trilogy of summary judgment cases as "faulty and ill-conceived in light of the purposes for which the civil litigation system exists"). Such a trend favoring defendants by limiting jury decision making power is also inconsistent with the Federal Rules of Evidence that were designed to enhance the search for truth by making more data available to the trier. Fortunately, the court of appeals for the Second Circuit generally has resisted this tendency towards hobbling of fact finding by juries. See, e.g., Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 169 n.13 (2d Cir. 2001) (approving jury bifurcation); In re Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1132 (2d Cir. 1995) (permitting statistical evidence).

Many authorities have demonstrated that jury fact-finding is enhanced by the use of aggregating techniques. See Manual for Complex Litigation, Third § 22.3, at 136; Joe S. Cecil, Valerie P. Hans & Elizabeth C. Wiggins, Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials, 40 Am. U. L. Rev. 727, 764 (1991). The essential protections of the Seventh Amendment are enhanced, not reduced, by procedures which streamline and focus jury

fact-finding. The jurors in this district are generally educated and aware of current technology; they would justly feel insulted by being denied modern fact finding techniques.

The Fifth Circuit has generally approved aggregate statistical techniques to calculate a lump sum damage figures in mass tort cases, despite rejecting their use in class actions where damages need to be apportioned among individuals. Compare In re Fibreboard Corp., 893 F.2d 706, 709 (5th Cir. 1990) ("there will inevitably be individual class members whose recovery will be greater or lesser than it would have been if tried alone"), with Watson v. Shell Oil Co., 979 F.2d 1014, 1018 (5th Cir. 1992) (aggregation proper to determine total compensatory damages as a means to determine punitive damages). But see Castano v. American Tobacco Co., 84 F.3d 734, 747 (5th Cir. 1996) (class action trial structure which divided questions of causation and comparative negligence between separate juries held inconsistent with Reexamination Clause of Seventh Amendment); In the Matter of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1303 (7th Cir. 1995) (class action trial structure which divided questions of proximate causation and comparative negligence between separate juries held inconsistent with Reexamination Clause of Seventh Amendment). See also Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1232 (9th Cir. 1996) (declining to adopt Rhone-Poulenc rationale); In re Copley Pharm., Inc. "Albuterol: Products Liability Litig.", 161 F.R.D. 456 460-61 (D.Wyo. 1995) (same). The result in Fibreboard in part was premised on the fact that individuals in a plaintiff class may be subjected to the risk of underpayment or overpayment because of sampling. See also Hilao v. Estate of Marcos, 103 F.3d 767, 787-88 (9th Cir. 1996) (Rymer, J., dissenting); Walker & Monahan, Sampling Liability, 85 Va. L. Rev. at 345. A threat to fairness of allocation is not posed when a jury verdict and court allocation is at issue.

Excluding information on the ground that jurors are too ignorant to evaluate it properly may have been appropriate in England at a time when a rigid class society created a wide gap between royal judges and commoner juries, but it is inconsistent "with the realities of our modern American informed citizens and the responsibility of independent thought in a working society." United States v. Shonubi, 895 F. Supp. 460, 493 (E.D.N.Y. 1995), rev'd on other grounds 103 F.3d 1085 (2d Cir. 1997); see also James Bradley Thayer, Select Cases on Evidence at the Common Law 1 (1892) ("'Reasoning, the rational method of settling disputed questions, is the modern substitute for certain formal and mechanical tests which flourished among our ancestors for centuries, and in the midst of which the trial by jury emerged.'") (quoting Thayer, "Law and Fact" in Jury Trials, 4 Harv. L. Rev. 147, 157 (1890)).

Enforcement of federal law in areas such as employment, copyright and patent law relies upon the appropriate use of statistical evidence. See, e.g., Castanedo v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (statistical data to prove discrimination in jury selection); Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F.Supp. 670 (S.D.N.Y. 1963) (Feinberg, J.) (survey data in trademark infringement case). There is no reason under either federal or state law why statistical evidence should be prohibited in mass tort class actions.

Fidelity to equitable and legal principles permits the use of statistical proof rather than compelling individualized showings as to hundreds-of-thousands of claims. See Kozlowski v. Briggs Leasing Corp., 408 N.Y.S.2d 1001, 1005 (N.Y. Sup. Ct. 1978) ("Equity regards substance rather than form." (quoting Pezenik v. Greenberg, 251 N.Y.S. 916, 917 (App. Div. 2d Dept. 1937)). But see Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F.Supp.2d 236, 246 (D.Mass. 1999).

The equity in allowing statistical proof of reliance and causation is underscored by the massive nature of the fraud alleged. If plaintiffs' allegations are borne out, the defendants sought to mislead the whole of the American public by distorting the entire body of public knowledge on the lethal and addictive effects of smoking. By carrying out this alleged widespread scheme, it was the defendants themselves who made a claim-by-claim showing virtually impossible.

5. Erie

A decision to allow statistical proof is not in conflict with Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). See Blue Cross & Blue Shield of N.J., Inc v. Philip Morris Inc., 133 F. Supp. 2d at 172 (E.D.N.Y. 2001). There is no ruling New York case which holds that state substantive law will not permit the use of modern aggregation forensic tools to support a massive fraud action. Aggregation is appropriate in light of New York Court of Appeals decisions on common law fraud.

Ample authority supports the conclusion that statistical calculations satisfy both federal and New York standards of evidentiary sufficiency and do not alter substantive elements of state law. Robert A. Barter & Vincent C. Alexander, Evidence in New York State and Federal Courts § 300.3(b) (1999) (standard of legal sufficiency same in New York and Federal practice). The issue of sufficiency was not squarely before the Daubert Court, but Justice Blackmun's opinion did briefly address it. Once units of scientific evidence pass the admissibility threshold, he noted, the "appropriate" means of challenging those which appear shaky or unreliable include the "traditional" devices of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 595.

New York state courts' failure to fully embrace Daubert does not suggest that they would

forego appropriate statistical sampling along with individual testimony to prove elements of consumer fraud. They have accepted such evidence in discrimination, tax assessment determinations, DNA sampling and criminal cases. See, e.g., People v. Chesler, 91 Misc.2d 551, 398 N.Y.S.2d 320 (N.Y. Sup. Ct. 1977) (sampling to determine discrimination in jury pool); 860 Executive Towers v. Bd. of Assessors of Nassau County, 84 Misc.2d 525, 377 N.Y.S.2d 863 (N.Y. Sup. Ct. 1975) (equal probability sampling in tax assessment determinations appropriate); People v. Wesley, 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (N.Y. 1994) (DNA identification analysis proper); People v. Shi Fu Huang, 145 Misc.2d 513, 546 N.Y.S.2d 920 (N.Y. Co. Ct. 1989) (DNA evidence admissible subject to lowest proposed figure of probability); People v. Victory, 166 Misc.2d 549, 631 N.Y.S.2d 805 (N.Y. City Crim. Ct. 1995) (scientific reliability of admitting retrograde extrapolation of alcohol in bloodstream); People v. McLaurin, 157 Misc.2d 783, 598 N.Y.S.2d 911 (N.Y. Sup. Ct. 1993) (extrapolation permitted to determine amount of drugs); see also e.g., Fisch on New York Evidence § 1018 (2d ed. 1977); Randolph N. Jonakait, Harold Baer, Jr., E. Stewart Jones, Jr., & Edward J. Imwinkelried, New York Evidentiary Foundations, 112-13 (1998) (somewhat higher standards for admissibility under New York law than under federal law); Robert A. Barker & Vincent C. Alexander, Evidence in New York State and Federal Courts (1996) (same).

The New York Court of Appeals has not ruled that "individualized proof" is the only way to prove causation and damages. In Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (2000), the Court of Appeals underscored that a showing of causation could be satisfied by a proving a "fraud-on-the-market," a theory friendly to modern sampling techniques:

> Similarly, in the securities context, proof of reliance is not required where a duty to

disclose material information has been breached, or where there are material omissions or misstatements in a proxy statement. Rather, the materiality of the omission or misstatement satisfies the causation requirement (see, e.g., Affiliated Ute Citizens v. United States, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 [breach of duty to disclose: the "obligation to disclose and (the) withholding of a material fact establish the requisite element of causation in fact"]; Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 [misstatement or material omission in proxy statement: "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress"] ).

Stutman v. Chem. Bank, 95 N.Y.2d at 30 n.2. While that case dealt with section 349 of the

General Business Law, a consumer fraud statute, which does not apply in the instant case, there

is good reason to believe that fraud-on-the-market is an equally valid way to approach common

law fraud cases.

New York cases suggest that aggregation techniques are available when the issues are

reliance, causation and damages. See, e.g., King v. Club Med., Inc., 430 N.YS.2d 65, 67-68

(App. Div. 1st Dep't 1980) (finding that issues of reliance should not ordinarily defeat class

certification and collecting cases); Weil v. Long Island Savings Bank, 200 F.R.D. 164, 175

(E.D.N.Y. 2001) (approving class action including statutory fraud claims; "generally, reliance

issues do not predominate, as the focus in this inquiry is on the common question of liability");

cf. Bertulli v. Indep. Ass'n of Continental Pilots, 242 F.3d 290, 298 (5th Cir. 2001) (class

certification proper even though damage determinations individualized); Broder v. MBNA Corp.,

722 N.Y.S.2d 524 (App. Div. 1st Dep't 2001) (accord).

Discussing developments in consumer protection law (including New York), Professor

Issacaroff trenchantly noted a trend towards aggregate proof:

The review of the substantive law of reliance shows that reliance is most often proven inferentially or based on an objective reasonable person standard, as opposed to being

proven through direct evidence of subjective individual understandings. Under such circumstances . . . there are no significant procedural hurdles to aggregate treatment of most consumer claims.

Samuel Issacharoff, The Vexing Problem of Reliance In Consumer Class Actions, 74 Tul. L. Rev. 1633, 1633 (2000); cf. Walker v. National Recovery Inc., 200 F.3d 500 (7th Cir. 1999) (a court cannot simply assume subjective effect of defendant's conduct on class, but may depend on experts and survey evidence to establish class members were mislead under the Fair Debt Collection Practices Act).

The procedural use of sampling is consistent with New York state substantive law. No Erie question is presented with respect to evidentiary issues.

VI.    Punitive Damages

A.    Principles

The primary function of punitive damages is to punish, to deter private actors from making particularly egregious decisions harmful to society. See generally, e.g., 1 Linda L. Schueter & Kenneth R. Renned, Punitive Damages §§1.3, 2.0 – 2.2 (2000); see also id. § 2.3 (collected bibliography); 1 John J. Kircher & Christine M. Wiseman, Punitive Damages: Law and Practice §§ 2:01 – 2:13 (2nd ed. 2000); Leonard B. Sand, John S. Siffert, Walter P. Loughlin, Steven A. Reiss, & Nancy Batterman, Modern Federal Jury Instruction §77-5 (2002) (Punitive Damage Instruction) ("The purpose of punitive damages is to punish a defendant for shocking conduct and to set an example in order to deter him and others from committing similar acts in the future. Punitive damages are intended to protect the community and to be an expression of the jury's indignation at the misconduct."). Secondarily, they compensate for social damages not likely to be fully reflected in compensatory damages to individuals. A third justification is the

126

assuaging of moral indignation of the individuals damaged, who may feel that mere compensation does not reflect the outrage done upon their personalities. See, e.g., Michael L. Rustad & Thomas H. Koenig, Taming the Tort Monster: The American Civil Justice System as a Battleground of Social Theory, 68 Brooklyn L. Rev. 1, 54–65; see also id. at 57–58 ("Exemplary damages protected the rights and dignity of individuals who lacked economic power or aristocratic status.").

An important, but sometimes ignored, purpose of punitive damages is to provide a kind of disgorgement where many individual compensatory claims cannot be brought; the total harm of tortious acts is then paid as an external cost of the operations of a tortfeasor. See, e.g., David Luban, A Flawed Case Against Punitive Damages, 87 Geo. L.J. 359, 366 (1998) ("One way to enforce environmental and safety law is through centralized public agencies – the regulators and the police. A second way is through private causes of action brought by private parties."); A. Mitchell Polinsky & Steven Shavel, Punitive Damages: An Economic Analysis, 111 Harv. L. Rev. 869, 874 (1998) ("[P]unitive damages ordinarily should be awarded, if, and only if, an injurer has a chance of escaping liability for the harm he causes"). For example, if a deleterious substance is released into the atmosphere by an egregiously negligent defendant and epidemiology shows only a 30% chance of increased cancer to millions, but a 200+% increase as to a few, compensation only to those few who can show causality statistically more likely leaves a huge deficit in payment for harm caused to society generally.

Punitive damages, in addition to punishing wrongful behavior, serve to compensate society for the major civil injuries to society at large which often accompany particular heinous acts. They are most closely related to the reprehensibility of a defendant's conduct and "should

reflect the enormity of the defendant's offense." In re The Exxon Valdez, 270 F.3d 1215, 1241

(9th Cir. 2001) (citing authority) (internal quotations and bracket omitted). The Supreme Court

recognizes that:

> In actions . . . for torts, a jury may inflict what are called exemplary, punitive, or
> vindictive damages upon a defendant, having in view the enormity of his offence
> rather than the measure of compensation to plaintiff. In actions of trespass, where
> the injury has been wanton and malicious or gross and outrageous, courts permit
> juries to add to the measured compensation of the plaintiff, which he would have
> been entitled to recover had the injury been inflicted without design or intention,
> something further by way of punishment or example, which has sometimes been
> called "smart money." This has been always left to the discretion of the jury, as
> the degree of punishment to be thus inflicted must depend on the peculiar
> circumstances of each case.

Barry v. Edmunds, 116 U.S. 550, 562–63, 6 S.Ct. 501, 29 L.Ed. 729 (1886).

Punitive damages need not, in theory, be related to compensatory damages. In practice,

they usually accompany compensatory damages. The kind of egregious antisocial behavior

which punitive damages are designed to deter is economically harmful and so also usually gives

rise to compensatory damages.

There has been an apparent increase in the imposition of punitive damages in mass

product as well as general negligence cases, leading to high awards. Schueter & Redden, supra,

at § 9.3, §9.5(B) (pp. 547–50 collects tobacco cases). The underlying principles supporting

punitive damage actions may be applied to this tobacco class action in view of the massive fraud,

huge numbers of claims, and extreme damages alleged.

Under New York common law an award of compensatory damages was not a prerequisite

to an award of punitive damages. See Toomey v. Farley, 2 N.Y.2d 71 (N.Y. 1956) (the amount

of punitive damages need not bear any ratio to that of compensatory damages); Clark v. Variety,

Inc., 178 N.Y.S. 698 (App. Div. 1st Dep't 1919) (punitive damages may be awarded despite the absence of compensatory damages). Modern courts have divided on the question. Compare Bryce v. Wilde, 333 N.Y.S.2d 614, 616 (App. Div. 3d Dep't 1974) ("Punitive damages are not recoverable alone although they may be based upon an award of nominal compensatory damages. . ."), and Hempstead General Hospital v. Allstate Ins. Co., 466 N.Y.S.2d 162, 168 (Sup. Ct. 1983), rev'd on other grounds, 482 N.Y.S.2d 523 (App. Div. 2d Dep't 1983) (same), with Rosenberg v. Lee's Carpet & Furniture Warehouse Outlet, Inc., 363 N.Y.S.2d 231, 234 (Sup. Ct. 1974) (award of $500 in exemplary damages under New York Civil Rights Law where no compensatory damages given), and Nitti v. Credit Bureau of Rochester, 375 N.Y.S.2d 817 (Sup. Ct. 1975) (dismissing request for compensatory damages under Fair Credit Reporting Act, but awarding $10,000 in punitive damages). See also, e.g., Hilliard v. A.H. Robbins Co., 148 Cal. App.3d 374 (2d Dist. 1983) (as long as plaintiff has suffered some injury, punitive damages available); Caterpillar v. Hightower, 605 So.2d 1193 (Sup. Ct. Ala. 1992) (same).

Federal Civil Rights Act punitive damages may be awarded without compensatory damages. See 42 U.S.C. § 1981a. This rule reflects the doctrine that where a plaintiff has been injured, punitive damages may be awarded despite the fact that the injury is not quantifiable. See Timm v. Progressive Steel Treating, 137 F.3d 1008 (7th Cir. 1998); see also Cush-Crawford v. Adchem Corp., 271 F.3d 352, 359 (2d Cir. 2001). Defamation, breach of a fiduciary relationship, intentional infliction of emotional distress, and misrepresentation are torts often specifically associated with conjectural compensatory damages. In such cases, courts have often permitted punitive damages without a finding of compensatory damages. See 40 A.L.R. 4th 11, at § 10.

Although punitive damages may be awarded for injury even where compensatory damages for that injury may not be cognizable, they may not be awarded where the defect in the compensatory claim applies equally to the punitive claim. See, e.g., Fisher v. Space of Pensacola, Inc., 483 So. 2d 392, 395-96 (Ala. 1986) (punitive damages not allowed for injury where compensatory damages were barred by statute of limitations, since statute of limitations applies equally to punitive damages).

Punitive damages are most effective when linked to a compensatory "anchor." See Cass R. Sunstein, Daniel Kahneman, & David Schkade, Assessing Punitive Damages, 107 Yale L.J. 2071, 2109 (1998). Juries generally agree on the reprehensibility of a party's conduct, but have difficulty expressing their outrage in dollar amounts, especially since punitive damages are an "unbounded" variable with no upper limit. Id. Commentators have suggested that juries best determine punitive damages when they have a compensatory finding to help guide them. Id.

Proposals to reduce punitive damage anomalies include having a separate administrative body determine such awards in the public interest. Cass R. Sunstein, Reid Hastie, John W. Payne, David A. Schkade and W. Kip Viscusi, Punitive Damages, How Juries Decide 242–58 (2002). That proposal is consistent with modern integration of the tort, criminal, and administrative adjudication systems for punishment and compensation. See Compensation for Mass Private Delicts: Evolving Roles of Administrative, Criminal, and Tort Law, 2001 U. Ill. L. Rev. 947. Such changes would require legislative approval.

Permitting plaintiffs to proceed with a punitive damages claim is consistent with the basic societal purposes of tort awards. Cf. John C.P. Goldberg, Twentieth Century Tort Theory, 90 Geo. L. J. (2002) (in conventional model of tort theory "judges and jurors were bringing to bear

social norms of responsibility" and forcing miscreant parties to adhere to socially approved "behavior in its customary forms").

In the tobacco action now before the court, plaintiffs can be viewed as acting as a kind of private attorney general. See Howard M. Erichson, Coattail Class Actions: Reflections on Microsoft, Tobacco, and the Mixing of Public and Private Lawyering in Mass Litigation, 34 U.C. Davis L. Rev. 1, 2 (2000) ("Properly managed, such class actions offer a relatively fair and efficient mechanism for extending the benefits of government legal work to provide redress to injured citizens.").

> Trial attorneys, acting as private attorneys general, have uncovered numerous 'smoking gun' documents unmasking corporate culpability. The treasure chest that funded the tobacco litigation was based in large part on successful asbestos cases. Private attorneys general, not state regulators, uncovered evidence of the industry's failure to warn workers and consumers of the hazards of asbestos dust."

Michael L. Rustad, Smoke Signals from Private Attorneys General in Mega Social Policy Cases, 51 DePaul L. Rev. 511, 520 (2001); see also David Rosenberg, The Causal Connection in Mass Exposure Cases: a 'Public Law' Vision of the Tort System, 97 Harv. L. Rev. 849, 855 (1984) ("Mass exposure torts are frequently products of the deliberate policies of businesses that tailor safety investments to profit margins. Such risk-taking policies should be especially amenable to control through threats of liability."); but see Linda S. Mullenix, Resolving Aggregate Mass Tort Litigation: The New Private Law Dispute Resolution Paradigm, 33 Val. U. L. Rev. 413, 424 (1999) ("Modern mass tort litigation is, in significant ways, dissimilar from the public law model."); Linda S. Mullenix, Mass Tort as Public Law Litigation: Paradigm Misplaced, 88 Nw. U. L. Rev. 579 (1994) ("Mass tort cases do not involve constitutional rights, either great or small ones. These are, after all, personal injury torts."). Since the plaintiffs are seeking recovery for

131

those with medical problems in the country at large, fulfilling a quasi-governmental role protecting the public, policy goals support providing the class with the full panoply of devices necessary to serve the public good, including punitive damages. Tort law provides a chance "for judges and juries to regulate behavior on a forward-looking basis." John C.P. Goldberg, Twentieth Century Tort Law, 90 Geo. L.J. (2002).

For plaintiffs to recover punitive damages they must recover under a legal theory which allows such an award. While such a judgment is appropriate in cases of fraud and conspiracy, punitive damages are not allowed under section 349 of the New York General Business Law, nor are they permitted under RICO (which has its own quasi-punitive provisions allowing triple damages). In the instant case, these restrictions on punitive damages mean that plaintiffs must pursue the theories on which Empire Blue Cross did not prevail (fraud and conspiracy) rather than on the theory on which Empire prevailed (section 349). In any event, section 349 claims may have been restricted in national class actions due to Goshen v. Mutual Life Ins. Co. of New York, 98 N.Y.2d 314 (2002). See Part VII.C, infra, (addressing Goshen).

As lead counsel for the class has conceded in her public writings, punitive damages are not well-established as a right of individual plaintiffs suing in their own right. See Elizabeth J. Cabraser, Unfinished Business, 36 Wake Forest L. Rev. 979, 981–82 (2001) ("Punitive damages are not an entitlement of the victims, but of society . . . . It is well established that no individual victim is entitled to receive punitive damages."). The history of punitive damages shows that "it was generally understood that punitive damages were not compensatory in nature, . . . a plaintiff's receipt of this damages was not considered to be an entitlement or a right." DeMendoza v. Huffman, 334 Or. 425 (2002) (chronicling history of punitive damages); Dunn v.

132

HOVIC, 1 F.3d 1371 (3d Cir. 1993) ("[P]unitive awards are windfalls and not compensation, courts should place less emphasis on plaintiffs' rights when evaluating due process arguments. Plaintiffs' entitlements are, after all, met by compensatory damages."). But cf. Panel Discussion, Mass Tort Litigation in Federal Courts, Judicial Conference of the Second Circuit, June 16, 2000, 201 F.R.D. 106, 135 (statement of Frederick M. Baron, Esq.) ("In many states, you are given the right to seek punitive damages"); compare id. at 136 (statement of Hon. Sam C. Pointer, Retired Chief United States District Judge, Northern District of Alabama) ("I'm unaware of any state in which there is a right to punitive damages . . . I thought there was always an instruction to a jury that says you're never obligated to grant punitive damages."); Leonard Sand et al., Modern Federal Jury Instruction §77-5 (2002) (Punitive Damage Instruction) ("You have the discretion to award . . . punitive damages."). "Punitive damages . . . are never awarded as of right, no matter how egregious the defendant's conduct. . . . Compensatory damages, by contrast, are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss." Smith v. Wade, 461 U.S. 30, 52, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

The individual plaintiff's action in a punitive damages case is but a vehicle for the bringing the punitive claim, which is intended to deter (more forcefully than compensatory damages) harmful behavior. In a punitive damages claim, unlike a compensatory claim, disbursement to an injured party is not an underlying reason for the award. Punitive awards could theoretically be given to the state or to non-profit agencies. Cf. DeMendoza v. Huffman, 334 Or. 425 (2002) (upholding Oregon law requiring that 60% of any punitive award go to state-administered fund). Since punitive damages claims often accompany compensatory damages

133

claims, it makes sense in many cases to allocate at least part of the punitive damages to the same parties receiving compensatory damages; otherwise no one might seek them. Individual plaintiffs serve a qui tam-like function in bringing claims which might benefit society.

In the context of a punitive damages-only class, opt out is less necessary than it would be with a compensatory damages class, since no injured party's vested right would be affected. Cf. Samuel Issacharoff, Preclusion, Due Process, and the Right to Opt Out of Class Action, 77 Notre Dame L. Rev. 1057, 1072 (2002) (importance of opt out availability in compensatory classes).

Scholars have suggested that punitive damages might be most appropriate in cases where the harmful conduct is hard to detect or trace to injured individuals. See A. Mitchell Polinsky & Steven Shavell, Punitive Damages: An Economic Analysis, 111 Harv. L. Rev. 869 (1998); John C.P. Goldberg, Twentieth Century Tort Law, 90 Geo. L.J. (2002). This is the situation prevalent in tobacco litigation.

B.    Caps

1.    Supreme Court Cases

For the first time, in BMW v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court vacated and remanded an award of punitive damages as a violation of the Due Process Clause of the Fourteenth amendment because of excessiveness. The ratio between punitive and compensatory damages was 500 to 1. Gore, 517 U.S. at 582. The Court stated that such excessive punitive damages result in a deprivation of property without due process. See also, e.g., TXO v. Alliance Resources, 509 U.S. 443, 454, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1999).

134

A single global ratio or formula is not available for setting punitive damages in all cases. Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. at 18. This is because the purpose of punitive damages is to protect the public by deterring the defendant and others from doing the same or similar acts in the future. Id. at 20–21. Since the amount it will take to deter will be different for each situation and for each defendant, a fixed ratio is inappropriate. Under the circumstances of Haslip, the court said that a four-to-one ratio was "close to the line." Id. at 23. The Court has declared that in order to be constitutional, punitive damages must further a state's legitimate interest in punishing conduct and deterring its repetition. Gore, 517 U.S. at 568. In addition, the defendant must have had fair notice of the severity of the penalty resulting from its conduct. Id. at 574.

The Court established and reiterated three very general guidelines in determining whether a punitive damage award would be constitutional. They are: first, the degree of reprehensibility of defendant's acts; second, the disparity between the harm (actual and potential) and the punitive damages; third, the difference between the remedy granted, and the civil or criminal penalties authorized or imposed in comparable cases. Id. at 575.

In gauging reprehensibility it would be appropriate to consider evidence that a defendant has repeatedly knowingly engaged in prohibited conduct, id. at 577; proof that the wrong committed was of a serious nature, id. at 576; and evidence of deliberate false statements, acts of affirmative misconduct or concealment of evidence of improper motive, id. at 579.

The Gore Court also addressed ratio disparity of compensatory to punitive damages. Id. at 582. No exact ratio or numerical limit provides an upper limit. Id. A higher ratio may be appropriate where an injury is hard to detect or the monetary value of non-economic harm is

135

difficult to determine. Id. at 582. With regard to comparison to other civil or criminal penalties, the court stated that some deference should be given to legislative judgments relating to appropriate sanctions. Id. at 583.

Under the facts in Gore, the Supreme Court found that punitive damages of $2 million were excessive for several reasons. First, the conduct was not particularly reprehensible–there was no effect on performance, safety or the appearance of the car (at least for the first 9 months). Id. at 576. Second, there was only economic harm. Id. at 576. Third, there was no potential for additional harm. Id. at 582. Finally, the court stated that a ratio of 500 to 1 between punitive and compensatory damages was not constitutionally acceptable. Id.

The Gore standard was last reiterated in Cooper Industries v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). The Cooper Court, in addition to confirming Gore, mandated that "courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." Id. at 436. In effect Cooper gave both trial and appellate courts considerable authority to limit total punitive damages, but with only ambiguous standards.

    2.    Applications

Pursuant to Gore and Cooper, courts must determine what a constitutional ratio is for each particular case based on the facts of that case—the degree of reprehensibility, the ratio sought, and any similar civil or criminal penalties. After Gore the Court vacated several cases that dealt with the issue of whether the punitive damages were constitutionally acceptable. The cases were remanded "in light of BMW v. Gore." Oxy USA v. Continental Trend Resources, 517 U.S. 1216, 116 S.Ct. 1843, 134 L.Ed.2d 945 (memorandum) (1996).

In American Pioneer Life Ins. Co. v. Williamson the Supreme Court of Alabama reduced punitive damages from $2 million to $750,000 with compensatory damages of $250,000 — a three-to-one ratio. 704 So.2d 1361, 1367 (Ala 1997). The court based its decision on the fact that the damage suffered by Williamson was economic only and did not endanger his health or safety. Id. at 1365. The court believed that the reduced award would be enough to remove any profit the company might have made from its actions and would act as a sufficient future deterrent. Id. at 1367.

The court of appeals for the First Circuit in Davis v. Rennie upheld a 10 to 1 ratio of punitive to compensatory damages stating that there was significant actual and potential harm to the plaintiff that seriously affected his quality of life. 264 F.3d 86, 117 (1st Cir. 2001), cert. denied sub nom Rennie v. Davis, 122 S.Ct. 1909, 152 L.Ed.2d 820 (2002).

The jury in Continental Trend Resources v. Oxy USA awarded the plaintiffs $269,000 in compensatory damages and $30 million in punitive damages, and the court of appeals for the Tenth Circuit reduced the punitive award to $6 million — a ratio of more than 20 to 1. 101 F.3d 634, 635 (10th Cir. 1996). It suggested a variety of aggravating factors that would allow for a greater ratio. The court stated that well established tortious behavior that was egregious would support greater punitive damages. Id. at 638. Additional punitive damages would be acceptable when there was loss of life, widespread health hazards and major environmental injury. Id. at 639. In addition, if the defendant's behavior resulted in physical rather than economic injury, was unlawful in all states, was repeated, was intentional, was based upon deliberate false statements rather than omissions or was aimed at a vulnerable target, larger amounts of punitive damages would be constitutional. Id. at 638. Finally, the court declared that courts could

137

consider the wealth of the defendant when determining what amount would result in deterrence as well as the cost of the litigation for the plaintiffs to prevent wealthy defendants from foot-dragging through costly litigation. Id. at 641-42.

In the Exxon Valdez case, the court of appeals for the Ninth Circuit reversed a punitive award of $5 billion against Exxon, finding that the jury did not establish that Exxon's conduct was sufficiently reprehensible to allow such a high award.

> The $5 billion punitive damages award at issue was against Exxon, which had some direct responsibility because it did not fire or transfer Hazelwood [the captain whose negligence caused the accident] after learning that he was drinking and taking command despite his alcohol treatment, as well as vicarious responsibility. However, the difference between the $5,000 awarded as punitive damages against the man who directly caused the oil spill, and the $5 billion awarded as punitive damages against his employer gives rise to concern about jury evaluation of the relative reprehensibility.

In Re The Exxon Valdez, 270 F.3d 1215, 1241 (9th Cir. 2001). That court also noted that Exxon did not intentionally cause the oil spill, and that no deaths resulted. Id. at 1242. Those factors were sufficient to warrant reversal of the jury award. The court also found a ratio of between 12 to 1 and 17 to 1 potentially excessive. Id. at 1244.

Federal courts of appeals have not arrived at a consensus on whether to consider "potential damage" to a party as part of the compensatory damages for the purpose of the punitive calculation. The court of appeals for the Sixth Circuit allowed the jury to consider potential damage where the evidence indicated that the plaintiff (a prisoner) might have been beaten even more severely had the defendant's supervisor not ordered him to stop. Johnson v. Howard, 24 Fed Appx 480, 486-487 (6th Cir. 2001). Although the ratio in the case was 10 to 1, the court believed that the jury could have found the potential compensatory damages to be much greater, thus possibly decreasing the disparity. The court of appeals for the Ninth Circuit has refused to

consider potential damage, holding that it is too speculative to be part of compensatory damages as a predicate for punitive damages. Leatherman Tool Group, Inc. v. Cooper Indus., Inc, 285 F.3d 1146, 1147 ( 9th Cir. 2002).

Difficulty in fixing the dollar equivalent for fright and pain that would set the punitive damages too low to deter is an acceptable basis for increasing the ratio. Cooper v. Casey, 97 F.3d 914, 919 (7th Cir. 1996). The court of appeals for the Eighth Circuit allowed ratios of 99 to 1 and 55 to 1 where the defendants had a "clear and disturbing disregard for [plaintiff's] safety and her economic interests." Grabinski v. Blue Springs Ford Sales Inc., 203 F.3d 1024, 1026-27 (8th Cir. 2000). The court of appeals for the Ninth Circuit has allowed a ratio of 28 to 1 for failure to control highly reprehensible conduct where compensatory damages were very low (employee was paid extremely low wages) and there was no evidence that a lower amount of punitive damages would induce the defendant to change its practices. Swinton v. Potomac Corp., 270 F.3d 794, 818-19 (9th Cir. 2001). The court of appeals for the Tenth Circuit has allowed a ratio of 12 to 1 when a defendant has disregarded safety concerns which led to permanent physical injuries. Bielicki v. Terminix Int'l Co., L.P, 225 F.3d 1159, 1165 (10th Cir. 2000).

For the Second Circuit the court of appeals found that when the compensatory damages are 60% of the punitive damages, the ratio was acceptable. Moskowitz v. Coscette, 3 Fed. Appx. 1, 6 (2d Cir. 2001). It has listed the following as aggravating factors: "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996).

In general, although the Supreme Court has declared that courts cannot select a ratio that

will be appropriate for all cases, it appears that a ratio of not more than 10 to 1 is likely to succeed in cases where compensatory damages are generous, especially in cases involving economic harm only. One court of appeals has suggested that a ratio of 6 to 1 is appropriate for cases involving solely economic harm that is not hard to detect. FDIC v. Hamilton, 122 F.3d 854, 862 (10th Cir. 1997). As already noted, if the court finds that aggravating circumstances exist, larger ratios may be appropriate.

Since the instant case may involve serious physical injury, long continued deliberate frauds and large exposure to the public through subvention of medical costs, a ratio in excess of 6 to 1 or 10 to 1 may be justifiable.

VII.    Choice of Law

This section deals primarily with conflicts of laws as they affect a non-opt-out punitive damages national class. It represents a shortening and summary of large sections of legal analysis in prior memoranda. See Simon v. Philip Morris Inc., 124 F.Supp.2d 46 (E.D.N.Y. 2000); Blue Cross v. Philip Morris, 178 F.Supp.2d 198 (E.D.N.Y. 2001).

A.  In General

A choice of law question is presented when a dispute implicates the interests of two or more states and application of each state's law would be consistent with the Full Faith and Credit and Due Process Clauses of the Constitution. See, e.g., Cooney v. Osgood Machinery, 81 N.Y.2d 66, 70-71, 612 N.E.2d 277, 279, 595 N.Y.S.2d 919, 921 (1993); Diehl v. Ogorewac, 836 F.Supp. 88, 91 (E.D.N.Y. 1993). These modest constitutional requirements are met if each state whose law is sought to be applied has "significant contacts or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."

Allstate Ins. Co. v. Hague, 449 U.S. 302, 313, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). See also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818-23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

A federal court sitting in diversity applies the choice of law principles of the forum state, in this case New York, to decide which state's substantive law controls. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Choice of law rules apply equally to claims brought under common law and statutory law. See, e.g., Bergeron v. Philip Morris, 100 F.Supp.2d 164, 170 (E.D.N.Y. 2000) (applying New York choice of law rules to resolve conflicts between the New York Consumer Protection Act and Massachusetts' Unfair Deceptive Trade Practices Act); see also Volt Systems Development Corp. v. Raytheon Co., 155 A.D.2d 309, 309-310, 547 N.Y.S.2d 280, 281 (App. Div. 1st Dept. 1989) (applying New York choice of law principles to Massachusetts' Unfair Deceptive Trade Practices Act).

For federal substantive law issues the court will apply the applicable national law (subject to circuit differences). Where both state and federal substantive claims are made in the same case the law of Klaxon continues to apply to state issues. In practice, there is a tendency to emphasize forum law for ease of administration of the litigation, as by utilization of state and federal jury charge books the judge is likely to have on chambers shelves.

A court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict. See Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis."); Diehl v. Ogorewac, 836 F.Supp. 88, 92 (E.D.N.Y. 1993); see also Barron v. Ford Motor Co. of Canada, Ltd., 965 F.2d 195, 197 (7th. Cir. 1992) ("[B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference

between the relevant laws of the different states."). A material conflict must have a significant possible effect on the outcome of the trial to bring into play choice of law rules. In re Complaint of Bankers Trust Co.,752 F.2d 874 (3d. Cir. 1984).

Plaintiffs' central theory sounds in fraudulent concealment. Though all possible applicable state laws are essentially based on a national common law core, since Simon II is a nationwide class, the interests of all 50 states are implicated. Some of these state laws conflict to some degree with New York's. Cf. In re Air Crash Disaster Near Chicago, 644 F.2d 594 (7th Cir. 1981) (interpreting various state laws as essentially the same as that of forum state); Friedrich K. Juenger, Mass Disasters and the Conflict of Laws, 1989 U. Ill. L. Rev. 105, 123, 124 (1989).

In cases involving compensatory damages, a court could appropriately use depecage to determine different issues in a case according to the laws of various states. See Simon v. Philip Morris, 124 F.Supp.2d 46, 75–77 (E.D.N.Y. 2000) (suggesting that depecage could be appropriate for compensatory class). In this case, where only global punitive damages are implicated, depecage is inappropriate.

There are some few states that limit or eliminate punitive damages. See generally Joan Steinman, Managing Punitive Damages: A Role for Mandatory "Limited Generosity" Classes and Anti-Suit Injunctions?, 36 Wake Forest L. Rev. 1043, 1111–27 (2001) (state laws limiting punitive damages). Yet the effective cap on such damages in any state is based on the Federal Constitution. Thus it is not unlikely that the total damage awarded to the punitive damages class will be based on a single substantive national law. In addition, the federal courts' procedural obligations under the Federal Rules of Civil Procedure to control the jury adds another national

unifying force complementing the constitutional restraint, reducing the importance of differences

in state laws. In any event, whether punitive damages should be allocated to plaintiffs from

states which do not permit punitive damages is not a decisive question since, as indicated below,

the single law of New York's compensatory and punitive damages will apply.

B.   New York Rule of Babcock v. Jackson and Interest Analysis

Choice of laws is largely governed in New York by Chief Judge Stanley Fuld's seminal

opinion in Babcock v. Jackson, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963). See

also Hamilton v. Accu-Tek, 47 F.Supp.2d 330, 335 (E.D.N.Y. 1996) (New York conflicts law

controlled by Babcock).

Babcock adopted for New York an "interest analysis" for torts conflicts. This was a

departure from the prior standard of lex loci delicti, the law of the place of the wrong, and the

accompanying "vested rights" theory. Babcock held that "[j]ustice, fairness and the best practical

result, may best be achieved by giving controlling effect to the law of the jurisdiction which,

because of its relationship or contact with the occurrence or the parties, has the greatest concern

with the specific issue raised in the litigation." Babcock v. Jackson, 12 N.Y.2d at 481, 191

N.E.2d 279, 240 N.Y.S.2d 743 (internal quotation marks and citation omitted). "Factors . . .

relevant to the purposes served by the enforcement or denial of the remedy" must be evaluated.

12 N.Y.2d at 477. The Babcock opinion rejected the old vested rights theory in favor of

"practical considerations." Id at 478.

The Court of Appeals emphasized that not all issues of law must be resolved by reference

to the law of the same jurisdiction :

[T]here is no reason why all issues arising out of a tort claim must be resolved by

reference to the law of the same jurisdiction. Where the issue involves standards of conduct, it is more than likely that it is the law of the place of the tort which will be controlling but the disposition of other issues must turn, as does the issue of the standard of conduct itself, on the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented.

Id at 484.

Babcock was influential in shaping choice of law rules in other jurisdictions. See Harold L. Korn, The Choice of Law Revolution: A Critique, 83 Colum. L. Rev. 772, 827 (1983); Blue Cross v. Philip Morris, 124 F.Supp.2d 46, 54–60. In a series of subsequent cases the Court of Appeals refined the interest inquiry, fashioning guidelines for particular classes of commonly occurring cases "which give[] the greatest weight to those contacts which are relevant to the policies animating the particular rules in conflict." Hamilton, 47 F.Supp.2d at 336 (describing refinements). None of these categories created by the Court of Appeals includes the complex activity described in the instant case which is claimed to have given rise to huge damages to millions of potential plaintiffs from every state in the union.

Post-Babcock Court of Appeals cases emphasize the need to be flexible in following interest analysis. See also Neumeier v. Kuehner, 31 N.Y.2d 121, 127 (1972) (Babcock and its progeny "have helped us uncover the underlying values and policies which are operative in this area of the law. . . Now that these values and policies have been revealed, we may proceed to the next stage in the evolution of law–the formation of a few rules of general applicability") (internal citation omitted); see also Korn, The Choice of Law Revolution: A Critique, 83 Colum. L. Rev. at 884 (noting Chief Judge Fuld's admonition that rules developed in Neumeier were a distillation of patterned cases applying interest analysis).

C. Application of Babcock Rules to Complex Fact Patterns

The New York Court of Appeals has never specifically addressed how conflicts rules apply in a complex litigation setting like the present one. Some cases have found that conflicts problems undermine class certification. See, e.g., Ackerman v. Price Waterhouse, 683 N.Y.S.2d 179, 189-190 (App. Div. 1st Dep't 1998); see also Geiger v. American Tobacco Co., 696 N.Y.S.2d 345, 352 (Sup. Ct. Queens Cty. 1999) ("Choice-of-law problems also require individual analysis where members of the putative class did not contract cancer in New York."); Russo v. Massachusetts Mut. Life Ins. Co., 680 N.Y.S.2d 916, 919 (Sup. Ct. Tompkins Cty. 1998). But see Simon v. Philip Morris, 124 F.Supp.2d at 56 (finding these cases unpersuasive). The question of whether a particular action qualifies for class status under New York law is a matter of discretion exercised on a case-by-case basis involving many criteria in addition to choice of law. See, e.g., Small v. Lorillard Tobacco Co., 94 N.Y.2d 43, 52–53 (1999) (examining relevant CPLR 901(a) class action factors, but deferring to Appellate Division's discretion to certify class); David D. Siegel, New York Practice § 142 (3rd ed. 2000-01 Supplement). These case-by-case lower court decisions do not purport to negate Court of Appeals choice of law principles.

The DES and Hamilton v. Accu-Tek decisions in this court involved trials of individual plaintiffs' claims. The cases applied traditional conflicts rules. The result in each was consistent with the case specific needs and policies in adjudicating a non-class action. See In re DES Cases, 789 F.Supp. at 568 (1992) ("Such a result also comports with the practicalities of mass tort cases. To the fullest possible extent, such cases should be consolidated for pretrial discovery and motions, settlement discussions and trial; administered by one or a few judges; and tried under one set of substantive and procedural rules applicable to all consolidated cases."); see also

Hamilton v. Accu-Tek, 47 F.Supp.2d at 340 ("The points of distribution involved many states and vary from company to company; if the significant contact were the point of distribution, so many states' laws would be involved that consolidation of defendants would be impractical.").

In two related cases, Falise v. American Tobacco Co. and Bergeron v. Philip Morris, it was held that the national and worldwide scope of tobacco companies' alleged deceptive conduct and false advertising requires re-examining choice of law guidelines heretofore applied in more limited disputes. See Falise, 94 F.Supp.2d 316, 353-354 (E.D.N.Y. 2000); accord Bergeron, 100 F.Supp.2d at 170; see also Patrick J. Borchers, Choice Of Law in the American Courts in 1992: Observations and Reflections, 42 Am. J. Comp. L. 125, 141 (1994) ("Mass torts have presented some of the most difficult problems for interest analysis and variants thereof"). In the present controversy the court is impelled to return to the bedrock principle in Babcock—that controlling effect should "be given to the law of the jurisdiction which has the greatest interest in the specific issues raised in the litigation." See Bergeron, 100 F.Supp.2d at 170 (quoting Falise v. Am. Tobacco Co., 94 F.Supp.2d at 353).

Founding principles in Babcock requires a hand-tailored application of that case's principle to a tort class action of the magnitude and scope of the Tobacco litigation. See Simon v. Philip Morris, 124 F.Supp.2d 46, 57-68 (examination of the New York Court of Appeals refinements of Babcock, the history of their application in mass torts cases, the general history of conflicts law, and current scholarship and precedent in complex litigation).

A court would ordinarily consider where the tort "occurred" in deciding which forum has the greatest interest in applying its laws. Multi-state transactions are more complex when the defendant's tortious conduct and the plaintiff's injury occur in different states. Id. (citing

sources); see Symeon C. Symeonides, Choice of Law in the American Courts in 1994: A View "From The Trenches", 43 Am. J. Comp. L. 1, 12 (1995) (describing the inapplicability of the Neumeier rules when conduct and injury occur in separate states); see also Rice v. Nova Biomedical Corp., 38 F.3d 909, 916 (7th Cir. 1994) ("[T]he place of the wrongful conduct and the place of the injury are treated as separate contacts between the lawsuit and the states in question. As a result, when the places are different the presumption that the law of the place of 'the tort' applies cannot be used; the tort has no place; instead it has contacts, presumably offsetting, with at least two states. If defamatory statements are uttered in Massachusetts, and the plaintiff is hurt in Illinois, neither state is the place of the tort.") (citations omitted); Korn, The Choice of Law Revolution, supra, at 805-806 (recounting how the *lex loci delicti* rule historically did not work well in "tort actions outside the personal injury field–such as defamation, unfair competition, or misrepresentation–in which it is often difficult to identify a single place of injury").

For actions sounding in fraud and deceit, the substantive law of the state in which the injury is suffered, rather than the state where the fraudulent conduct was initiated, often governs. See, e.g., Sack v. Low, 478 F.2d 360, 365 (2d Cir. 1973) ("When a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."); Sound Video Unlimited v. Video Shack Inc., 700 F.Supp. 127, 134 (S.D.N.Y. 1988) (in fraud and related actions, the last event necessary is where the loss is suffered); Natural Resources Corp. v. Royal Resources Corp., 427 F.Supp. 880, 882 (S.D.N.Y. 1977) ("Such a claim has been said to arise where 'plaintiffs' pocketbooks are situated.'") (quoting Arneil v. Ramsey, 414 F.Supp. 334, 338 (S.D.N.Y. 1976)). This simple "last place" criterion is not

entrenched, but rather gives way when it is at war with superior state interests so that the more general Babcock principle is operative. When applied to cases involving mass delicts–with many plaintiffs, complex causation questions, and transitory goods–rules designed for one-on-one disputes may require modification.

State laws' elements of a claim for fraudulent concealment, while not uniform in all states, share many attributes. See discussion supra V.A.; see also Restatement (Second) of Torts, §§ 550, 551. A plaintiff must prove that: (1) the defendant had a duty to disclose; (2) the defendant suppressed material facts; (3) the suppression induced the plaintiff to act or to refrain from acting; and 4) the plaintiff suffered damages as a proximate result of defendant's conduct. See Simon v. Philip Morris, 124 F.Supp.2d 46, 71 (E.D.N.Y. 2000) (claims for fraud are "substantially similar and any differences fall into a limited number of predictable patterns"); In re Cordis, 1992 WL 754061 at *14 (S.D. Ohio 1992) ("[A]lthough there are differences in the standards which govern . . . fraud, the similarities outweigh the differences.").

In cases like products liability and airplane crashes, New York federal courts properly use some form of Babcock "interest" analysis. See, e.g., Pescatore v. Pan American World Airways, Inc. 97 F.3d 1, 12 (2d Cir. 1996) (displacing traditional rule when explosion occurred over Scotland, but "causative misconduct" occurred in either Frankfurt or London); Champlain Enterprises, Inc. v. U.S., 945 F.Supp. 468, 473-474 (N.D.N.Y. 1996) (noting in products liability cases involving airplanes or automobile tires, courts consider transitory nature of product in displacing traditional rule); Campbell v. Goodyear, 1985 WL 1514 (S.D.N.Y. 1985) (multi-state products liability cases involving mobile products present extraordinary circumstances that defeat application of traditional rule).

The court of appeals for the Second Circuit followed New York's pragmatic and flexible analysis in AroChem Intern., Inc. v. Buirkle, 968 F.2d 266, 271 (2d Cir. 1996). It ruled that Connecticut was not the "locus state" even though it was the state where the injury resulting from a California defamation occurred. It found the plaintiff's reliance on the "last event necessary test" misplaced because New York ultimately relied on interest analysis. Id. Characterizing California's law as conduct-regulating, the court of appeals concluded that "even assuming that injuries suffered by Harris and AroChem occurred in Connecticut, California interests prevail." Id.

The most difficult choice of law problems occur when mass torts plaintiffs from many jurisdictions sue a number of defendants, all of whom have different contacts with the forum state. This problem usually occurs in two contexts. The first is the mass disaster at a single location, such as the crash of a commercial airplane. Hundreds of claimants from dozens of states and countries may sue the airline, manufacturers, and other defendants. Traditional choice of law rules could theoretically simplify the analysis, applying the law of the place of the injury or the place of "causative misconduct."

The second form of the problem is even more difficult for the traditional *lex loci delicti* approach: many plaintiffs are injured by a defective product or products in many locations (and the products' producers may be operating from many places). Federal Rule of Civil Procedure 23, covering class actions, is viable in such mass tort cases, but requires "caution when individual stakes are high and disparities among class members are great." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The question is whether traditional or modern conflicts of law methods apply to these massive cases under New

149

York choice of law rules so as to make possible an aggregation of claims in a class action and timely disposition without overburdening the courts.

Although they are not conclusive on these questions, New York mass disaster cases–particularly those involving complex questions of causation and transitory goods–rely upon interest analysis. In airplane crashes and products liability cases, even courts claiming to apply rigid rules do not strictly abide by them, but ultimately turn decision on some evaluation of the theoretical and practical aspects of the jurisdictions' interests in the action.

In Pescatore v. Pan American World Airways, Inc., the court of appeals for the Second Circuit analyzed the applicability of an Ohio "loss of society" damage rule to an aircraft explosion over Lockerbie, Scotland. 97 F.3d at 12 (2d Cir. 1996). It first stated that the law where the accident occurred would "presumptively apply," since the injured party and defendant resided in different jurisdictions, and the accident occurred in a third jurisdiction. Pescatore, 97 F.3d at 13 (citing Neumeier, 31 N.Y.2d at 128). After discussing the principles underlying Babcock and the limited concern Scotland might have in imposing loss-allocating rules to aircraft passengers, the court departed from the "last event necessary" test. Pescatore, 97 F.3d at 14. It gave diminished significance to this mechanical approach, suggesting that the causal chain leading up to the explosion limited Scotland's interest in claims by injured passengers:

> Although the explosion occurred over Scotland, the causative misconduct occurred in Frankfurt (where the bomb eluded Pan Am's X-ray inspection and was placed on Flight 103), or in London (where Pan Am failed to remove or inspect the unaccompanied bag that carried the bomb). Under these circumstances, where no negligence or misconduct took place in Scotland, and where no damages [to the persons claiming through airline passengers] were incurred in Scotland, there is really no reason at all why the compensability of the plaintiff's damages should be governed by Scottish law.

Id. at 13 (citations omitted).

Champlain Enterprises v. United States, 945 F.Supp. 468 (N.D.N.Y. 1996), took the

Pescatore analysis a step further, applying Kansas law to a New York air crash, when the aircraft

was defectively manufactured in Kansas. The court relied upon the analysis in Pescatore to find

the tort occurred in Kansas because the manufacturing plant was the site of causative misconduct.

The court reasoned that Kansas had the greater interest in a negligence dispute because "that state

has a large stake in governing the liability of manufacturers within its borders." Champlain, 945

F.Supp. at 473-74.

These cases demonstrate that New York choice of law does not automatically look to

what would have once been considered the *lex loci delicti*. Assessing causative misconduct is an

important component of interest inquiry involving conduct regulation. In Champlain, the court

used evidence of causative misconduct in Kansas to find that Kansas, and not New York (where

the airline crashed) was the "locus of the tort." A number of commentators have suggested that

place of the conduct (when injury occurs in a different state) has a greater bearing in determining

what law to apply. See, e.g., Thomas E. Willging, Mass Torts Problems and Proposals, Federal

Judicial Center 97 (January 1999) ('In mass torts settings, the only jurisdiction with an interest

that could be recognized as applicable to a group of plaintiffs from multiple states will be the law

of the place of conduct"); see also Robert A. Sedler, The Complex Litigation Project's Proposal

for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State

Sovereignty, 54 La. L. Rev. 1085, 1100-1102 (1994); American Law Institute: Complex

Litigation: Statutory Recommendations And Analysis § 6.01(d)(4) ("In all other cases, the law of

the state where the conduct causing the injury occurred governs").

In the products liability line of conflicts cases, causative misconduct plays a strong role in

pinpointing what law to apply when transitory goods hurt people. See Hadar v. Concordia Yacht Builders, 886 F.Supp. 1082, 1094 (S.D.N.Y. 1995); Carlenstolpe v. Merck & Co., 638 F.Supp. 901, 910 (S.D.N.Y. 1986). The fact patterns in these cases represent typical problems modern torts pose for conflicts law. Generally, the goods pass through, and are constructed in multiple jurisdictions. Moreover, plaintiffs and defendants hail from different states or countries–ultimately requiring modification of boundary restrictions on choice of law.

Carlenstlope involved a suit brought by a Swedish opera singer against a New Jersey based drug manufacturer alleging that a hepatitis vaccine, HB-Vax, gave her disabling arthritis. See Carlenstolpe, 638 F.Supp. at 901. The defendant, self described as a "worldwide organization engaged primarily in the business of discovering, developing, producing and marketing human and animal health products," was a New Jersey corporation which developed and produced HB Vax through a Pennsylvania based subsidiary. Id. at 903. In deciding to apply Pennsylvania law, the court followed Babcock. See id. at 910 (court was "applying the law of the place of the tort where conduct-regulating rules are concerned").

In Hadar, the purchaser of a yacht sued defendant when two incompatible substances, epoxy resin and peel ply, were applied to the deck, causing delamination. See Hadar, 886 F.Supp. at 1086-87. The epoxy resin was manufactured in Washington state and the peel ply in North Carolina; the substances were combined in Massachusetts; the plaintiff and yacht were in New York; the defendants were in Massachusetts, New Hampshire, Rhode Island, and North Carolina. Id at 1093. The court did not apply the law of the site of the injury–which in this case would presumably have been New York. Instead, the court seemed to apply the law where the causative misconduct took place, that is where the two products were combined–in Massachusetts. Id.

_Babcock_ remains the backdrop of New York conflicts jurisprudence–binding on this court under _Klaxon_–when specific rules fail to accommodate modern case realities. The use of goods shipped and marketed interstate, and the possibility of extraterritorial causative misconduct, diminishes the utility of traditional emphasis courts have placed on the "place of injury" when determining the locus of a simple tort.

A rule applying New York liability law in the instant case, rather than the laws of all the states individually to people injured all over the country finds support in the history of conflicts law. See _Simon v. Philip Morris_, 124 F.Supp.2d 46, 63–69 (detailing history of choices of laws from ancient times to modern). _Babcock_ was a result of the realization that sovereign interests of a particular state might be less important than reaching a fair and just result. _Id._ at 66 (outgrowth of _Babcock_ from this principle).

The history of choices of laws shows that notions of individual justice have trumped sovereign interests in affairs that by their nature have a supranational or suprastate scope. The unique nature of some cases demand flexibility and comparison of alternative results achieved by applying different laws. The changing forms of personal injury in the twentieth century, due to increased mobility of goods, people, and information, imposes strong pressures to account for the interests of all harmed parties and their states. See _Simon v. Philip Morris_, 124 F.Supp.2d 46, 67 (E.D.N.Y. 2000) (historical analysis).

Recent scholarship and precedent suggests that the wheel has turned to a "period of equity and natural law" with regard to modern, complex tort problems. Most modern scholarship concludes that choice of law rules can, and should, lead to the application of either a few state laws, a single state law, federal common law, national consensus law, or abandoning _Klaxon_

analysis altogether in complex litigation. See, e.g., Ryan Patrick Phair, Resolving the "Choice of Law Problem" in Rule 23(b)(3) Nationwide Class Actions, 67 U. Chi. L. Rev. 835 (2000) (advancing the viability of a limited number of subclasses or application of a single state law); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547 (1996) (while acknowledging that most scholars prefer one law, proposing manageable subclasses among small groups of differing state laws); Mary J. Davis, Toward the Proper Role For Mass Tort Class Actions, 77 Or. L. Rev. 157, 220 (1998) ("A thoughtful reasoned analysis of a class action involving claimants from all states could legitimately result in applying the law of the defendant's home state to determine liability for conduct-based claims such as fraudulent misrepresentation or negligence"); James A.R. Nafziger, Choice of Law in Air Disaster Cases: Complex Litigation Rules and the Common Law, 54 La. L. Rev. 1001, 1013 (1994) (forum shopping concerns have created consensus in favor of applying the same body of rules to govern all issues in a single case); American Law Institute, Complex Litigation Project § 6.01 comment a, at 398-399 (desirability of applying law of single state to particular issue that is common to all claims); Friedrich K. Juenger, Mass Disasters and the Conflict of Laws, 1989 U.Ill. L. Rev. 105, 126 (in choosing the applicable rule for any issue in a mass disaster case, it is preferable to frame an alternative reference position that favors application of the better substantive rule that can be expected to produce decision-making rules similar to national consensus law).

Judicial preference for material justice in conflicts cases has grown in the United States as courts have moved from vested rights. See James A.R. Nafziger, Making Choices of Law Together, 37 Willamette L. Rev. 207, 209-10 (2001). In many single accident mass disasters, courts have been influenced by scholarship. See, e.g., In re Air Crash Disaster Near Chicago, Ill.

on May 25, 1979, 644 F.2d 594, 616 (7th Cir. 1981) (using "most significant relationship" test to justify application of Illinois law on punitive damages and smoothing over minor differences in various relevant state laws); In re Disaster at Detroit Metro. Airport on August 16, 1987, 750 F. Supp. 793, 795 (E.D. Mich. 1989) (applying law of California to product liability claims and law of Michigan to all damage claims except those filed in California); In re Air Crash Disaster at Stapleton Int'l Airport, Denver, 720 F. Supp. 1445, 1447 (D. Colo. 1988) (finding that Texas had most significant relationship to punitive damage claims); In re Paris Air Crash of March 3, 1974, 399 F. Supp. 732, 749 (C.D. Cal. 1975) (applying California law where there was no showing of greater or equal interest of foreign state to apply its own law); see also James A.R. Nafziger, Choice of Law in Air Disaster Cases: Complex Litigation Rules and the Common Law, supra, at 1015-84 (describing analysis and result in 62 cases decided between 1975 and 1993 which support use of a single law in mass tort cases).

This trend has received encouragement from the Supreme Court's decision in Sun Oil v. Wortman, 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988), which increased flexibility in interpreting and possibly reconciling multiple state laws. 486 U.S. at 730-31 ("To constitute a violation of the Full Faith and Credit Clause or the Due Process Clause, it is not enough that a state court misconstrue the law of another state. Rather, our cases make plain that the misconstruction must contradict law of the other State that is clearly established and that has been brought to the court's attention . . . We cannot conclude that any of the interpretations at issue here runs afoul of that standard."). Flexibility and adjustments to choice of law are structurally and philosophically easier in uncodified systems like New York's. Cf. Simon v. Philip Morris, 124 F.Supp.2d 46, 48 (E.D.N.Y. 2000) (discussion of private law mechanisms in

Europe to provide flexibility). Open approaches to jurisdiction also support more pliant parallel choice of law standards. Id.

Under the rules of Klaxon, this court is bound to analyze issues consistently with New York conflicts of laws. It must predict how the New York Court of Appeals would view the matter. Because the New York Court of Appeals has never directly spoken to conflicts decisions in massive class actions, such as those in tobacco, courts are left to assess trends in New York law, history, and current scholarship to reach a "just, fair, and logical result." While New York has fashioned some rules to lend uniformity to conflicts analysis in general, these rules do not contemplate a complex fact pattern such as this one. This area of the law in New York is still cooking. Under these circumstances, courts are required, as already noted, to return to the fundamental rule of New York, the Babcock interest analysis.

In July of 2002, the New York Court of Appeals decided that General Business Law section 349, New York's Consumer Protection Act, did not apply to persons injured outside New York by reason of fraudulent activities within the state. See Goshen v. Mutual Life Ins. Co. of New York, 98 N.Y.2d 314 (2002). If that opinion could be read as the forerunner of a more restrictive conflict of laws conception than that described above its implications in the instant case would be profound.

The Goshen opinion, while it may ultimately have a broader implication than it now seems to possess, appears to be restricted to cases under section 349 of New York's Business Law. It relies heavily on the language and legislative history of section 349, nowhere referring to general conflicts of laws principles. The one reference to a possible general view critical of application of New York law globally, explicitly refers only to section 349. It reads:

> To apply the statute to out-of-state transactions in the case before us would lead to an unwarranted expansive reading of the statute, contrary to legislative intent, and potentially leading to the nationwide, if not global application of General Business Law § 349.

Id. at 325. By implication the legislature might have applied the statute to harms that occurred elsewhere because of frauds that took place in New York. Id. In common law conflicts and torts situations where the courts are responsible for the law's development, they can do what the legislature has left them free to do — apply the conflicts rule in a sensible expansive form.

Failure of the Court of Appeals to rely in Goshen on New York's rich conflicts of law tradition lends support to the more expansive reach described in this memorandum. It should be noted that applying New York law to this national class action will tend to provide more protection to New York members of the class — a result seemingly supported by New York policy. They will gain from the reduction in transactional costs per class member. They will also benefit from the procedural advantages of Federal Rule of Civil Procedure 23 as contrasted with the somewhat weaker (in application) New York CPLR Article 9 class action.

Improving plaintiffs' procedural posture does have an impact on enforcement of substantive rights. This indirect effect of the Federal Rules in conjunction with Erie, state conflicts law, and state substantive law does not constitute a violation of the Federal Rules Enabling Act. See 28 U.S.C. § 2072 (b) (2002); Amchem Products Inc. v. Windsor, 521 U.S. 591, 613, 117 S.Ct. 2231, 2244, 138 L.Ed.2d 689 (1997).

Nothing in Goshen or any federal statute, the Federal Constitution, or the Federal Rules of Civil Procedure prevents interpreting New York's conflicts rules to permit application of New York's general fraud law for the benefit of the present national class which includes many New

Yorkers. Should the court of appeals for the Second Circuit, or the New York Court of Appeals on a certified question, decide to the contrary, the court could allow subclassing by states with essentially the same law; this was one of the proposals briefed by plaintiffs in earlier stages of this litigation.

The single substantive law result is particularly appealing in the present case where New York's law of fraud will be used to determine compensatory damages primarily as a predicate for punitive damages which themselves will be largely determined by the Federal Constitution and Rules of Procedure— national law.

D. Constitutional Limits

The United States Supreme Court has never fully articulated the exact nature of the contacts that would be sufficient for application of local law. Cases that have fleshed out the kinds of contacts sufficient to apply a single law are not dissimilar from the present one. See, e.g., Gruber v Price Waterhouse, 117 F.R.D. 75, 82 (E.D. Pa. 1987) (finding selection of forum law constitutional in securities litigation where defendant Price Waterhouse maintained its principal place of business in the forum and auditing and financial statement preparation occurred there); In re ORFA Securities Litigation, 654 F. Supp. 1449 (D. N.J. 1987) (applying New Jersey law to the class where defendant's principal place of business was New Jersey and alleged misrepresentations originated there); In re Activision Securities Litigation, 621 F. Supp. 415, 430-31 (N.D. Cal. 1985) (selecting California law to govern a class where Activision maintained its principal place of business in the state, issued securities in the state, and the purchasers' acceptances were directed at the state); In re LILCO, 111 F.R.D. 663, 670 (E.D.N.Y. 1986) ("Without doubt, Shutts does not require us to apply the law of each state in which the

plaintiffs reside nor does it prohibit the application of one state's law to all plaintiffs, regardless

of residence"); Alan M. Mansfield, Nationwide Class Actions in State Court: Starting With

Shutts, 1172 Practicing Law Institute: Corporate Law and Practice Course Handbook Series, 263,

270 (2000) ("[A] number of courts have cited Shutts for the questionable proposition that the

laws of every state in which a class member resides must be considered in nationwide class

actions for state law violations, without explanation of how Shutts supports such a

proposition."); but see In re Ford Motor Co Bronco II Product Liability Litigation, 177 F.R.D.

360, 369-71 (E.D. La. 1997) (Shutts test was not satisfied by plaintiff's attempt to apply

Michigan law to a nationwide class on the grounds that defendant Ford has its principal place of

business in Michigan and design decisions were made there). A California appellate court has

even held it reversible error to *fail* to consider the possibility of a single governing law on a

motion for class certification. See Clothesrigger Inc v. GTE Corp., 191 Cal. App. 3d. 605 (1987).

E.    Interest Analysis in This Case

The tobacco industry and present defendants' activities underlying the litigation have

decisive connections to New York State. Philip Morris and Lorillard both have their principal

places of business in New York City, and both of these companies have been headquartered in

New York. See Simon v. Philip Morris, Inc., 86 F. Supp. 2d 95, 107 (E.D.N.Y. 2000).

Much of defendants' conduct took place in New York, particularly activities relating to

the alleged conspiracy that led to plaintiffs' damages. For example, the original 1953 meeting at

which the major companies agreed to pursue a public relations program in reaction to a health

scare took place at the Plaza Hotel in New York City. H&K, the firm retained to develop the

public relations program, is a New York corporation with its principal place of business in New

159

York. See Simon, 86 F. Supp. 2d at 107. One of H&K's initial recommendations to the industry was to establish a subcommittee of chief executives resident in New York. See Plaintiffs' Proffer at 21. The companies are regularly identified in the media as being New-York-based companies.

All six major tobacco companies joined together to form TIRC and later TI. CTR (formerly TIRC) and TI were both incorporated in New York. See Simon, 86 F. Supp. 2d at 107. "CTR's offices in New York City generated critical data with which to dispute and deflect attention from the evidence linking smoking to lung cancer, heart disease and other illnesses." Id. These entities were allegedly at the center of the fraud.

The tobacco industry also had critical business and legal ties to New York. Some of BAT's major investors have been based in New York, including Oppenheimer Capital Management, Chancellor Capital Management, and Manufacturers Hanover Trust. Dominant industry lawyers were also based in New York. "JM & F, the law firm which . . . played an important role in CTR 'special projects' is located in New York City." Id. at 107.

Finally, substantial amounts of cigarettes are sold in New York. For example, B&W has an 18% share of the American market.

> While the percentage of these profits ultimately traceable to New York is unclear, B&W's strong market presence and the size of the New York population strongly support the inference of substantial New York cigarette sales roughly proportional to the percentage of New York residents in the total United States population – somewhere in the neighborhood of seven percent.

Id. at 100. The Blue Cross trial demonstrated that probably millions of smokers were New Yorkers. The same analysis can be applied to the other major tobacco companies. There is a significant aggregation of New York contacts sufficient to satisfy the Constitution.

160

Application of New York law in this case satisfies Due Process and Full Faith and Credit under Shutts. It is worth noting that Shutts itself was not a complex case. The potential application of four different state interest rates in Shutts was not likely to create the kind of joinder, pretrial, trial, or remedial complexity as does the case at bar. Moreover, states other than Kansas, the Shutts forum state, had a greater interest in the case than did Kansas, which essentially applied its own law, to protect a relatively small number of its citizens compared to those from Texas. Justifying application of its own law on the ground that the other interested states had the same law was a formality to in effect construct a rule of consensus.

Shutts left open the possibility that the choice of a single law (or multiple state laws) is constitutionally permissible if the mechanical application of multiple laws threaten the rational adjudication that lies at the heart of due process, and "this threat outweighs the countervailing Due Process and Full Faith and Credit Clause considerations that animated Shutts." Jay Tidmarsh & Roger H. Transgrud, Compex Litigation and the Adversary System 804 (1998).

As already established, the parties' domiciles and the "locus of the tort" are usually the most significant contacts for purposes of evaluating the relative strength of state interests in ordinary tort cases. Plaintiffs in the present case are domiciled around the country, and have been allegedly harmed throughout the nation. Defendants are domiciled in New York, North Carolina, and Kentucky. The injuries resulting from tobacco smoking stretches over tens of years and concerns a highly portable product. Yet the gravamen, focus, center of activity and prominence of defendants' misconduct converged in New York. An analysis of New York primary interests needs to be set against interests of those other jurisdictions.

The three reasons most often urged in support of applying the law of the "locus of the

tort" in cases such as the one before us are: (1) to protect medical creditors who provided services to injured parties; (2) to prevent injured tort victims from becoming wards in the locus state; and (3) to deter future tortfeasors in the locus state. Schultz, 65 N.Y.2d at 200. New York, along with the other states, shares an interest in these first two factors. As the evidence proffered by the plaintiffs illustrates, approximately 150,000 United States residents die each year from lung cancer; established medical science concludes that where primary lung cancer is found in a person who has at least a twenty year history of smoking conventional cigarette products, smoking was a substantial causative factor. The resulting widespread medical crisis has placed a substantial burden on all 50 states' coffers and medical services (which tend more and more to be national in scope through HMO's and national medical compensation for broad classes of the poor, the elderly, and the disabled). All states as well as the national government share an interest in determining how to compensate and protect diseased smokers.

With regard to deterrence, New York has an obvious and substantial leading interest in ensuring that it does not become either a base or a haven for law breakers to wreak injury nationwide. See, e.g., Bergeron, 100 F.Supp.2d at 170 (2000). Substantial portions of defendants' alleged conspiracy were orchestrated in New York. See, e.g., Simon v. Philip Morris, Inc., 86 F.Supp.2d 95, 107 (E.D.N.Y. 2000). CTR, which was a major vehicle for perpetuating the conspiracy, operated in New York. A number of critical meetings of tobacco representatives necessary to the scheme occurred in New York, and at least two of the companies, Lorillard and Philip Morris, Inc., have their principal places of business in New York.

Each smoker's state of residence does have some regulatory interest in punitive damages.

See, e.g., In re Agent Orange Products Liability Litigation, 580 F.Supp. 690, 705 (E.D.N.Y. 1984). States that disallow or limit punitive damages are more interested in controlling excessive liability (or loss allocation) than in punishing and deterring dangerous conduct. Cf. Schultz, 65 N.Y.2d 189, 200 (finding locus of tortious conduct less important because rule in conflict was loss allocating, rather than conduct-regulating). In complex tort litigation, jurisdictions with the strongest nexus to the offending conduct have the greatest interests in punishment and deterrence. See ALI Complex Litigation: Statutory Recommendations and Analysis (choice of law) § 6.06, comment a. (general rationale).

New York's interest in punitive damages appears more significant in this action than that of any other state. Punitive damage issues bear directly on the regulation of dangerous conduct within its borders. See, e.g., Pescatore, 97 F.3d at 14 ("New York has an interest in regulating the extent to which New York . . . corporations may be held liable for excessive or punitive damages"). Dispersal difficulties in the mass tort tobacco cases underscore the conclusion that conflict rules generally applicable to single tort situations do not control a case as complex as the present one; Babcock principles do. As the place of incorporation and business of the major actors in the conspiracy New York also has an interest in seeing that they, as its wards, are not unduly punished by excessive punitive damages imposed in other states.

That another state limits damages does not deny New York's authority to sensibly apply its own law to protect those it has a policy to safeguard. This is illustrated by the leading case of Hurtado v. Superior Court of Sacramento County, 11 Cal. 3d 574, 522 P.2d 606, 114 Cal. Rptr. 106 (1974). The court held that in a California action for wrongful death of a Mexican citizen based upon an automobile accident in California, the court should not apply Mexican limits on

recovery. The court declared:

> The interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims . . . Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants.

11 Cal. 3d at 580-81. Cf. Labree v. Major, 111 R.I. 657, 662, 673, 306 A.2d 808, 812, 818

(1973) (after a comprehensive analysis of the New York cases, applying an interest analysis

favoring the plaintiff, "no matter what the law of his residence or the place of the accident"). The

Hurtado court went on to point out that California's interest was "to deter conduct" in California.

11 Cal.3d at 583; see also Abogados v. AT&T, Inc., 223 F.3d 932, 935 (9th Cir. 2000)

(confirming Hurtado's proposition that damage limitation rules are intended to protect

defendants from large verdicts). The Fifth Circuit decision in Spence v. Glock, 227 F.3d 308

(5th Cir. 2000), relied upon by defendants, is not inconsistent with the conclusion reached in this

memorandum on the applicability of New York law to elements of the plaintiffs cause of action.

See Simon v. Philip Morris, 124 F.Supp.2d 46, 74 (E.D.N.Y. 2000) (analysis of Glock decision).

The interests of other states in substituting their law of punitive damage liability for New

York's are limited. The Attorneys General have already jointly obtained compensation for each

of their states, thus diluting each states' disparate continuing interest in the tobacco litigation.

See National Association of the Attorneys General, "Master Settlement Text," Multistate

Settlement With The Tobacco Industry (visited Nov. 13, 2000)

<http://www.tobacco.neu.edu/Extra/multistate _settlement.htm>.

Determining general questions of liability under New York law dovetails well with a

policy ensuring that New York can enforce its own set of civil obligations amongst its own

domiciliaries and serve as an effective forum for determining injuries for its own (and others') citizens, who, without a centralized trial, may be left without an effective remedy. Mass Tort Jurisdiction and Choice of Law in a Multinational World Communicating by Extraterrestrial Satellites, 37 Willamette L.Rev. 145, 153-54 (2000). The policies undergirding Rule 23 – providing an effective remedy for the injured – add one more justification for certifying a class under a single New York fraudulent concealment claim. See, e.g., In re Seagate Technologies Securities Litigation, 115 F.R.D 264, 271 (N.D.Ca. 1987) (foreign states interest in maintenance of Rule 23 class action may outweigh interest in the application in the law to its own residents). See also, e.g., Lesley Frieder Wolf, Evading Friendly Fire: Achieving Class Certification After The Civil Rights Act of 1991, 100 Colum. L. Rev. 1847 (2000) (effectively carrying out public substantive rights policy requires an effective class action regime).

More generally, a state's policy interest in allowing application of similar rules of law and redress for its citizens in another forum may outweigh an interest in strict application of its own law – particularly if the result is a lack of an effective remedy for its residents. See, e.g., Platano v. Norm's Castle, Inc., 830 F.Supp. 796 (S.D.N.Y. 1993) (applying New York Dram Shop Act to action arising from Connecticut accident caused by driver who became intoxicated in New York tavern, but awarding compensatory damages under Connecticut's more generous standards so as to better effectuate the deterrence policy in New York); Arthur T. von Mehren, Special Substantive Rules for Multistate Problems: Their Role and Significance in Contemporary Choice of Law Methodology, 88 Harv. L. Rev. 347, 367-369 (1974) (proposing conflicts be resolved more expediently through compromise of competing policies); Aaron D. Twerski & Renee G. Mayer, Toward a Pragmatic Solution of Choice of Law Problems–At the Interface of

Substance and Procedure, 74 Nw. U. L. Rev. 781, 793, 797, 799 (1979) (proposing that a guest statute conflict be resolved by allowing the suit, but raising the standard of proof so that the guest plaintiff can recovery only if he proves ordinary negligence by clear and convincing evidence); Stanley E. Cox, Substantive, Multilateral, and Unilateral Choice of Law Approaches, 37 Willamette L. Rev. 171, 179 (2000) (suggesting these flexible approaches work best in "mass disaster and consolidated or class litigation situations").

States can have a broader concern with the protection of the welfare of their own citizens than in the strict application of conflicts law. The differences between states are unlike the differences between nations. People and goods move across state lines in the United States with ease and rapidity. It is understandable that each state will be sympathetic to the needs of out-of-state residents, particularly when those needs are intertwined with those of its own citizens. Choice of law decisions are made in part based on the interrelated "interstate judicial system's interest in obtaining the most efficient resolution of controversies." World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

There are many nuances, both substantively and procedurally, in law from state to state. Courts, however, cannot ignore two fundamentals: 1) they deal with human institutions that, unlike the exquisite machinery of atomic physicists with tolerances approaching zero, must interpret the law reasonably, with some play in its joints, if it is to effectively serve its protective role, and 2) they respond here to a complex nationwide fraud allegedly created by defendants; the contention of the defendants that the plaintiff's claims are too widespread to be dealt with effectively by the courts must be considered in light of the allegations that it is defendants' pervasive fraud that has led to the need for nationally applicable effective remedies. The basic

premise of law in this country remains that for every wrong there is a remedy, an effective and realistic remedy.

Choice of law is primarily a substantive matter, a decision that determines the nature and specific contours of a party's rights. The class action is also an outgrowth of history and equity, that affects the real power and substantive balance of rights of those whose claims are aggregated. Both the drafters and critics of Rule 23 perceived this, and it accounts for the political content that underlies some of the attacks on, and defenses of, class actions. See generally Lesley Frieder Wolf, Evading Friendly Fire: Achieving Class Certification After The Civil Rights Act of 1991, 100 Colum. L. Rev. 1847 (2000) (federal courts can, and should, comply with the certification rules and the Constitution in carrying out national policy); Judith Resnick, From Cases to Litigation 66-67 (May 1990) (contrast between substantial controversy that greeted 1966 revisions of class action rule and absence of objections to consolidation pursuant to Multidistrict Litigation Act); Robert L Carter, The Federal Rules of Civil Procedure as a Vindicator of Civil Rights, 137 U.Pa.L.Rev. 2179, 2184-2190 (1989). Although the New York Court of Appeals has never directly decided conflicts policy in massive class actions, trends in New York law, history, and current scholarship involving mass torts suggest that a "just, fair, and logical result" under Babcock should respect and balance these equitable rights and considerations, allowing the present action to go forward.

Interpreting applicable law in light of precedent and need, it is the unitary and substantive law of New York, the unitary federal procedure and the Federal Constitution in limiting punitive damages that will govern in Simon II. If, on appeal from orders certifying the class, the court of appeals of this circuit or the New York Court of Appeals should disagree with the district court's

interpretation of New York's conflict of laws policy suggested in this memorandum, then, as already pointed out, certification based upon similarity of state substantive law and its classification into a relatively few types would permit certification on that basis. A remand for reconsideration of the certification issue would then be appropriate in the conversation between the trial and appellate courts encouraged by Rule 23(f) of the Federal Rules of Civil Procedure. See National Asbestos Worker's Medical Fund v. Philip Morris, 71 F. Supp. 2d 139, 160 (E.D.N.Y. 1999).

Should the court of appeals for the Second Circuit reject the application of New York law in the way sketched in this memorandum, it could remand to determine the manageability of state subclasses or other techniques to accommodate the variations that do exist among state laws. See, e.g., In re Telectronics Pacing Sys., Inc., 172 F.R.D. 271, 292 (S.D. Ohio1997) (describing options court faces in conflict of laws' class action determination to "(1) find that state law is sufficiently similar that a single class is appropriate; (2) find that the state law varies so much that class certification is inappropriate; or (3) find that state law variations can be categorized and then divided into subclasses"). Use of subclasses to make class actions more manageable is fair and routine. Alexander v. Centrafarm Group, 124 F.R.D. 178, 186 (N.D. Ill. 1988) (predicting that lack of variation among state fraud laws would produce few individual questions and providing for individualized hearings or alteration of class certification); In re Computer Memories Sec. Litig., 111 F.R.D. 675, 686 & n.7 (N.D. Cal. 1986) (either California law would apply "across the board" or subclasses would be employed; otherwise, class could be decertified or modifications could be made in structure of litigation); In re Lilco Sec. Litig., 111 F.R.D. 663, 670 (E.D.N.Y. 1986) (doubting that differences in state laws were "so great as to preclude class

treatment" and providing for the use of subclasses if necessary); <u>Maywalt v. Parker & Parsley</u>

<u>Petroleum Co.</u>, 147 F.R.D. 51, 58 (S.D.N.Y. 1993) (discounting "defendants' speculative forecast

of difficulties" with making choice-of-law determination and certifying provisionally on ground

that subclasses can be created). There is relative uniformity among the states' fraudulent

concealment laws; material differences are few. <u>See</u>, <u>e.g.</u>, Larry Kramer, <u>Choice of Law in</u>

<u>Complex Litigation</u>, 71 N.Y.U. L. Rev. 547, 583 (1996) ("[T]here will never be 50 different

substantive rules, or even fifteen or ten. States tend to copy their laws from each other, and many

use identical or virtually identical rules. In practice, the court will seldom have to deal with more

than three or four formulations . . . .").

VIII.    Class Certification Analysis

The standard case-by-case process for adjudicating mass tort claims generally denies

efficiencies to plaintiffs, but automatically affords those litigation advantages to defendants, who

are repeat litigators of the same issues. <u>See</u> <u>generally</u> David Rosenberg, <u>Mass Tort Class</u>

<u>Actions: What Defendants Have and Plaintiffs Don't</u>, 37 Harv. J. Legis. 393, 404 (2000)

("Systemic bias . . . poses a major obstacle by preventing plaintiffs from investing optimally in

developing the aggregate value of their claims, while the defendant engages in precisely that

investment strategy to strengthen its case on the common questions and further drive down its

adversary's expected benefit . . . .[T]he systemic bias favoring the defendant subverts the goal of

fully internalizing the costs of tortious harm."); Marc Galanter, <u>Why the "Haves" Come out</u>

<u>Ahead: Speculations on the Limits of Legal Change</u>, 9 L. & Soc'y Rev. 95 (1974) (analyzing

repeat player issue). The aggregation of claims in a multiple action as in the case at bar restores

balance in litigation power to ensure one of the primary goals of tort law: effective and

administratively efficient deterrence and compensation. David Rosenberg, Individual Justice and Collectivizing Risk-Based Claims In Mass Exposure Cases, 71 N.Y.U. L. Rev. 210 (1996) (calling for consideration of collectivization in mass exposure cases from the perspective of the deterrence and compensation policies underlying tort law); cf. Kenneth S. Abraham, Individual Action and Collective Responsibility: The Dilemma of Mass Tort Reform, 73 Va. L. Rev. 845, 896-97 (1987) (proposing a compensation fund with quasi-subrogation rights of punitive damages against a tortfeasor).

A. General Requirements

1. Requirements of Rule 23

Rule 23(a) of the FRCP lists the general requirements to certify a class for a class action. They are as follows:

1) The class is so numerous that joinder of all members is impracticable

2) There are questions of law or fact common to the class

3) The claims or defenses of the representative parties are typical of the claims or defenses of the class

4) The representative parties will fairly and adequately protect the interests of the class.

In addition, parties seeking class certification must show that the action is maintainable under 23(b) (1), (2) or (3). Amchem Prods. v. Windsor, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 68 (1997).

The four requirements of Rule 23(a) are commonly referred to as: numerosity, commonality, typicality and adequacy of representation. A court must conduct a "rigorous analysis" to be certain that the proposed class meets the four requirements. The court will give

weight to the allegations of the complaint, but is not bound by them when its inquiry provides useful supplemental information. Here, adequacy raises the only serious issues.

### a.    Numerosity

Plaintiffs, when seeking class certification, do not need to have an exact number of the total members of the class. All that is required is that joinder of all potential parties is difficult or inconvenient. Fed. R. Civ. P. 23.

### b.    Commonality

A class meets the commonality requirement when its members have a common question of law or fact. Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 155 (2d Cir. 2001). Issues of fact are common when the injuries derive from a "unitary course of conduct by a single system." Marisol A. v. Guliani, 126 F.3d 372, 377 (2d Cir. 1997). "That inquiry trains on the legal and factual questions that qualify each class member's case as a genuine controversy." Amchem, 521 U.S. at 623.

### c.    Typicality

Claims are considered typical when "each class member's claims arises from the same course of events, and each class member makes similar legal arguments to prove defendant's liability." Robinson, 267 F.3d at 155 (quoting Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997).

### d.    Adequacy of Representation

The purpose of the adequacy requirement is to ensure that there are no conflicts of interest between the named plaintiffs and the class they represent. The representative must have essentially the same interest and have suffered essentially the same injury as the rest of the class.

See generally Selection of Class Counsel, Third Circuit Task Force Report, August 2002, 208 F.R.D. 340 (2002) (factors to consider in choosing class counsel).

Recent Supreme Court case law has re-emphasized the need for vigilance in assuring that plaintiffs' attorneys do not have conflicts of interest which would impede them in fairly and adequately representing their clients. The Court has spoken on this issue twice in recent years, first in Amchem Products Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and again in Ortiz et al. v. Fibreboard Corp., 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). Amchem and Ortiz represent the current position of the Court regarding adequacy of representation in class actions. See also Panel Discussion, Mass Tort Litigation in Federal Courts, Judicial Conference of the Second Circuit, June 16, 2000, 201 F.R.D. 106, 116 ("In Amchem Products, and then last year in Ortiz v. Fibreboard, in terms that were quite openly outraged in some portions, the court found conflicts of interest to be pervasive in this field, conflicts both internally within the class and external conflicts between the class members and [other plaintiffs].") (statement of Professor John C. Coffee, Jr.). The viability of settlement based class action lawsuits following Amchem and Ortiz was widely discussed at that Second Circuit conference, where many of the panelists examined the concept at length.

Amchem presented the court with a settlement-only class action which would have dealt with claims for a large number of plaintiffs with asbestos-related injuries. Many of the plaintiffs were currently suffering from asbestos-related harm, while others were possible "future" claimants with no existing disability. Numerous claims from allegedly injured plaintiffs had been consolidated in a single court. After intensive negotiations, the parties agreed on a settlement. The plaintiffs' attorneys were representatives of individuals claiming current

disability or harm. Defendants did not wish to settle in the absence of a guarantee against future claims. Plaintiffs counsel "endeavored to represent the interests of the anticipated future claimants, although those lawyers then had no attorney-client relationship with such claimants." Amchem, 521 U.S. at 601. Once a settlement was agreed upon, the attorneys filed a class action on behalf of future claimants which was settled that same day, never having been intended to be litigated. The class had nine named plaintiffs; most of them qualified as people with "current" harm. Id. at 602–03. No subclasses were created. Id. The proposed settlement provided a payment matrix for different types of disease with no adjustment for inflation. Some kinds of claims, such as loss of consortium, increased risk, fear of future harm, and medical monitoring, as well as all punitive damages, were barred. Id. at 604. The District Court certified the class. No additional counsel was appointed. Id. at 606. The court of appeals for the Third Circuit reversed. The appellate court focused on individual differences between claimants—commonality—and on conflicts of interest between future and present claimants. Id. at 609–10.

The Supreme Court affirmed, holding that settlement classes, while they need not meet all manageability requirements of trial classes, must meet all other requirements, including adequate protection of absentee class members, and that heightened attention to this issue was appropriate. Id. at 620. Standards set up for protection of class members are meant to ensure thorough analysis and fairness. Id. at 621.

In Amchem, a primary reason that class certification was ultimately denied was that the Supreme Court found that the currently injured plaintiffs and the exposure-only plaintiffs had different interests. Id. at 627. The Court noted the incompatibility of these two groups: "For the

currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." Id. at 626. This kind of problem is not present in the instant case, because there are no future plaintiffs in the class.

Ortiz reinforced the lessons of Amchem. The Ortiz Court was concerned that "the District Court took no steps at the outset to ensure that the potentially conflicting interests of easily identifiable categories of claimants be protected by provisional certification of subclasses under Rule 23(c)(4), relying instead on its *post hoc* findings at the fairness hearing that these subclasses had in fact been adequately represented." Ortiz, 527 U.S. at 831–32. The Ortiz court's rejection of the class action was based in large part on findings that "the legal rights of absent class members" had not been adequately protected. Id. at 846–49.

The principal concern in both Ortiz and Amchem was ensuring adequate protection and attention to the needs of all members of the class by avoiding conflicts of interest between attorneys and some of their clients. "In the class action, the class representative is usually a token figure, with the class counsel being the real party in interest." John C. Coffee, Jr., Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370, 384 (2000).

Professor Coffee suggests that:

[S]tructural conflicts in the mass tort class action can be grouped under four basic headings: (1) internal conflicts that exist within the class--typically, because subcategories of class members are competing over the allocation of the settlement; (2) external conflicts that arise because class members (or their attorneys) have some extraneous reason for favoring a settlement that does not truly benefit the interests of all class members; (3) risk conflicts that arise because class members or class counsel have very different attitudes about the level of risk they are willing to bear; and (4) conflicts

174

over control of the litigation.

Id. at 386. It is the responsibility of the court, following Amchem and Ortiz, to ensure that each of these types of conflicts are neutralized. This court has considered each of these possible conflicts; none of them are of concern in this case where a jury trial, court supervision and the nature of the issues ensures absence of any possible debilitating conflicts adverse to class members.

### 2. Subclassing

The Federal Rules of Civil Procedure provide that "a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall be then construed and applied accordingly." F.R.C.P. 23(c)(4)(B). Each subclass must be represented by a different class representative who must be a member of the subclass with essentially the same interest. Amchem Prods. v. Windsor, 521 U.S. 591, 625-26 (1997). If the court finds that subclasses should have been established, it can deny certification or decertify the class because the court must have "structural assurance" of appropriate representation for all the subgroups and individuals involved in the class action. Amchem at 627. Appropriate subclasses are necessary to insure that all class members have had their interests properly represented: "But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 743 (2d Cir. 1992), modified on reh'g, 993 F.2d 7 (2d Cir. 1993).

In Amchem, the Supreme Court suggested that groups with diverse medical conditions, as well as those people who were currently suffering disabilities and those who had only been

exposed to asbestos would require individual subclasses. Amchem, 521 U.S. at 611, 626-27. In

Ortiz v. Fibreboard Corp, the other major Supreme Court decision on this point, the court stated

that subclasses must be established to distinguish between those class members with present and

future claims. Each subclass requires separate class representatives and counsel to eliminate any

conflicts of interest. 527 U.S. 815, 856 (1999). One court of appeals has found that the failure to

subclass is not fatal when the differences are modest amongst the individuals and the expense of

division is great. Reynolds v. Benefit Nat'l Bank, 288 F.3d 277, 282 (7th Cir. 2002) (Posner, J.)

("[I]n light of the modesty of the stakes even of class members who had multiple refund

anticipation loans and the expense of subdividing the class (and how many subdivisions would

be necessary to reflect the full range of damages?), we are not disposed to regard this particular

defect in the settlement as fatal.").

Depending on the facts of a particular case, subclassing may be appropriate to avoid

conflicts of interest by counsel, and to ensure that the best interests of all the plaintiffs are

represented. Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 (1999). Subclassing can help to

ensure vigorous prosecution of all parties' claims. See, e.g., Robinson, 267 F.3d at 168–70.

Subclassing may not be necessary in a punitive damages case where division of damages

is based on an estimate of total compensatory damages or a fluid recovery. See Panel

Discussion, Mass Tort Litigation in Federal Courts, Judicial Conference of the Second Circuit,

June 16, 2000, 201 F.R.D. 106, 129 ("A punitive damages class, for example, may be a very

appropriate mechanism to resolve claims that don't necessarily lend themselves to subclassing. . .

.") (statement of Marc E. Kasowitz); cf. id. at 127 ("Punitive damages possibly lends itself to a

single resolution instead of all kinds of general resolutions.") (statement of New York State

Supreme Court Justice Helen E. Freedman).

Commentators have cautioned that overzealous application of subclassing could lead to "Balkanization" of the class action. "The danger here, and I think it's a real danger if the rules of Amchem are applied literally, is what I've called the Balkanization of the class action, the danger that the class will be broken down into a fragmentary series of groups, each with its own counsel, each counsel warring against other subclass counsel over the settlement fund and over the fees." Panel Discussion, Mass Tort Litigation in Federal Courts, Judicial Conference of the Second Circuit, June 16, 2000, 201 F.R.D. 106, 119 (statement of Professor John C. Coffee, Jr.).

In the present action for punitive damages without future claimants, subclassing would be counterproductive.

### 3. Methods of Modern Notice

Rule 23(d)(2) of the Federal Rules of Civil Procedure requires that:

> In the conduct of actions to which this rule applies, the court may make appropriate orders . . . requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgement, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action. . .

Notice of an impending class action suit need only be the best notice practicable under the unique circumstances of each case; this is a fact-intensive inquiry. See Agent Orange, 100 F.R.D. 718 (E.D.N.Y. 1983); Berland v. Mack, 48 F.R.D. 121 (S.D.N.Y. 1969). Individual notice to each plaintiff is unnecessary, as long as the notice given is reasonably calculated to apprise the members of the pendency of the action. See Cranston v. Hardin, 504 F.2d 566 (2d Cir. 1974). Absentee class members are bound by the judgement if appropriate notice was given,

regardless of whether such members actually received notice. Fontana v. Elrod, 826 F.2d 729 (7th Cir. 1987). Neither due process nor Rule 23 requires that notice to class members be in any particular form or that notice must be read in order to be adequate. In re Four Seasons Securities Law Litigation, 63 F.R.D. 422 (W.D. Okla. 1974).

Approved have been a variety of means of disseminating notice to potential plaintiffs. See, e.g., Katz v. Carte Blanche Corp., 53 F.R.D. 539 (W.D. Pa. 1971) (use of a party's monthly billing system for disseminating individual notice at plaintiff's expense); Rota v. Brotherhood of Railway, 64 F.R.D. 699 (N.D. Ill. 1974) (communication between a union and its members through the union newspaper, plant bulleting boards, and union meetings); Dean v. Coughlin, 107 F.R.D. 331 (S.D.N.Y. 1985) (notice to plaintiff class composed of prison inmates by distributing a copy of notice to each inmate and by posting such notice in the law library, dental clinic, and in each housing area); Johnson v. Robinson, 296 F.Supp. 1165 (N.D. Ill. 1967) (extensive news media provided sufficient notice in class action); but see American Finance System v. Harlow, 65 F.R.D. 94 (D. Md. 1974) (discretionary notice by publication is inappropriate where the class members are scattered throughout the country); In re Asbestos School Litigation, 115 F.R.D. 22, 25 (E.D. Pa. 1987), citing Erhardt v. Prudential Group, Inc., 629 F.2d 843, 846 (2d Cir. 1980) (unapproved notice which is factually or legally incomplete and lacks objectivity and neutrality is impermissible).

Plaintiffs' expert, Ms. Katherine Kinsella, has provided a detailed preliminary sketch of a notice plan for presentation to the court when notice becomes necessary. See Simon II Plaintiffs' Supplemental Memorandum in Support of Amended and Renewed Motion for Class Certification, July 24, 2002. The plan relies upon various forms of media including television,

radio, newspaper and magazine ads; press conferences and releases; establishment of a toll-free number; and the use of the internet including web sites. Ms. Kinsella suggests that appropriate targeting can reach an audience likely to be class members. Any final determination on the adequacy of a notice program will have to await submission of a detailed plan, but in the abstract, it appears that a nationwide program of the type outlined by Ms. Kinsella would be an appropriate way of disseminating notice to class members. See generally Jeanne C. Finegan, Determining Adequate Notice in Rule 23 Actions, For the Defense, Sept. 2002, at 23, 23–25 (noting various methods of providing notice using modern media).

### 4. Special Requirements for Limited Fund Actions

The instant case is brought as a limited fund under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure. Recent decisions of the Supreme Court have clarified the requirements of limited fund cases. The three criteria for limited fund class are:

> The first and most distinctive characteristic is that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims. . . . Second, the whole of the inadequate fund was to be devoted to the overwhelming claims. . . Third, the claimants identified by a common theory of recovery were treated equitably among themselves.

Ortiz, 527 U.S. at 838. All of these criteria are met by the present class certification.

Ortiz cautions courts not to certify a limited fund class action if the limited fund is itself a creation of the certification. Ortiz involved certification in conjunction with a settlement, which itself created the limited fund. The Court found that that process was not a sound application of Rule 23(b)(1) which requires the existence of a pre-existing limited fund. Ortiz, 527 U.S. at 840–42. A limited fund must not, the Court ruled, "give a defendant a better deal than *seriatim* litigation would have produced." Id. at 839. See also Panel Discussion, Mass Tort Litigation in

179

Federal Courts, Judicial Conference of the Second Circuit, June 16, 2000, 201 F.R.D. 106, 116 ("Amchem is filled, and Ortiz even more so, with rhetoric about the dangers of trapping within the class individuals who might have done better had they remained within the traditional court litigation system."). The court expressly declined to rule that a limited fund class action was not appropriate in a mass tort proceeding. "We do not . . . decide the ultimate question whether Rule 23(b)(1)(B) may ever be used to aggregate individual tort claims." Ortiz, 527 U.S. at 844.

Justice Breyer's dissent is not inconsistent with the majority opinion in its general principles. He has provided an analysis to govern future litigation. Ortiz is not designed to read out of Rule 23 the explicit authority of trial courts to exercise discretion in authorizing a non-opt-out limited fund class. Nor should that case be excessively extended in its precedential force. It is based upon a highly unique factual situation where, as with its sibling Amchem, there were serious questionable ethical aspects. Insider defendants and plaintiffs' counsel worked out a deal that might have given the class less than it should have received. No such ethical question surrounds the highly contested case now in this court. (This analysis should not be taken as a criticism of parties and counsel in those cases; they were responding to the bleeding of industry and workers in the still unresolved asbestos national tragedy. See discussion of ethics under Adequacy of Representation, supra.) The instant action is not based upon a prearranged settlement class with built in dangers of conflicts.

### 5. Limited Fund Class Action Based on Constitutional Caps

Recent scholarship and court decisions have concluded that the theory of limited punishment supports a punitive damages class action. Under this theory, the limited fund involved would be the constitutional cap on punitive damages, set forth in BMW v. Gore and

related cases. See supra section VI.B. (caps on punitive damages). See generally Elizabeth Cabraser & Thomas M. Sobol, Equity for the Victims, Equity for the Transgressor, 74 Tulane L. Rev. 2005, 2023 (2000) (setting forth this theory); Joan Steinman, Managing Punitive Damages: A Role for Mandatory "Limited Generosity" Classes and Anti-Suit Injunctions?, 36 Wake Forest L. Rev. 1043 (2001); John C. Coffee, Jr., The Tobacco Wars: Peace in Our Time?, N.Y.L.J., July 20, 2000, at 1 (examining limited punishment in the context of tobacco litigation); but see Richard A. Nagareda, Punitive Damage Class Actions and the Baseline of Tort, 36 Wake Forest L. Rev. 943 (2001) (suggesting that these actions are not appropriate). One commentator has noted that:

> One of the pressing and thus far unresolved issues in mass torts is whether there is some due process limitation, as normatively it appears that there must be, on how many times a particular defendant may be exposed to punitive damage awards for the same conduct, without successive juries even being informed that punitive damages for the egregiousness or social harm of the conduct had previously been awarded. This notion of a right to "limited punishment" for repeated and notorious harms is certainly one of the prime issues awaiting serious appellate scrutiny. It is highly disturbing that, in the interim, courts continue to allow punitive damages claims to deplete the limited coffers available for compensation.

Samuel Issacharoff, "Shocked": Mass Torts and Aggregate Asbestos Litigation After Amchem and Ortiz, 80 Tex. L. Rev. 1925, 1934 (2002) (emphasis added); see also id. at n.41 ("The question of constitutional limitation on punitive damages has been the subject of increasing, if inconclusive, Supreme Court review."); Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 Baylor L. Rev. 331, 352–57 (2002) (examining the practice of multiple punitive damages award, arguing that this threatens "the availability of funds needed to compensate sick plaintiffs," and concluding that "no constitutionally justifiable or sound public policy goal is served by repeated punitive

damage awards in asbestos cases").

In Exxon Valdez the class proceeded on a limited punishment theory. See In re the Exxon Valdez, No. A89-0095-CV (HRH), 1995 WL 527990, at *9 (D. Alaska 1995) ("The court, on Exxon's motion, created a mandatory punitive damages class for Exxon Valdez claims for punitive damages to prevent separate state and federal court punitive damage awards which might escape collective judicial review."). The court noted that:

> [R]ecent developments in the law have, in substance, created a limited fund for punitive damages in multi-claim cases . . . .
>
> From the case law it is apparent that a defendant's assets are not the only consideration which may limit a punitive damages award. Substantive due process also limits punitive damages by placing reasonable limits on punishment. A defendant with tremendous assets, such as Exxon, does not face unlimited punitive damages. Rather, due process places a limit on punitive damages and, in substance creates a limited fund from which punitive damages may be awarded.
>
> In re "Agent Orange" Prod. Liab. Litig., 100 F.R.D. 718 (E.D.N.Y. 1983), mandamus denied sub nom., In re Diamond Shamrock Chem. Co., 725 F.2d 858 (2d Cir. 1984), which certified a punitive damages class under a "limited punishment" theory, expressed concerns similar to those expressed by this court. Agent Orange recognized that where several claimants bring separate suits, the claimants who are first to recover may be awarded punitive damages sufficient to punish and assure deterrence. Substantive due process having been satisfied, later claimants may be precluded from recovering punitive damages. These considerations, along with due process concerns, fit within the parameters of 23(b)(1)(B) in that "adjudication with respect to individual members of the class . . . would as a practical matter be dispositive of the interests of the other members not parties to the adjudication . . . ."

In re The Exxon Valdez, No A89-0095-CV (HRH) (Consolidated), Order No. 180 Supp., at 8–9 (D. Alaska Mar. 8, 1994) (footnotes omitted), vacated as to amount of punitive award, In Re Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001).

Defendants with such enormous assets as the tobacco producers, like the Exxon oil company, do not realistically face a limited fund through prospective bankruptcy. Rather, it is

the Constitution through limits placed on the total punitive damages which creates the limited fund. But cf. Richard A. Nagareda, Punitive Damage Class Actions and the Baseline of Tort, 36 Wake Forest L. Rev. 943, 958 (2001) (arguing that "the constitutional limit upon punitive damages for a single course of conduct . . . is merely a theoretical limit . . . . and the decentralized structure of the tort system defies efforts to enforce in any meaningful way the constitutional limit").

The Valdez case echoes reasoning developed in the context of the Agent Orange litigation. In Agent Orange a mandatory nationwide class was certified and approved, In re Agent Orange Litigation, 100 F.R.D. 718, 728 (E.D.N.Y. 1983), aff'd, 818 F.2d 145 (2d Cir. 1987), because,

> There must . . . be some limit, either as a matter of policy or a matter of due process, to the amount of times defendant may be punished for a single transaction. At the very least, a trial court in passing on future claims may admit evidence as to the payment of prior awards which may be used by a jury to reduce an award to a party seeking additional punishment for the same misconduct. There is, therefore, a substantial probability that "adjudication with respect to individual members of the class . . . would as a practical matter be dispositive of the interests of the other members not parties to the adjudication." Accordingly, a class of all [claimants is] certified under (b)(1)(B) . . . for the award of punitive damages."

100 F.R.D. at 728 (citations omitted); see also In re Diamond Shamrock Chems. Co., 725 F.2d 858, 862 (2d Cir. 1984) (denying mandamus, and noting "the large number of potential claimants [and] the fact that punitive damages ought in theory to be distributed among the individual plaintiffs on a basis other than date of trial. . . ."). As the court of appeals for the Second Circuit pointed out in In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 736–37 (2d Cir. 1992), the total deterrence of many individual claims must be considered:

> *Diamond Shamrock* presented a situation much closer to the traditional concept of a

limited fund than occurs whenever an entity becomes insolvent. Though the potential amount of aggregate punitive damages had not yet been determined, that amount was finite and was not claimed to have rendered the defendant insolvent. The (b)(1)(B) class was thought appropriate because the recoveries of early successful claimants for punitive damages would quickly reach a total sufficient to assure deterrence, thereby precluding later claimants as a matter of law.

That is precisely the situation faced in the present class action.

This class action is intended to cover all punitive damages nationwide. This could include punitive damages due to outrageous conduct by defendants towards non-class members. The punitive function served by this certified class could be utilized in part for persons outside the class as, for example, passive breathers of the smoke exuded by others, those with diseases other than those represented by this certified class, and future diseased persons. This result could be accomplished through grants for research and treatment.

The amount of damage will be decided by the jury at the third stage of the trial. Allowing the jury to consider evidence of damage to others at this stage in setting the punitive award is appropriate in a nationwide class action where a portion of the harmful behavior may not be correlatable with class members. It is consistent with parallel procedures used in the criminal law context. For example, in the second stage of a murder trial, new factors may be introduced in determining punishment. See, e.g., Ring v. Arizona, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (right to trial abridged where judge alone determines the factors supporting capital punishment); Arthur W. Campbell, Law of Sentencing § 6:3 (2d ed. 1991, Supp. 2000) (collecting cases). A similar technique in general criminal sentencing has long been used and is now part of the Federal Guidelines. See Williams v. New York, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949) (sentencing court may properly take into account any information known to

it); <u>United States v. Concepcion</u>, 983 F.2d 369 (2d Cir. 1992) (upholding sentencing guidelines allowing judge to increase sentence based on offenses not charged or for which the defendant was not convicted); <u>United States v. Blake</u>, 89 F.Supp.2d 328 (E.D.N.Y. 2000) (new evidence on post-crime rehabilitation used to depart downward); <u>United States v. K.</u>, 160 F.Supp.2d 421 (E.D.N.Y. 2001) (same); <u>United States v. Flowers</u>, 983 F.Supp. 159 (E.D.N.Y. 1997) (postponement of sentence to allow demonstration of rehabilitation). Evidence that defendants had become more forthcoming about dangers in recent years could also be introduced at this third stage to reduce punitive damages even though they might not be admissible at the first and second trial stages. <u>Cf.</u> Fed. R. Evid. R. 407 (subsequent remedial measures).

Should the court of appeals rule that punitive damages based on outrageous conduct towards persons not included in the class may not be adjudicated, consideration can be given to modification of the class without significantly affecting its status as a non-opt out limited fund action under Rule 23(b)(1)(B).

B. 23(f) Review

Rule 23(f) of the Federal Rules of Civil Procedure allows for an interlocutory appeal to the court of appeals regarding class certification. The rule reads:

> A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

F.R.C.P. Rule 23.

Certification will be granted if it is demonstrated:

> (1) [T]hat the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable, or (2) that the

certification order implicates a legal question about which there is a compelling need for immediate resolution.

In re Sumitomo Copper Litigation, 262 F.3d 134, 139 (2d. Cir. 2001). See In re Simon II

Litigation, 200 F.R.D. 21 (E.D.N.Y. 2001) (history and application of Rule); National Asbestos

Workers v. Philip Morris, 2000 WL 1424931 (slip op. E.D.N.Y. Sept. 26, 2000) (same); National

Asbestos Workers v. Philip Morris, 71 F.Supp.2d 139 (E.D.N.Y. 1999) (same). The views of the

district court are relevant but not required for an interlocutory appeal. The court recommends

such review here since the legal questions implicated are serious, somewhat novel and require

immediate resolution.

   C.   Amendments to Federal Rules of Civil Procedure

   Proposed amendments to Rule 23 of the Federal Rules of Civil Procedure are under

consideration by the Supreme Court. The class as proposed meets the standard for certification

under either the old or new Rules.

   D.   Jury Trial by Stages

   Sectionalization of a jury trial into phases is appropriate in many cases involving mass

torts, class actions, or other complex suits. Power to so control the litigation is provided by

Federal Rule of Civil Procedure 42(b):

   The court, in furtherance of convenience or to avoid prejudice, or when separate trials
   will be conducive to expedition and economy, may order a separate trial of . . . any
   separate issue . . . always preserving inviolate the right of trial by jury as declared by the
   Seventh Amendment of the Constitution. . . .

The most common instances of bifurcation involve the separation of issues of liability

186

and damages, with a jury usually deciding the issue of liability first. See Steven S. Gensler, Bifurcation Unbound, 75 Wash. L. Rev. 705 (2000). Trials may also be reverse-bifurcated, with the issue of damages being tried first where the issue of damages is most contentious. See, e.g., Angelo v. Armstrong World Inds., 11 F.3d 957 (10th Cir. 1993).

Rule 42(b) provides great flexibility. Courts have on occasion split trials into three or more distinct phases. See, e.g., Hilao v. Estate of Marcos, 103 F.3d 767, 782 (9th Cir. 1996) (three stages: liability, compensatory-damage, and exemplary-damage). In In Re Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001), the appellate court approve trifurcation, recognizing the discretion of the trial court. It wrote:

> The district court, which did a masterful job of managing this very complex case, tried the case to the jury in three phases. In the first phase, the jury found that Hazelwood and Exxon had been reckless, in order to determine liability for punitive damages. The second phase assessed the amount of compensatory damages attributable to the spill to commercial fishermen and Alaska Natives. The third phase established the amount of punitive damages.

Id. at 1225; see also Edward F. Sherman, Class Actions and Duplicative Litigation, 62 Ind. L.J. 507, 516 (1987) (arguing that a "class action should not be found unmanageable without [first] exploring the procedural devices available for bringing it in line. These include . . . bifurcating liability and damages"); Gensler, supra, at 708–10. Support for severance in complex litigation including mass torts is extensive. See John K. Setear, Comments on Judges' Opinions on Procedural Issues, 69 B. U. L. Rev. 765, 778 (1989). Severance in these cases is justified on the basis of efficiency, expediency, and juror comprehension. See, e.g., Barr Laboratories Inc. v. Abbott Laboratories, 978 F.2d 98 (3d Cir. 1992).

The most important limitation on judges' ability to sever trials is the Seventh

Amendment. See Fed. R. Civ. Pro. 42(b). Gasoline Products v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) is the defining Seventh Amendment case, although it did not expressly discuss bifurcation. The Supreme Court rejected a static reading of the Seventh Amendment which would deny trial courts the freedom to experiment with novel trial procedures to meet unique situations. See Gensler, supra, at 731. The Court held that the Trial-By-Jury Clause of the Constitution permits separate consideration of separable issues. Gasoline Products, 283 U.S. at 499. The American Law Institute concluded that "there is a near universal consensus among the authorities that Gasoline Products upholds the constitutionality of the bifurcation procedure." American Law Institute, Complex Litigation: Statutory Recommendations and Analysis 3.06(a).

The other constitutional limitation on severance is the Reexamination Clause of the Seventh Amendment. See discussion at Part V.E., supra. It reads: "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." The Reexamination Clause does not present a problem with respect to separation of a trial before the same jury. The effect of the Clause is to prevent different juries from deciding the identical issue. See Allison v. Citgo Petroleum Corp., 151 F.3d 402, 423 (5th Cir. 1998). In order to prevent such an occurrence, courts must carefully delineate the roles of each jury so that one jury does not infringe upon the prerogatives of the other. See Gensler, supra, at 737. In addition, the court should explain the verdict of the first jury so that the second jury knows precisely what has already been decided. See id.

Bifurcation orders are rarely appealed. They will only be reversed for a clear abuse of discretion or a strong showing of prejudice. See United States v. Garber, 413 F.2d 284, 285 (2d

Cir. 1969); Garber v. Randell, 477 F.2d 711, 714 (2d Cir. 1973).

The presence of any one of the factors conducive to severance mentioned in Rule 42(b) —
avoidance of prejudice, convenience, and conduciveness to expedition and economy — suffices
to sustain a staging order. See United States v. I.B.M., 60 F.R.D. 654, 655 (S.D.N.Y. 1973).
Here all of these criteria are satisfied in the instant enormously complex case.

In addition to the enumerated factors, valid causes for severance include avoidance of
juror confusion, the possibility of inconsistent verdicts, and reducing the discovery time period.
See, e.g., Beights v. W.R. Grace & Co., 67 F.R.D. 81, 85 (W.D. Okl. 1975); Henry v. Goliger, 94
F.Supp. 385, 385 (S.D.N.Y. 1950); Sogmose Realties v. Twentieth Century-Fox, 15 F.R.D. 496,
497 (S.D.N.Y. 1954). The paramount consideration is always a fair and impartial trial. See
Martin v. Bell Helicopter Co., 85 F.R.D. 654, 658 (D.C. Colo. 1980), invoking a ten-question
checklist in deciding whether to bifurcate: 1) Will separate trials be conducive to expedition of
the litigation and economy?; 2) Will separate trials be in furtherance of convenience to the parties
and avoid prejudice?; 3) Are the issues sough to be tried separately significantly different?; 4)
Are the issues triable by jury or by the court?; 5) Has discovery been directed to single trial of all
issues or separate trials?; 6) Will substantially different witnesses and evidence be required if
issues are tried separately?; 7) Will a party opposing severance be significantly prejudiced if it is
granted?; 8) Will an unfair advantage be afforded to a party if bifurcation is granted?; 9) Will
management of trial, delineation of issues, and clarity of factual questions be substantially
enhanced by bifurcation?; and 10) Will bifurcation assist efficient judicial administration of the
case? None of these questions suggests a negative result in the present case. See also Hicks v.
Unger Motor Co., 332 F.Supp. 118, 121 (D.C. Pa. 1971); Ennix v. Clay, 703 S.W.2d 137, 138

(Tenn. 1986).

Sectionalization into three stages before the same jury is appropriate in the instant case. The stages of the trial are clearly delineated. Because of the nature of the claims, later stages may become unnecessary as the trial progresses. Trifurcation conserves judicial resources. It also permits the jury to focus on discrete questions, allowing it to digest the complex issues presented. The plan now presented by plaintiffs is similar in many respects to the trial plan used by the district court in the <u>Exxon Valdez</u> case and approved by the court of appeals. <u>In Re Exxon Valdez</u>, 270 F.3d 1215, 1225 (9th Cir. 2001).

    E.   Rule 23 Findings of Fact

        1.     Numerosity

The members of the class are believed to number in the millions. This large number makes joinder of all class members impracticable.

        2.     Commonality

Numerous critical common questions of law and fact exist. These include determinations regarding the harm caused by tobacco; the extent, if any, of defendants' knowledge of tobacco harm; the extent, if any, of defendants' actions to defectively or fraudulently design, manufacture, or market their products; the extent, if any, of defendants' alleged conspiracy or cover-up; and similar related questions.

The class is not seeking compensatory relief. Individual determinations of fact are largely unnecessary, and the common questions of law and fact strongly predominate over any individual questions which may need to be resolved.

<u>Amchem</u>'s focus on the lack of commonality as one fatal flaw in the proposed class has

no bearing on the present case. See 521 U.S. at 623–25. Amchem involved a settlement class, and the Court was applying "heightened" scrutiny to issues of commonality. 521 U.S. at 620. More importantly, Amchem involved a proposed class under Rule 23(b)(3). Rule 23(b)(3) requires not only that commonality exist, but that common issues predominate. It was in this predominance analysis that that class was found wanting. Amchem, 521 U.S. at 623–25. The present class has not been certified under that rule.

In the interest of maintaining commonality, plaintiffs have excluded both secondhand smoke and "future" harm parties. No need for subclassing for these injured persons waters down the strong common issues shared by members of the present class.

### 3. Typicality

Plaintiffs' claims are typical of the class members they represent. They make similar legal and factual assertions regarding defendants' behavior and the cause of their smoking, failing to quit and cause of the diseases they suffer. Cf. Hilao v. Estate of Marcos, 103 F.3d 767, 774 (1996) (typicality analysis in a large class action). Their different diseases do not have any substantial bearing on typicality for purposes of the contemplated trial.

### 4. Adequacy of Representation

Plaintiffs' attorneys are well-experienced, seasoned litigators in the class action arena with what appears to be adequate financial resources. See Plaintiff's Letter of Oct. 1, 2002 (containing firm résumés for plaintiffs firms as well as for individual attorneys working on the case). Counsel have thus far prosecuted the case vigorously and expeditiously and have given the court no reason to believe they will not continue to do so.

Named plaintiffs do not have any apparent conflict with class members. This class differs

in dispositive ways from class actions invalidated by the Supreme Court's in <u>Amchem</u> and <u>Ortiz</u>. One difference, which the Supreme Court repeatedly emphasized as crucial to its determinations in <u>Amchem</u> and <u>Ortiz</u>, is the nature of the class as a litigation rather than a settlement class. "[I]n settlement-only class actions the procedural protections built into the Rule to protect the rights of absent class members during litigation are never invoked in an adversarial setting," noted the Court. <u>Ortiz</u>, 527 U.S. at 847. "[A] court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." <u>Amchem</u>, 521 U.S. at 620. <u>See also Ortiz</u>, 527 U.S. at 850 n.27, <u>citing</u> Samuel Issacharoff, <u>Class Action Conflicts</u>, 30 U.C.D. L. Rev. 805, 822 (1997) ("In the context of a mandatory *settlement* class, the individual class member is presented with what purports to be a binding *fait accompli*, with the only recourse a likely futile objection at the fairness hearing required by Rule 23(e)") (emphasis in original).

The instant case, being a litigation class, will be subjected to the full rigor of the adversarial process. It does not present the kinds of conflicts of interest which were a concern in <u>Ortiz</u>. In that case, plaintiffs attorneys who negotiated a settlement also represented other claimants, whose payments depended on the success of the settlement. <u>Ortiz</u>, 527 U.S. at 852. "Class counsel thus had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class." <u>Id.</u> In the instant case, counsel are not faced with such conflicts.

The instant case also presents none of the conflicts between future harmed parties and presently injured plaintiffs, which proved fatal in <u>Amchem</u> and <u>Ortiz</u>. The <u>Amchem</u> court

192

focused on the fact that "for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only [future harm] plaintiffs in ensuring an ample, inflation-protected fund for the future." Amchem, 521 U.S. at 626. The problem was also a factor in Ortiz, which found "an egregious example of the conflict noted in Amchem resulting from divergent interests of the presently injured and future claimants." Ortiz, 527 U.S. at 853. In the present case, there are no future claimants and this potential conflict is not an issue.

One final issue is the value of separate claims. Where claims have widely disparate values, the court may be required to appoint separate counsel to subclasses. Ortiz, 527 U.S. at 857. Ortiz involved a set of claimants who had pre-1959 exposure, which was fully insured, and another set who had post-1959 exposure, which was only covered by the assets of the company then being rapidly depleted. The Supreme Court found that the trial court erred in placing these two groups within the same class. The instant case does not suffer from that problem. The class members may have claims of differing values, based on differences in their medical costs, but those kinds of differences are normal in a large class action and do not require division into subclasses. What is vital is that the class not include members whose legal rights and interests conflict as they did in Ortiz.

In Amchem and Ortiz, hundreds of thousands of successful claims had been filed by earlier plaintiffs against the defendants in courts and bankruptcy proceedings. As already pointed out, one respected commentator has suggested that at the core, "Amchem is filled, and Ortiz even more so, with rhetoric about the dangers of trapping within the class individuals who might have done better had they remained within the traditional court litigation system." Panel Discussion,

Mass Tort Litigation in Federal Courts, Judicial Conference of the Second Circuit, June 16, 2000, 201 F.R.D. 106, 116 (statement of Professor John C. Coffee, Jr.). The case at bar, particularly since it relates to punitive rather than compensatory damages, does not present that conflict.

     5.     Limited Punishment under Rule 23(b)(1)

A limited punishment theory class is appropriately certified. Should this action be successful, defendants might be forced to pay a large sum, but this payment will limit liability for future awards. See Part VI.B., supra (noting constitutional limits on punitive damages).

Because punitive damages will be capped, plaintiffs are forced to draw any damages from a limited fund of resources. This creates a potential first-in-time problem where the first plaintiffs may recover vast sums while others who arrive later are left with a depleted fund against which they cannot recover. In such instances, a Rule 23(b)(1) action may be appropriately maintained.

The Supreme Court has recognized that this potential problem may support the use of a class action. The Amchem decision notes the "concerns about the efficient use of court resources and the conservation of funds to compensate claimants who do not line up early in a litigation queue." Amchem, 521 U.S. at 618 (citing authorities); see also Exxon Valdez and Agent Orange.

In the instant case it is appropriate to proceed under the limited punishment theory. There has been a spate of recent cases awarding punitive damages against tobacco manufacturers. See section IV.G., supra (discussion of other tobacco litigation). This creates the problem that the court of appeals for this circuit has instructed district courts to avoid, namely that "punitive damages ought in theory to be distributed among the individual plaintiffs on a basis other than date of trial." In re Diamond Shamrock Chems. Co., 725 F.2d 858, 862 (2d Cir. 1984).

IX.    Disposition of Funds by Court

A.    Powers

American courts have historically turned to equity in times of social change, or when faced with a need to address new and socially important problems. This shift is reflected, as already pointed out, in the equitable maxim, "equity will not suffer a wrong to be without a remedy." See Amchem, 521 U.S. at 613 ("Rule 23, governing federal-court class actions, stems from equity practice."). Cf. Ortiz, 527 U.S. at 855–56 ("[A] settlement must seek equity by providing for procedures to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves."); Individual Justice in Mass Tort Litigation 123–62 (1995); Eileen B. Hershenov et al., The Effect of Equity on Mass Tort Law, 1991 U. Ill. L. Rev. 269. In the mass tort context, the factors courts must consider in fashioning appropriate equitable remedies and equitable tools of procedure include (1) fairly and expeditiously compensating numerous victims and (2) deterring wrongful conduct while (3) preventing overdeterrence in mass torts from shutting down industry or removing needed products from the market, (4) keeping the courts from becoming paralyzed by tens or even hundreds of thousands of repetitive personal injury cases, and (5) reducing transactional costs of compensation. All these factors are well served by the present class certification.

The development of equitable procedures to deal with the problem of massive delicts has been explored. Considerations long associated with equity jurisprudence have driven the creative procedural and substantive responses of American courts to the many problems posed by complex multi-party, multi-issue mass tort cases. In recent years it is in toxic tort litigation that we can most clearly see equity at work in "its traditional roles of adjusting legal rules that do not

work well, providing a moral force, and shaping new substantive law." Stephen Subrin, <u>David Dudley Field and the Field Code: A Historical Analysis of an Earlier Procedural Vision</u>, 6 L. & Hist. Rev. 311, 345 (1988).

Three factors have led to courts' equitable role in mass torts: (1) the lack of a national or state administrative regulatory scheme capable of controlling undesirable tortious conduct by manufacturers; (2) the absence of a comprehensive social welfare-medical scheme for compensating victims of mass torts; and (3) the lack of adequate state or federal legislation controlling these cases. Administrative agencies such as the Occupational Safety and Health Administration, the Federal Trade Commission, the Food and Drug Administration, the Social Security programs for disabled workers (Social Security Disability Insurance and Supplemental Security Income), the National Vaccine Injury Compensation Program, and other agencies, while they do excellent work in their fields, have not superceded the need for an underlying tort sanction, at least in the absence of the legislature's so saying. Preemption has not been adopted by national or state policy.

The procedural techniques employed to aggregate and manage these mass disaster cases, such as broad joinder devices and class actions, were developed by equity. Promulgation and adoption of the Federal Rules of Civil Procedure in 1938 merged law and equity in the federal system, which is where many mass tort cases are filed, and strongly influenced state practice, where increasingly these cases are commenced. Fed. R. Civ. P., 308 U.S. 645 (1938). These rules embodied the philosophical and procedural tenets of equity far more than they did the more rigid common law. After 1938, the flexible techniques that equity once had reserved to protect property holders were to a large extent democratized and made universally applicable to civil

actions, whether grounded in constitutional, statutory, or common law.

Were it not for the jury system, protected as it is by the seventh amendment to the United States Constitution, the procedural swing to equity would have been even greater. As it is, the growth of deposition practice, Fed. R. Civ. P. 26-32, summary judgment, Fed. R. Civ. P. 56, and judgment notwithstanding the verdict, Fed. R. Civ. P. 50, has tended to attenuate the traditional jury system, characterized as it is by testimony in open court. See Terence Dungworth & Nicholas Pace, Statistical Overview of Civil Litigation in the Federal Courts 30 (1990) (RAND Corporation) (terminations after motions activity have become much more significant for contract, real property, and tort litigation; between 1971 and 1986 percentage rose from 21% to 30% for contracts and from 12% to 25% for torts); Marc Galanter, The Day After the Litigation Explosion, 46 Md. L. Rev. 3, 26 (1986).

Mass tort cases have outstripped the ability of the common law, with its relatively rigid adherence to precedent, to fashion remedies that adequately redress the harms of modern technological society. In circumstances where the rules of the common law prove to be too strict and fail to provide adequate remedies, the courts historically have turned to equity. See Harold G. Hanbury & Jill Martin, Modern Equity 4 (15th ed. 1997). Judicially-created equitable-legal doctrines enhanced the ability of toxic tort victims to recover for their injuries in the absence of particularized proof of causation and liability. See also Stephen Subrin, How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective, 135 U. Pa. L. Rev. 909, 932 & n.123 (1987) (citing Gary McDowell, Equity and the Constitution: the Supreme Court, Equitable Relief, and Public Policy 76-79 (1982)).

[E]quity follows the law, so far as the law goes in securing the rights of the parties, and

no further; and, when the law stops short of securing this object, equity continues the remedy until complete justice is done. In other words, equity is the perfection of the law, and is always open to those who have just rights to enforce where the law is inadequate. Any other conclusion would show our system of jurisprudence not only a failure, but a delusion and a snare. Justice alone can be considered in a court of chancery, and technicalities never be tolerated except to obtain and not to destroy it . . . .

Isgrigg v. Schooley, 125 Ind. 94, 100-01, 25 N.E. 151, 153 (1890) (quoting Grand Lodge

A.O.U.W. v. Child, 38 N.W. 1, 5 (Mich. 1888)).

Balancing the various equities in mass tort litigation inevitably will lead to some lack of congruency between the rule of law (formal and procedural correctness) and justice (the intuitive correctness of the substantive end result of the legal system). This problem is not new. John Locke warned that sometimes "a strict and rigid observation of the laws may do harm." John Locke, Second Treatise on Civil Government: Two Treatises Of Government § 160 (P. Laslette ed. 1970). Much of American modern procedural jurisprudence has developed out of this tension between predictability based on rigid rules of the past and flexibility based on present needs of a changing society. Our legal system provides the tools to adjudicate the massive dispute now tendered, dispensing justice under the rule of law.

B.   Distribution

The court will distribute the funds in accordance with equitable principles, after consultation with class members and, as needed, experts in the medical, legal, and other fields who can assist in devising an appropriate equitable distribution scheme.

Court-ordered or -facilitated distribution plans have been effectively used in other mass tort cases. For example, the Holocaust Assets case led to a complex settlement with victims, and $1.25 billion in payments distributed according to a plan and corresponding to the different

claims of victims. In re Holocaust Victim Assets Litigation, 105 F.Supp.2d 139, 142–45 (E.D.N.Y. 2000). Chief judge Korman found that arrangement appropriate. Id. at 145. Judge Korman noted that "the adequacy and reasonableness of the settlement must be measured against the practical alternative to the settlement in the real world." Id. at 148. See the two-volume plan for distribution in that case. See also Ortiz, 527 U.S. at 867 (Breyer, J., dissenting) ("[W]hen calls for 'national legislation' go unanswered, judges can and should search aggressively for ways, within the framework of existing law, to avoid delay and expense. . . .") (citations omitted).

A court-ordered distribution plan was also approved in the Agent Orange litigation. See generally Stephenson v. Dow Chemical Co., 273 F.3d 249 (2d Cir. 2001) (detailing history of Agent Orange case). Approximately 75% of the settlement amount was awarded directly to harmed parties according to a matrix with a right to appeal to a special master. Payments were made over ten years. Most of the remaining funds went to agencies providing services for veterans and their families. Id. See also Final Report of the Special Master on the Distribution of the Agent Orange Settlement Fund, MDL No. 381, Sept. 1997 (Deborah Greenspan, Special Master); Dennis K. Rhoades et al., The Legacy of Vietnam Veterans and Their Families (Papers from 1994 National Symposium of the Agent Orange Class Assistance Program). The effective distribution in the Dalkon Shield litigation provided a widely admired example. While less successful because of unexpectedly large numbers of "future claimants," the Manville Trust distribution is generally efficient. See, e.g., Individual Justice in Mass Tort Litigation 106–07 (1995).

Even though the present case involves a trial class, not a settlement, the same consideration applies as in the Holocaust, Agent Orange, Valdez, Manville Trust, Dalkon Shield,

<u>Estate of Marcos</u> and other complex cases. Distribution of funds is not an issue which normally concerns defendants; once a money judgment has been entered against them, the result is the same for them no matter how the funds are divided. The fairness of a court-ordered distribution must be considered primarily as it relates to plaintiffs. It is possible that some plaintiffs might, hypothetically, receive higher awards in a traditional litigation than they might in a court-arranged matrix for distribution. This is a normal result in mass litigations; it can be minimized by appropriate trial court supervision. The adequacy and fairness of a court-arranged plan must be considered against the practical alternative in the real world which is likely to be no recovery at all.

Court-ordered distribution may be especially appropriate in this case, given the well-publicized criticism accompanying the relatively unsupervised state Attorney Generals' settlement with tobacco companies. That settlement garnered hundreds of billions of dollars for the states. The money is, by all reports, being spent in a number of ways, most of which have little or nothing to do with alleviating harm caused by tobacco or compensating its victims. "The states, according to the Government Accounting Office, are using less than a tenth of the tobacco-settlement money on anti-tobacco programs. Meanwhile, they are spending bales of it on all kinds of unrelated projects, such as highways, bridges, and museums," or golf course sprinklers. Dave Barry, In War on Tobacco, Money Goes up in Smoke, Miami Herald, Sept. 15, 2002; <u>see also</u> Liz Chandler, N.C. Spends Settlement on Tobacco, not Health, Charlotte Observer, June 23, 2002 (subsidy to tobacco farmers).

X. Trial Procedure

The trial will proceed in three stages. The first stage will be before a jury requested to

make a class-wide determination of fraud and conspiracy claims and estimated total compensatory claims. Compensatory awards, if any, for individual class representatives will be determined. If that jury finds no fraud or conspiracy, there will be no need for a second stage.

At the second stage the same jury will determine whether the defendants engaged in conduct warranting punitive damages. If the jury finds no conduct warranting punitive damages, there will be no need for a third stage.

The third stage will be used to present evidence of the amount of harm suffered by the class to the same jury.

The jury will apply New York law.

The jury will be asked to consider punitive damages for all harm caused by defendants' fraud. The jury may also be permitted to apportion part of any award to possible future injured parties or passive smoking harmed parties by breaking down apportionment through the verdict sheet.

XI. Conclusion

The order of September 19 certifying the class is confirmed.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: Brooklyn, N.Y.
October 22, 2002